## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>CORAM HEALTHCARE CORP. and<br>CORAM, INC.<br><br>        Debtors | BK No. 00-3299 through 00-3300 |
| UBS SECURITIES, LLC,<br><br>        Appellant<br><br>      v.<br><br>CORAM HEALTHCARE, et al.<br><br>        Appellee | Civ. No. 04-1558-SLR |

**APPELLANT'S BRIEF ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE'S NOVEMBER 15, 2004 ORDER GRANTING IN PART AND DENYING IN PART THE APPLICATION OF UBS SECURITIES, LLC AS FINANCIAL ADVISOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR FINAL ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FOR THE PERIOD NOVEMBER 1, 2000 THROUGH OCTOBER 27, 2003**

**Counsel for Appellants**

Susan Power Johnston
Charles H. Jeanfreau
Martin E. Beeler
COVINGTON & BURLING
1330 Avenue of the Americas
New York, NY 10019

Neal Levitsky
L. Jason Cornell
FOX ROTHSCHILD, LLP
919 North Market Street, Suite 1300
Wilmington, DE 19899

*Attorneys for Appellant UBS Securities, LLC*

**Counsel for Appellees**

Barry E. Bressler
Richard A. Barkasy
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Kenneth E. Aaron
WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
Wilmington, DE 19899

*Attorneys for Appellee Arlin M. Adams as Chapter 11 Trustee for Coram Healthcare Corporation, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

Preliminary Statement ........................................................................................................ 1

I.    Jurisdictional Basis ..................................................................................................... 2

II.   Issues on Appeal And Standard of Review .............................................................. 2

    A.    Issues on Appeal........................................................................................................ 2

        1)    Whether the Bankruptcy Court erred by denying the Application of UBS for
            payment of a $700,000 Valuation Fee, when:........................................................ 2

        2)    Whether the Bankruptcy Court erred by refusing to admit testimony of Mr.
            Reynertson concerning the parties' understanding of the Engagement
            Agreement, when: ................................................................................................ 4

    B.    Standard of Review ................................................................................................. 4

III.  Statement of the Case ................................................................................................. 5

    A.    Nature Of The Case and Procedural History.................................................... 5

    B.    Statement Of The Facts ........................................................................................ 7

        1)    The Engagement Letter ..................................................................................... 7

        2)    The Bankruptcy Court Approves the Engagement Letter ......................... 8

        3)    UBS's Fee Application........................................................................................ 9

    C.    The Bankruptcy Court Denies the Valuation Fee ....................................... 10

    D.    UBS's Appeal........................................................................................................ 10

ARGUMENT ...................................................................................................................... 11

    A.    The Canons of Contract Interpretation Require That The Court Give Contracts a
        Fair and Reasonable Interpretation. ............................................................... 11

    B.    Courts Should Avoid Interpreting Contracts So As To Work A Forfeiture of a
        Party's Compensation After The Party Has Performed The Contract ........................... 15

        1)    New York Courts Recognize an Interpretive Preference Against Finding
            Conditions in Doubtful Contract Language. ............................................. 16

2) Excuse of the Non-Occurrence of a Condition  that Results in Disproportionate Forfeiture.................................................................... 21

C. The Bankruptcy Court Should Have Allowed Testimony As To The Intent of The Parties................................................................................................... 23

1) Testimony Regarding Surrounding Circumstances is Admissible........................... 23

2) Testimony Is Admissible To Clarify The Provisions Of An Ambiguous Contract. ........................................................................................................ 25

CONCLUSION ........................................................................................................ 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Big Rivers Electric Corp.*, 266 B.R. 100 (W.D. Ky, 2000) ........................................ 2

*Bank of New York v. Epic Resorts (In re Epic Capital Corp.)*, 307 B.R. 767 (D. Del 2004 ................................................................................................................. 5

*Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485 (E.D. Pa. 1977) ................ 21

*Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525 (2d Cir. 1990) ...................... 24

*Buchanan Ingersoll v. Chase Manhattan Bank (In re Smith Technology Corp.)*, No. Civ.A.99-132 (MMS) 1999 WL 1427681 (D.Del., Dec. 23, 1999) ...................... 4

*In re Dewey*, 237 B.R. 783 (B.A.P. 10th Cir. 1999) ........................................... 2

*Eskimo Pie Corporation v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987 (S.D.N.Y. 1968) ........................................................................................................ 11

*Folksamerica Reinsurance Company v. Republic Insurance Company*, No. 03 Civ. 04022003 (HB), 2003 WL 22852737 (S.D.N.Y. 2003) ...................................... 19

*In re Fireman's Fund Insurance Cos.*, 948 F.Supp. 1227 (S.D.N.Y. 1996) .................... 25

*International Fidelity Insurance Co. v. County of Rockland*, 98 F.Supp.2d 400 (S.D.N.Y. 2000) ...................................................................................... 16, 17, 18

I*n re Kennedy Inn Associates*, 221 B.R. 704 (Bankr. S.D.N.Y. 1998) ............................ 12

*In re Kids Creek Partners, L.P.*, 200 F.3d 1070 (7th Cir. 2000)......................................... 2

*Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Connecticut (In re Dow Corning Corp.)*, 86 F.3d 482 (6th Cir. 1996) ........................ 2

*In re Metz*, 231 B.R. 474 (E.D.N.Y. 1999) ................................................................ 12, 13

*North America Graphite Corp. v. Allan*, 184 F.2d 387 (D.C. Cir. 1950) ........................ 20

*Nowack v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2nd Cir. 1996).......... 23, 24

*Sayers v. Rochester Telegraph Corp. Supp. Mgt. Pension Plan*, 7 F.3d 1091 (2d Cir. 1993)................................................................................................ 12

*Seiden Associate v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992)............................ 24

*Silver Air v. Aeronautic Development Corporation, Ltd.*, 656 F.Supp. 170 (S.D.N.Y. 1987) ........................................................................................ 21, 22

*In re WorldCorp, Inc.*, 252 B.R. 890 (Bankr. D. Del. 2000) ........................................... 25

## STATE CASES

*805 Third Avenue Co. v. M.W. Realty Associates*, 484 N.E.2d 445 (NY 1983) ................ 4

*Arrow Communications Laboratories, Inc. v. Pico Products, Inc.* 616 N.Y.S.2d 187 (N.Y. App. Div. 2d Dept. 1994)............................................................. 24

*Becque v. Egan (In re Friedman)*, 407 N.Y.S.2d 999 (N.Y. App. Div., 1st Dept. 1978) ................................................................................................... 23

*Boody v. Giambra*, 192 Misc.2d 128,(N.Y.Sup., 2002)..................................................... 23

*Browing-Ferris Industrial of NY, Inc. v. City of Monroe*, 478 N.Y.S.2d 408, (N.Y. App. Div. 4th Dept., 1984)................................................................. 13

*Cornhill Corp. v. S.D. Plants, Inc.*, 176 N.E.2d 37 (N.Y. 1961) ..................................... 13

*Cromwell Towers Redevelopment Company v. City of Yonkers*, 359 N.E.2d 333 (NY 1976) ........................................................................................ 14

*Harza Northeast, Inc. v. Lehrer McGovern Bovis, Inc.*, 680 N.Y.S.2d 379, (N.Y. App. Div. 4th Dept., 1998)................................................................. 23

*Heller v. Pope*, 164 N.E. 881 (N.Y. 1928)....................................................................... 11

*Hudson-Port Ewen Associate, L.P. v. Chien Kuo, et al.*, 578 N.E.2d 435 (N.Y. 1991) ...................................................................................................... 12

*Kass v. Kass*, 696 N.E. 2d 174 (N.Y. 1998).................................................................. 5, 25

*New York Bronze Powder v. Benjamin Acquisition. Corp.*, 716 A.2d 230 (Md. 1998) ....................................................................................................... 18

*M. O'Neil Supply Co., Inc. v. Petroleum Heat & Power Co., Inc.*, 19 N.E.2d 676 (N.Y. 1939) ....................................................................................................... 15

*Mass Transport Electric Construction Corp. v. Penta Construction Corp.*, 527 N.Y.S.2d 422  (N.Y. App.Div. 1st Dep't 1988)................................... 20

*McKegney v. Illinois Surety Co.*, 155 N.Y.S. 1041 (N.Y. App. Div. 1st Dep't 1915) ................................................................................................................ 18

*Merrit Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077 (N.Y. 1984) ....................................................................................................... 17

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995) ........................................................................................ 16, 17, 20

*Pikul v. Clough, Harbour & Associate*, 593 N.Y.S.2d 585 (N.Y. App. Div. 3d Dept., 1993)........................................................................................ 5, 9

*Posh Pillows v. Hawes*, 525 N.Y.S.2d 877 (N.Y. App. Div. 2d Dept., 1988) ............. 5, 25

*Reape v. New York News, Inc.*, 504 N.Y.S.2d 469 (N.Y. App. Div. 2d Dept., 1986) ........................................................................................ 13, 14

*Schecter Associates, Inc. v. Major League Baseball Players Associates*, 681 N.Y.S.2d (N.Y. App. Div. 1st Dept., 1998) ............................................... 25

*Schuler-Haas Electric Co. v. Aetna Casualty & Surety Co.*, 389 N.E.2d 1003 (N.Y. 1976) ...................................................................................... 19, 20

*Trump Equitable Fifth Avenue Corp. v. H.R.H. Construction Corp.*, 484 N.Y.S.2d 65 (N.Y. App. Div. 1st Dept., 1985) ..................................... 12

*W.W.W. Assoc. Inc. v. Giancontieri*, 566 N.E.2d 639 (NY 1990) ..................................... 5

## FEDERAL STATUTES

28 U.S.C. § 158(a).................................................................................................. 2

## MISCELLANEOUS

Restatement (Second) of Contracts § 227 ...................................................... 16

22 N.Y. Jur. 2d Contracts, § 222.................................................................. 11

**Preliminary Statement**

UBS Securities LLC ("UBS") brings this appeal from the denial by the Bankruptcy Court for the District of Delaware of UBS's application for compensation for valuation services rendered to the Official Committee of Unsecured Creditors (the "Committee") during the Chapter 11 cases of Coram Healthcare Corp. and Coram, Inc. (the "Debtors"). The Bankruptcy Court committed clear error when it held that confirmation of a plan of reorganization proposed by the Debtors, and not by any other party, was a condition precedent to UBS's right to compensation for valuation services it rendered to the Committee. The Bankruptcy Court's reading of the Engagement Agreement was clearly erroneous, because it was illogical, ungrammatical, set different portions of the Engagement Agreement at odds with each other and was neither fair, reasonable nor the reading which a person acquainted with the general usages and customs of the investment banking industry, or the surrounding circumstances would have given. Finally, the Bankruptcy Court's holding works a forfeiture of UBS' compensation after UBS fully performed its contractual obligations, a result which is strongly disfavored by the governing New York law. In contrast, the reading of the Engagement Agreement proposed by UBS (and agreed to by the Committee) is not only a more grammatically correct reading, but it is also the reading which gives the Engagement Agreement internal consistency and which a person acquainted with the purposes and circumstances surrounding the parties' entry into the Engagement Agreement would give it. Finally, the reading of the Engagement Agreement proposed by UBS gives effect to the interpretive preference adopted by New York courts against forfeiture of compensation by a party after full performance of that party's contractual obligations.

Alternatively, assuming for the sake of argument that the Engagement Agreement were capable of being read in two mutually exclusive fashions, the Bankruptcy Court committed clear

error in ruling that the Engagement Agreement was unambiguous and refusing to hear evidence as to the parties' intent in entering in to the Engagement Agreement.

## I.    <u>Jurisdictional Basis</u>

This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1) over this appeal from the November 15, 2004 order of the United States Bankruptcy Court for the District of Delaware's *Order Granting in Part and Denying In Part the Application of UBS Securities LLC As Financial Advisor to the Official Unsecured Creditors' Committee For Final Allowance of Compensation for Professional Services Rendered and For Reimbursement of Actual and Necessary Expenses Incurred For the Period November 1, 2000 Through October 27, 2003* (the "Fee Application Order"). Section 158(a)(1) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees[.]" The Fee Application was the first and final fee application made by UBS, and the Fee Application Order is therefore a final and appealable order because it "finally disposes of discrete disputes within a larger [bankruptcy] case." *In re Big Rivers Elec. Corp.*, 266 B.R. 100, 102 (W.D. Ky. 2000) (quoting *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Connecticut (In re Dow Corning Corp.)*, 86 F.3d 482, 488 (6th Cir. 1996)); *In re Kids Creek Partners, L.P.*, 200 F.3rd 1070 (7th Cir. 2000); *In re Dewey,* 237 B.R. 783, 787 n. 3 (B.A.P. 10th Cir. 1999) ("while orders denying attorney's fees are typically not final for purposes of appeal … such orders may be "final" if they are the final fee application submitted by counsel in a case)."

## II.    <u>Issues on Appeal And Standard of Review</u>

### A.    <u>Issues on Appeal</u>

1)    Whether the Bankruptcy Court erred by denying the Application of UBS for payment of a $700,000 Valuation Fee, when:

a)  the plain language of the Engagement Agreement entered into by UBS and the
    Committee and approved by the Bankruptcy Court provided that a Valuation
    Fee would be paid "upon the effective date of the Debtor's Plan of
    Reorganization."  The Bankruptcy Court's conclusion that this language
    meant that the Valuation Fee would only be paid upon the effective date of a
    plan of reorganization proposed by the Debtors (and not upon the effective
    date of a plan proposed by any other party) failed to construe the contract as a
    whole, resulted in an unfair and anomalous consequence, and thus violated the
    basic rule of contract interpretation which requires that a court endeavor to
    give contracts a fair and reasonable construction which avoids unfair and
    anomalous consequences.

b)  New York law, which governs the Engagement Agreement, sets forth an
    interpretive preference against finding conditions precedent in doubtful
    contractual language, especially where the existence of such a condition will
    result in the forfeiture by a party of that party's compensation after it has fully
    performed its own contractual obligations.  New York courts will only find
    that such a condition precedent exists where it is expressed in unmistakable
    language.  Because the Engagement Agreement does not use such
    unmistakable language, the Bankruptcy Court's holding that the Engagement
    Agreement did establish such a condition precedent failed to honor this
    interpretive preference in New York law.

2)      Whether the Bankruptcy Court erred by refusing to admit testimony of Mr.

Reynertson concerning the parties' understanding of the Engagement Agreement,

when:

a)   under general principles of contract interpretation, testimony regarding the

"surrounding circumstances" of a contract is admissible in order to determine

the intent of the parties to the contract.  The testimony sought to be introduced

by UBS would have elucidated the use of Valuation Fee arrangements in the

investment banking industry and thus have been essential to the interpretation

of the terms of the Engagement Agreement; and

b)   alternatively, because UBS and the Chapter 11 Trustee had raised conflicting

interpretations of the Engagement Agreement, the Bankruptcy Court should

have found that the Engagement Agreement was ambiguous and warranted the

introduction of extrinsic evidence, including the testimony of Mr. Reynertson.

## B.    Standard of Review

The District Court should review the Fee Application Order *de novo*.  The Bankruptcy

Court's decision was based entirely on the Bankruptcy Court's interpretation of the Engagement

Agreement, which is a question of law.  *See, e.g., Buchanan Ingersoll v. Chase Manhattan Bank*

*(In re Smith Technology Corp.)*, No. CIV.A.99-132MMS, 1999 WL 1427681, at *5 (D. Del.

Dec. 23 1999) ("this Court reviews the Bankruptcy Court's factual finds for clear error, and

conclusions of law are subject to plenary review").  The Engagement Agreement is governed by

New York law, and under New York law general questions of contract interpretation and

construction are questions of law for the court to decide.  *805 Third Avenue Co. v. M.W. Realty*

*Assocs.*, 448 N.E.2d 445, 450 (N.Y. 1983); *Posh Pillows v. Hawes*, 525 N.Y.S.2d 469 (N.Y.

App. Div. 2d Dept., 1988).  Whether a contract is ambiguous is decided by the trial court as a

matter of law. *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998); *Pikul v. Clough, Harbour & Assocs.*, 593 N.Y.S.2d 585 (N.Y. App. Div. 3d Dept., 1993) ("the threshold issue of whether an agreement is ambiguous is a question of law to be resolved by the court"), and the appellate court reviews such determinations *de novo*, *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Because the Bankruptcy Court based its ruling not on factual findings regarding the Engagement Agreement, but rather on its interpretation of the Engagement Agreement, the District Court's review of the Bankruptcy Court's Fee Application Order is plenary. *Bank of New York v. Epic Resorts (In re Epic Capital Corporation)*, 307 B.R. 767, 771 (D. Del. 2004).

The "abuse of discretion" standard generally applicable to appellate review of a bankruptcy fee award does not apply because the Bankruptcy Court did not review the reasonableness of the fee or the necessity to the estate of the services provided (as is usual with respect to contested fee applications), or make any other factual finding of any sort.[1] Instead, the arguments of the parties below, and the decision of the Bankruptcy Court, focused entirely on the legal issues of whether the Engagement Agreement was ambiguous and, if not, the correct interpretation of the Engagement Agreement.

III.  **Statement of the Case**

  A.  **Nature Of The Case and Procedural History**

This is an appeal from the Bankruptcy Court's November 15, 2004, *Order Granting in Part and Denying In Part the Application of UBS Securities LLC As Financial Advisor to the Official Unsecured Creditors' Committee For Final Allowance of Compensation for*

---

[1] Assuming for the sake of argument, however, that the Fee Application Order were reviewed for abuse of discretion, the Court should reverse the Bankruptcy Court's Fee Application Order, as it was an abuse of discretion for the Bankruptcy Court to adopt a reading of the Engagement Agreement contrary to the stated intent of both parties to the Engagement Agreement and that violates New York law's canons of contract interpretation by forfeiting UBS' earned compensation.

*Professional Services Rendered and For Reimbursement of Actual and Necessary Expenses*
*Incurred For the Period November 1, 2000 Through October 27, 2003.*

On August 8, 2000 (the "Petition Date"), Coram Healthcare Corporation and certain of its affiliates commenced their chapter 11 bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). App. at 4.

On August 22, 2000, the United States Trustee for the District of Delaware (the "US Trustee") appointed the Committee pursuant to Section 1102 of the Bankruptcy Code. App. at 15.

On November 21, 2000, the Committee and UBS Warburg LLC (now known as UBS Securities, LLC) entered into a Letter Agreement, dated as of November 21, 2000, (the "Engagement Agreement."), App. at 648.

By order dated December 1, 2000 (the "Retention Order"), the Bankruptcy Court approved the Committee's retention and employment of UBS pursuant to the terms of the Engagement Agreement. App. at 52.

On the Petition Date, the Debtors filed their Joint Plan of Reorganization (the "Debtors' First Plan") and their Joint Disclosure Statement with the Bankruptcy Court. App. at 4. At a confirmation hearing on December 21, 2000, the Bankruptcy Court denied confirmation of the Debtor's First Plan. App. at 56.

The Debtors filed their Second Joint Plan of Reorganization (the "Debtors' Second Plan") and their Second Joint Disclosure Statement on July 31, 2001. App. at 105.

On October 9, 2001, UBS and counsel for the Committee entered into a supplemental letter agreement pursuant to which (a) UBS agreed to make itself available to produce a second

valuation, and (b) the Committee agreed that UBS had earned the Valuation Fee of $700,000 and would be entitled to further Monthly Fees.  App. at 656.

On December 21, 2001, the Bankruptcy Court denied confirmation of the Debtors' Second Plan.  App. at 153.

On March 7, 2002, the Honorable Arlin M. Adams was appointed as chapter 11 trustee (the "Chapter 11 Trustee") for the Debtors' estates.  App. at 179.

On May 2, 2003, the Chapter 11 Trustee filed a Joint Plan of Reorganization for the Debtors (the "Chapter 11 Trustee's Plan).  App. at 343.  On October 4, 2004, the Bankruptcy Court confirmed the Chapter 11 Trustee's Plan.  App. at 552.

**B.     Statement Of The Facts**

1)     <u>The Engagement Letter</u>

The Committee retained UBS to provide valuation services in connection with the plan of reorganization originally proposed by the Debtors in order to assist the Committee in the execution of their statutory duty to evaluate the Debtors' proposed plan of reorganization and to represent the interests of the Debtors' creditors in the plan process.  The valuation services UBS was to provide included, among other things: (i) preparing a valuation of the Debtors for the Committee's use in the bankruptcy cases; (ii) communicating the results of the valuation in writing and/or orally to the Committee; and (iii) providing expert testimony, if necessary, in any proceeding before the Bankruptcy Court.  UBS agreed to perform such services in exchange for the fees set forth in the Engagement Agreement, which included (i) a $700,000 Valuation Fee, earned upon execution of the agreement and payable upon the effective date of the Debtors' plan of reorganization, and (ii) monthly advisory fees of $50,000 per month, payable in the event that UBS was required to perform services past March 21, 2001.  The Engagement Agreement specifically provided:

> <u>Fees</u>: For [UBS'] services hereunder, the Committee, subject to
> approval of the Bankruptcy Court pursuant to the Retention Order or
> otherwise, shall cause the Company to pay [UBS] on the effective date
> of the Company's plan of reorganization seven hundred thousand
> dollars ($700,000) ("the Valuation Fee"). The Company's obligation
> to pay the Valuation Fee shall arise upon execution of this Agreement
> and shall survive the termination of this Agreement by the Committee.

App. at 648.

At the time UBS and the Committee entered into the Engagement Agreement, UBS

agreed to defer payment of the Valuation Fee until the confirmation of the Debtors' plan of

reorganization. Neither the Engagement Agreement nor the Retention Order specified the

identity of the proponent of such a plan of reorganization, nor did they identify a particular

proposed plan (even though the First Plan had been filed on the Petition Date and was under

consideration at the time the Engagement Agreement was signed). Both UBS and the

Committee have subsequently explained that their intention was to defer payment of the

Valuation Fee until the Debtors' emergence from bankruptcy to preserve the Debtors' cash flow,

but they did not intend to create a condition precedent to UBS' right to receive compensation for

its valuation services. App. at 657, 673.

UBS provided valuation services to the Committee in advance of the hearing on the

Debtors' First Plan and testified in support of their valuation at the confirmation hearing. App. at

56. On October 9, 2001, UBS and counsel for the Committee entered into a supplemental letter

agreement pursuant to which (a) UBS agreed to perform a second, updated, valuation and (b) the

Committee confirmed that UBS had earned the Valuation Fee of $700,000 and agreed that it

would be entitled to further Monthly Fees. App. at 656. Once again, UBS provided valuation

services to the Committee in advance of the hearing on the Debtors' Second Plan and testified in

support of their valuation at the confirmation hearing. App. at 153.

      2)      <u>The Bankruptcy Court Approves the Engagement Letter</u>

The Bankruptcy Court approved the Engagement Agreement in an order that confirmed the parties' agreement to delay payment of the fee until after plan confirmation: "the valuation fee of $700,000 is to be paid to [UBS] at the time of the effective date of the Debtors' plan of reorganization (the 'Valuation Fee')." App. at 682. UBS performed the services contemplated by the Engagement Agreement, including two separate valuations of the company, and provided testimony in support of these valuations at two separate, contentious, confirmation hearings. App. at 56, 153.

       3)     <u>UBS's Fee Application</u>

On October 31, 2003, UBS filed its First and Final Fee Application (the "Fee Application") with the Bankruptcy Court, pursuant to which UBS requested payment of the $700,000 Valuation Fee and $450,000 in Monthly Fees. App. at 438. The Chapter 11 Trustee filed an objection (the "Objection") to the Fee Application on November 24, 2003, App. at 448, and the Official Committee of Equity Security Holders filed an Objection on November 25, 2003 (the "Equity Committee Objection"). App. at 449. UBS and the Committee each filed replies to the Objection and the Equity Committee Objection on October 13, 2004, App. at 661, 671, and the Bankruptcy Court heard the matter (the "Hearing") on October 18, 2004. App. at 685.

With its Reply, UBS filed the affidavit of J. Soren Reynertson, Executive Director of UBS, (the "Reynertson Affidavit") setting forth the usual practices in the investment banking industry regarding compensation for valuation services and the intentions of the parties in entering into the Engagement Agreement. App. at 657.

Had the Bankruptcy Court admitted Mr. Reynertson's testimony at the hearing, Mr. Reynertson would have testified, consistently with his affidavit, first, that the Chapter 11 Trustee's proposed reading of the Engagement Agreement created a "contingent" valuation fee

arrangement, because it would have made payment of the Valuation Fee contingent upon a particular outcome.  Such a contingent valuation fee is completely unheard of in the investment banking industry.  App. at 657.  Second, Mr. Reynertson would have testified that all of the parties to the Engagement Agreement understood that creating a contingent valuation fee arrangement would have arguably undermined the independence of UBS's valuations, and thus would have been contrary to the interests of all parties to the Engagement Agreement.  Finally, Mr. Reynertson would have testified that the parties to the Engagement Agreement intended to defer payment of the Valuation Fee until the Debtors' emergence from bankruptcy to avoid any strain on the Debtors' cash flow, but they did not intend to make confirmation of the First Plan (or indeed any other specific plan) a condition precedent to UBS' right to receive payment.  App. at 657.

### C.    The Bankruptcy Court Denies the Valuation Fee

At the Hearing, after hearing arguments from UBS and the Chapter 11 Trustee concerning the meaning of the phrase "on the Effective Date of the Company's plan of reorganization," the Bankruptcy Court disallowed UBS' application for payment of the Valuation Fee holding that "there was a condition precedent and that was the effective date of the Debtors' plan of reorganization."  App. at 697.  The Court allowed UBS' application for payment of $450,000 in monthly advisory fees, on the ground that no condition precedent to the payment of such fees existed.  Id.  On November 15, 2004, the Bankruptcy Court entered the Fee Application Order.  App. at 563.

### D.    UBS's Appeal

On November 24, 2004, UBS filed its Notice of Appeal of the Order, App. at 567 and on December 6, 2004, UBS filed its Statement of Issues and Designation of the Record on Appeal.

App. at 568.  The Trustee did not file a counter-statement of issues or counter-designation of the Record.  The appeal was docketed in the District Court on December 28, 2004.  App. at 582.

On January 5, 2005, Kevin Gross, Esq. informed UBS and the Trustee that he had been appointed to act as a Mediator with respect to this appeal pursuant to this Court's mandatory mediation procedure.  Following Mr. Gross' appointment, the parties conducted good faith negotiations over a period of several months but were unable to reach an agreement.  On August 19, 2005, Mr. Gross filed a Mediator's Report stating that settlement discussions had reached an impasse and that the parties wished to proceed with the appeal.

## ARGUMENT

### A.    The Canons of Contract Interpretation Require That The Court Give Contracts a Fair and Reasonable Interpretation.

The fairest and most reasonable construction of the Engagement Agreement under the laws of New York is that the Valuation Fee was payable upon the effective date of any plan which reorganized the Debtors' estates, whether proposed by the Debtors or by any other party. *Heller v. Pope*, 164 N.E. 881, 882 (N.Y. 1928) ([courts] must endeavor to give contracts a fair and reasonable construction bearing in mind that "form should not prevail over substance and a sensible meaning of words should be sought").  This general rule of interpretation applies whether or not a contract is ambiguous.  22 N.Y. Jur. 2D *Contracts*, § 222 (2004).

New York courts consistently hold that the meaning to be attributed to contract language is that which a "reasonably intelligent person acquainted with general usage, custom and the surrounding circumstances would attribute to it" *Eskimo Pie Corporation v. Whitelawn Dairies, Inc.,* 284 F. Supp. 987, 993 (S.D.N.Y. 1968) (applying New York law) and which allows the contract to be read as a coherent whole.  *Hudson-Port Ewen Assoc., L.P. v. Chien Kuo et al.,* 578 N.E.2d 435 (N.Y. 1991) ("where consideration of a contract as a whole resolves the ambiguity

created by one clause, there is no occasion to consider extrinsic evidence"); *In re Metz,* 231 B.R. 474, 479 (E.D.N.Y. 1999) ("the contract should be construed so as to give full meaning and effect to all of its provisions" quoting *Trump Equitable Fifth Ave. Corp. v. H.R.H. Constr. Corp.*, 485 N.Y.S.2d 65 (N.Y. App. Div. 1st Dept., 1985)).  The Bankruptcy Court's interpretation of the Engagement Agreement, that UBS made payment of its fee contingent upon a particular outcome in the bankruptcy cases, violates these standards of contract interpretation.

First, the Bankruptcy Court failed to construe the Engagement Agreement as a whole and instead rendered the provisions of the Engagement Agreement providing that the Valuation Fee was earned upon execution of the Engagement Agreement meaningless, defeating the reasonable expectations of UBS and the Committee that retained it.  *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("by examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous"); *In re Kennedy Inn Assoc.*, 221 B.R. 704, 709 (Bankr. S.D.N.Y. 1998) ("where, however, the meaning of a word or phrase is ambiguous, the court will examine the record as a whole, … so as to effectuate the intent of the parties and to reach a fair and reasonable result").

The Engagement Agreement provides for the retention of UBS in the Debtors' cases without regard to a particular result achieved in the cases and further explicitly provides that the Debtors' obligation to pay the Valuation Fee arose upon execution of the agreement.  App.  at 648.  The reading adopted by the Bankruptcy Court makes the Debtors' obligation to pay the Valuation Fee contingent upon the approval of a specific plan of reorganization - one proposed by the Debtors - rather than any plan proposed by any other conceivable party (including, in addition to the Chapter 11 Trustee and the Equity Committee, UBS' own clients on the

Committee). This is not consistent with the general purpose of the Engagement Agreement, which was to perform an objective, analytical valuation of the Company.[2]

Second, the Bankruptcy Court's reading is not consistent with the immediately following sentence of the Engagement Agreement, which provides that the obligation to pay the Valuation Fee arose "upon execution of this Agreement." *In re Metz*, 231 B.R. at 479. This could hardly be the case if the obligation to pay the Valuation Fee were contingent on the approval of a particular plan of reorganization. The Bankruptcy Court's reading thus fails to make sense of all of the contractual provisions, *see Cornhill Corp. v. S. D. Plants, Inc.*, 176 N.E.2d 37, 38 (N.Y. 1961) (refusing to adopt interpretation of contract which would leave other provisions "entirely meaningless"); *Browning Ferris Indus. of NY, Inc. v. Cty of Monroe,* 478 N.Y.S. 2d 408 (N.Y. App. Div. 4th Dept, 1984) and, by rendering the immediately following provision of the Engagement Agreement meaningless, violates the rules of construction employed by the New York courts.

Third, the forfeiture of the Valuation Fee represents an "unfair and anomalous" consequence militating against the Bankruptcy Court's interpretation of the Engagement Agreement, in that it makes UBS' compensation for its services on behalf of the Committee dependent upon the actions of a third party - the Debtors - in confirming a particular plan of reorganization. It would be odd, to say the least, for an investment banking firm to put itself in a situation where payment of its fee was contingent upon the occurrence of an event not under its control or that of its client. *See Browing-Ferris Indus. of NY, Inc. v. Cty of Monroe*, 478 N.Y.S.2d at 408 (holding that if possible, contract should be interpreted to avoid reading which made compensation dependent on happenstance rather than services rendered); *Reape v. New*

---

[2] Indeed, as Mr. Reynertson was prepared to testify to the Bankruptcy Court (and as Mr. Reynertson stated in his affidavit), UBS and its peer firms would not agree to the payment of a "contingent valuation fee," largely because doing so would arguably undermine the independence of the valuation analysis.

*York News, Inc.* 504 N.Y.S.2d 469 (N.Y. App. Div. 2d Dept., 1986) (court refused to adopt interpretation of contract which would have produced net loss per transaction to defendant, despite literal language of contract).

At a minimum, one would expect that if a firm were willing to make its compensation dependent on the actions of a third party, it would be at some pains to specify what actions or events were required before the firm could be paid. Nothing in the Engagement Agreement contains the specificity one would expect from an investment bank making its compensation dependent upon the actions of third parties. A reading of the Engagement Agreement which puts UBS in that situation, where other, more reasonable, interpretations are available, is decidedly unfair, anomalous and contrary to New York law.

Fourth, the Bankruptcy Court's interpretation of the Engagement Agreement creates a contingent fee arrangement that is (i) incompatible with the actual contract language, which provides that the Valuation Fee was earned and payable regardless of the outcome of the case, (ii) contrary to the relevant industry practice regarding payment for valuation services, and (iii) inconsistent with the objective nature of the services performed. *See Cromwell Towers Redevelopment Co. v. City of Yonkers*, 359 N.E.2d 333, 337 (N.Y. 1976) ("due consideration must be given to the purposes of the parties in making the contract") (citing 4 Williston, Contracts (3d ed.) s 619, pp. 730-733); *Becque v. Egan (In re Friedman)*, 407 N.Y.S.2d 999 (N.Y. App. Div., 1st Dept. 1978) (in interpreting a contract containing inconsistent language, court took custom and usage into account to reject interpretation inconsistent with industry custom). The Bankruptcy Court, in adopting a reading which disregarded the provision that the Valuation Fee was earned and payable at closing and which created a fee structure contrary to industry practice failed to read the contract as a whole and disregarded the "general usage,

14

custom and the surrounding circumstances" relevant to the interpretation of the Engagement Agreement.

Finally, the Bankruptcy Court's interpretation of the Engagement Agreement defeats the reasonable expectations of the parties to the Engagement Agreement, as those expectations were stated by both of the parties to the Engagement Agreement. *Cromwell Towers*, 359 N.E.2d at 337; *Reape*, 504 N.Y.S.2d at 470. As set forth in Mr. Reynertson's affidavit, App. at 657 and as stated by the Committee in their Reply, App. at 673**,** the parties did not intend to make payment of the Valuation Fee contingent upon the confirmation of the particular plan of reorganization under consideration at the time, but instead merely intended to preserve the Debtors' cash flow by deferring payment of the Valuation Fee until the Debtors emerged from bankruptcy. The Bankruptcy Court's interpretation of the Engagement Agreement ignored the stated intent of the parties to the contract, and thus violated a fundamental rule of New York law. *M. O'Neil Supply Co., Inc. v. Petroleum Heat & Power Co., Inc.*, 19 N.E.2d 676, 679 (N.Y. 1939) ("the fundamental rule in the construction of all agreements is to ascertain the substantial intent of the parties"). Where, as here, both parties to a contract are in agreement as to the intentions and expectations of the parties in entering into the agreement, a court should not disregard such stated intentions and expectations unless the contractual language leaves it no choice.

### B.    Courts Should Avoid Interpreting Contracts So As To Work A Forfeiture of a Party's Compensation After The Party Has Performed The Contract

The Bankruptcy Court specifically held that the occurrence of the "effective date of the Debtors' plan of reorganization" was a condition precedent to the estate's obligation to pay the Valuation Fee. App. at 697. Because the effective date of a plan of reorganization proposed by the Debtors rather than by the Chapter 11 Trustee or any other party has not occurred -- and presumably will never occur -- the Bankruptcy Court's holding caused a forfeiture of the

majority of UBS' fees in these cases. The Bankruptcy Court's interpretation of the language of the Engagement Agreement is contrary to the strong preference under New York law for interpreting contracts to avoid the forfeiture of a party's compensation after the party has performed under the contract. This preference is manifested in the case law under two separate but related doctrines: (1) the interpretive preference against finding a condition in ambiguous or "doubtful" contract language, and (2) the ability of the courts to excuse an express condition that would result in a disproportionate forfeiture by the obligee.

    1)    New York Courts Recognize an Interpretive Preference Against Finding Conditions in Doubtful Contract Language.

New York courts recognize that "in determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E. 2d 415, 418 (N.Y. 1995) (citing RESTATEMENT (SECOND) OF CONTRACTS § 227(1)); *see also International Fidelity Ins. Co. v. County of Rockland*, 98 F.Supp.2d 400, 418 (S.D.N.Y. 2000). This interpretive preference is "especially strong when a finding of express condition would increase the risk of forfeiture by the obligee." *Oppenheimer*, 660 N.E.2d at 418 (citing RESTATEMENT (SECOND) OF CONTRACTS § 227(1)); *see* Restatement (Second) Contract § 227(1) ("In resolving doubts as to whether an event is made a condition of the obligor's duty, and as to the nature of such event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk"). The Restatement defines "forfeiture" as "the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as

by preparation or performance, on the expectation of that exchange." RESTATEMENT (SECOND)

CONTRACTS § 229 (cited in *Oppenheimer*, 660 N.E. 2d at 419 n.2).

The danger of forfeiture identified by the New York Court of Appeals in *Oppenheimer* is

present in this case because UBS has indisputably fully performed under the Engagement

Agreement in expectation of payment of the Valuation Fee and the Bankruptcy Court has denied

UBS its full compensation. *See International Fidelity*, 98 F.Supp.2d at 434 n. 19 (finding that

the interpretive preference against conditions precedent was applicable when primary surety

allowed substitute contractor to proceed with work in reliance on payment under second surety

contract). The example of "doubtful" contract language provided in the official comment to

Restatement § 227 is analogous:

> For example, under a provision that a duty is to be performed "when" an event
> occurs, it may be doubtful whether it is to be performed only if that event occurs, in
> which case the event is a condition, or at such time as it would ordinarily occur, in
> which case the event is referred to merely to measure the passage of time. In the
> latter case if the event does not occur some alternative means will be found to
> measure the passage of time, and the non-occurrence of the event will not prevent the
> obligor's duty from becoming one of performance.

RESTATEMENT (SECOND) CONTRACTS § 227, comment b; *see also* discussion of New York cases

regarding interpretation of provision setting forth timing of payment, *infra*.

New York courts, following the Restatement, recognize that "interpretation as a means of

reducing the risk of forfeiture cannot be employed if the 'occurrence of the event as a condition

is expressed in unmistakable language.'" *Oppenheimer*, 660 N.E.2d at 418 (quoting

RESTATEMENT (SECOND) CONTRACTS §§ 227, 229); *International Fidelity*, 98 F.Supp.2d at 434-

35. In *Oppenheimer*, a letter agreement relating to a sublease provided that there would be no

sublease "unless and until" the prospective subtenant delivered to the tenant the landlord's

written consent to certain "tenant work" prior to a specified deadline, and that the letter

agreement and the sublease were to be deemed "null and void and of no further force and effect"

if the landlord's consent was not timely obtained.  Oppenheimer, 660 N.E.2d at 415.  The Court

of Appeals held that such language "unambiguously establishes an express condition precedent

rather than a promise, as the parties employed the unmistakable language of condition ("if,"

"unless and until")."  *Id.* at 418.

      If the contract actually uses the term "condition precedent," the term will be construed as

a condition.  *International Fidelity*, 98 F.Supp.2d at 434 (citing *Merrit Hill Vineyards, Inc. v.*

*Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077 (N.Y. 1984) (finding condition precedent where

requirements were contained in section entitled "Conditions Precedent to Purchaser's Obligation

to Close," which provided the plaintiff's obligation was "subject to" fulfillment of the

requirements); *McKegney v. Illinois Sur. Co.*, 155 N.Y.S. 1041, 1042 ( N.Y. App. Div. 1st Dep't

1915) (finding condition precedent where bond was "issued and accepted subject to the

following conditions, which shall be conditions precedent to any right to recover hereunder");

*see also New York Bronze Powder v. Benjamin Acquisition Corp.*, 716 A.2d 230, 233 (Md. 1998)

(applying New York law and finding that issuer of notes' duty to pay noteholder was not subject

to condition that the noteholder surrender the note for cancellation "in order to receive

payment").  The district court found that the language in the surety bond at issue in *International*

*Fidelity*, which provided that "the Surety's obligation under this Bond shall arise after," the

giving of certain notices, did not create a condition precedent to recovery under the bond.

*International Fidelity*, 98 F.Supp.2d at 435.  The court explained that this language "not only

contains none of the unmistakable language such as "condition precedent" or "unless and until,"

but -- of critical importance -- contains no statement whatever that the obligation does not arise

in the absence of the actions listed."  *Id.* (citations omitted).

These cases make clear that the language in the Engagement letter on which the bankruptcy court relied is completely insufficient as a matter of law to condition payment of the Valuation Fee on the effectiveness of the "Debtors'" (or the "Company's") plan of reorganization:

> Fees: For [UBS'] services hereunder, the Committee, subject to approval of the Bankruptcy Court pursuant to the Retention Order or otherwise, shall cause the Company to pay [UBS] on the effective date of the Company's plan of reorganization seven hundred thousand dollars ($700,000) ("the Valuation Fee"). The Company's obligation to pay the Valuation Fee shall arise upon execution of this Agreement and shall survive the termination of this Agreement by the Committee.

App. at 648. The Engagement Agreement employs none of the "unmistakable language of condition," *International Fidelity*, 98 F.Supp.2d at 435, with respect to the payment of the Valuation Fee "on the effective date of the Company's plan of reorganization." The Retention Order, similarly, fails to use such "unmistakable language of condition" with respect to the Valuation Fee. The Retention Order provides, in language similar to the language used in the Engagement Agreement, that "the valuation fee is to be paid to [UBS] at the time of the effective date of the Debtors' plan of reorganization." App. at 682. The parties did not provide, for example, that the payment of the Valuation Fee was payable only "if" the plan of reorganization proposed by the Debtors was confirmed and became effective; payment of the Valuation Fee was not made "subject to" the effectiveness of the Debtors' plan of reorganization; the parties did not provide that the obligation to pay the Valuation Fee would be null and void if the First Plan was not confirmed. Further, the Engagement Agreement, which provides that payment of the Valuation Fee is "subject to" approval of the Bankruptcy Court, makes it plain that the parties knew how to expressly provide for a condition precedent when they intended to include one. Provisions lacking such express language should therefore not be interpreted as conditions. *Folksamerica Reinsurance Company v. Republic Insurance Company*, No. 03 Civ. 04022003

(HB), WL 22852737 at *8 (S.D.N.Y. Dec. 2, 2003) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning"), (quoting *International Fidelity*, 98 F.Supp.2d at 412).

More important, as in *International Fidelity*, there is no indication that the Debtors' obligation to pay the Valuation Fee would not arise if a plan of reorganization proposed by the Debtors failed to become effective. To the contrary, the Engagement Agreement unmistakably provides that "[t]he Company's obligation to pay the Valuation Fee shall arise upon execution of this Agreement."

Finally, the requirement of exact expression of contractual conditions is particularly strong in the case of provisions that may be interpreted as setting forth the timing of payment, rather than conditioning the obligation to pay. *Schuler-Haas Electric Co. v. Aetna Cas. & Sur. Co.*, 389 N.E.2d 1003, 1003 (N.Y. 1976); 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS, 434 (3d ed. 2004). As the Court of Appeals explained in *Schuler-Haas*, "If as here there is no express language to the contrary in the written document (and no extrinsic evidence), the standard would seem to be that where payment is stipulated to occur on an event, the occurrence of the event fixes only the time for payment; it is not be imported as a substantive condition of the legal responsibility to pay." *Schuler-Haas*, 357 N.E. 2d at 1003.[3] It is quite clear that the reference in both the Engagement Agreement and the Retention Order to the effectiveness of the Debtors' Plan of Reorganization simply sets forth the timing of the payment, rather than a condition precedent to the obligation to pay the Valuation Fee. *See* App. at 682,

---

[3] The court further noted that the party seeking payment had fully performed under the contract. *Schuler-Haas*, 357 N.E.2d at 1003.

("the valuation fee is to be paid to [UBS] *at the time of* the effective date of the Debtors' plan or reorganization") (emphasis added).

This rule has most often been applied in cases in which a subcontractor seeks payment under a construction contract that provides that payment of the sub is due upon the general contractor's receipt of payment from the owner, *see, e.g., Mass Transp. Elec. Constr. Corp. v. Penta Constr. Corp.*, 527 N.Y.S.2d 422 (N.Y. App. Div. 1st Dep't 1988), but the rule has application beyond such cases and is generally applicable when a party has supplied services and risks forfeiture of its compensation through a similar timing provisions. *See* Farnsworth § 8.4, 438 n.34 (citing *North Am. Graphite Corp. v. Allan*, 184 F.2d 387 (D.C. Cir. 1950).

2)      Excuse of the Non-Occurrence of a Condition

that Results in Disproportionate Forfeiture.

Even if the language of the Engagement Agreement were held to create an express condition precedent and were therefore immune to the interpretive preference discussed above, New York courts would still avoid enforcing such a condition because it would result in the forfeiture of compensation that UBS had indisputably earned by providing services as required under the Engagement Agreement. New York courts recognize that "to the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." *Oppenheimer*, 660 N.E.2d at 418 (quoting Restatement (Second) Contracts § 229). The commentary to Restatement § 229 explains that "In determining whether the forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to

which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture." RESTATEMENT (SECOND) CONTRACTS § 229, comment b.

Application of this section of the Restatement requires that the court balance the competing interests of the parties and take into account "any restitution to which the party [suffering forfeiture] would be entitled." FARNSWORTH § 8.7, 462; *see also Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485, 493-95 (E.D. Pa. 1977) (applying predecessor section to Restatement § 229 and finding that franchisor-obligor would suffer "relatively modest" harm by excusing compliance with condition whereas compliance with non-material condition would result in forfeiture of franchisee's interest).

There is no evidence in the Engagement Agreement or elsewhere in the record that the alleged condition which the Chapter 11 Trustee now seeks to enforce was a "material part of the agreed exchange" between the parties. Indeed, both the Committee and UBS, the two parties who negotiated the contract, have stated explicitly that no such condition was intended as a material part of the exchange. App. at 657, 672. The agreed exchange consisted, rather, of the provision by UBS of objective valuation services to the Committee in return for payment of the Valuation Fee by the Debtors. *Compare Silver Air v. Aeronautic Development Corporation, Ltd.*, 656 F.Supp. 170, 175 (S.D.N.Y. 1987) (holding that provision requiring party to deposit certain funds with the other party was material when it was subject of specific negotiations between the parties and compliance with the provision was closely monitored).

Further, there can be no doubt that UBS' loss of its compensation is disproportionate to any interest that the Debtors' estates have in seeking strict compliance with the alleged condition. First, UBS has in all respects complied with its obligations under the Engagement

22

Agreement and Retention Order and has provided services that have conferred an undisputed benefit on the estates. It has a valid restitutionary interest in the payment of the Valuation Fee.

Second, the Chapter 11 Trustee has failed to articulate any interest of the Debtors' estates that compliance with the alleged condition was designed to protect, which would counterbalance UBS' loss of compensation and would indicate that the estates are not unjustly enriched by the forfeiture of UBS' compensation. In contrast, in *Silver Air*, the deposit payments from which the plaintiff sought relief constituted an essential part of the defendant's overall compensation; the defendant was therefore not unjustly enriched -- and the forfeiture was not "disproportionate" -- to the extent that it had earned the money held in deposit. *Silver Air*, 656 F.Supp. at 175-76. The sole "interest" of the Debtors' estates that the alleged condition in the Engagement Agreement protects is the Chapter 11 Trustee's desire to avoid payment of UBS' fees for services that UBS has fully performed under the contract.

### C.    The Bankruptcy Court Should Have Allowed Testimony As To The Intent of The Parties

1)    Testimony Regarding Surrounding Circumstances is Admissible

The Bankruptcy Court held that the affidavit of Soren Reynertson regarding the parties' understanding of the Letter Agreement was inadmissible because the Engagement Agreement was unambiguous. The Bankruptcy Court's holding on this point was erroneous for two reasons.

First, under the general contract interpretation principles discussed above, testimony regarding the "surrounding circumstances" is admissible --and in fact the court must consider such evidence -- in order to discern the intent of the parties to the contract. *See also* 6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS, 127 (Int. Ed. 2002) (stating that, in determining meaning of contract language, relevant evidence of surrounding factors is essential to interpretation of contract and may be proved by any kind of relevant evidence). *See Harza Northeast, Inc. v.*

23

*Lehrer McGovern Bovis, Inc.,* 680 N.Y.S.2d, 379, 380 (N.Y. App. Div. 4th Dep't) (considering the accepted meaning of the term "cost construction" to interpret a construction contract). *See Becque v. Egan,* 407 N.Y.S. 2d at 1003 - 1005 (reexamining customary practice between artists and art dealers).

The testimony offered by Mr. Reynertson regarding the use of "contingent valuation fee" arrangements in the investment banking industry was essential to the interpretation of the terms of the Engagement Agreement. Had this testimony been heard, any seeming ambiguity (arising from an examination of a single sentence in the Engagement Agreement) could have been resolved, *see Boody v. Giambra,* 744 N.Y.S.2d 803, 810 (N.Y. Sup. Ct. 2002) ("The customs, practices, usages and terminology as generally understood in the particular trade or business are to be examined"), and it would have been clear that the Engagement Agreement was intended merely to defer payment of UBS' Valuation Fee and not to create a condition precedent to UBS' right to payment.

As the Court of Appeals for the Second Circuit has held, contract terms are ambiguous only "if they are capable of more than one meaning when view objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Nowack v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2nd Cir. 1996). Mr. Reynertson's testimony would have demonstrated that the Engagement Agreement was not a contingent fee arrangement, and that investment banks retained to provide valuation services do not enter into agreements that premise their compensation on outcomes. This testimony would have thus demonstrated that the only reasonable interpretation of the Engagement Agreement which is consistent with the customs, practices, usages and terminology

employed by investment banks performing valuations is that the Valuation Fee was payable upon confirmation of any plan reorganizing the Debtors' estates.  *Id.*

        2)    <u>Testimony Is Admissible To Clarify The Provisions Of An Ambiguous Contract</u>.

Second, and alternatively, because the Chapter 11 Trustee and UBS raised conflicting interpretations of the Engagement Agreement, the Bankruptcy Court should have found that the agreement was ambiguous and that extrinsic evidence was warranted.  Under New York law, a contract may be ambiguous when the agreement "on its face is reasonably susceptible of more than one interpretation."  *Arrow Communications Laboratories, Inc. v. Pico Products, Inc.*, 616 N.Y.S.2d 187, 188 (N.Y. App. Div. 4th Dep't, 1994); *Nowack*, 81 F.3d at 1192; *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2nd Cir. 1990).  Conversely, contractual language is not ambiguous when it has "a definite and precise meaning, unattended by danger of misperception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference in opinion."  *Seiden Assoc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2nd Cir. 1992).

The reading of the Engagement Agreement urged by the Chapter 11 Trustee and adopted by the Bankruptcy Court - that payment of the Valuation Fee was contingent upon the confirmation of a plan of reorganization proposed by the debtor in possession only - cannot be said to be the only reading possible for a reasonably intelligent person reading the entire agreement as an integrated whole.  The interpretation of the Engagement Agreement put forth by both UBS and the Committee - that the language of the contract merely delayed payment of the Valuation Fee until a plan of reorganization was confirmed but did not specify a required proponent for that plan - is more grammatically sensible than the Bankruptcy Court's reading,

makes more sense of the contract as a whole and is more consistent with the surrounding circumstances and the expressed intentions of the parties to the Engagement Agreement.

Because the reading of the Engagement Agreement urged by the Chapter 11 Trustee and adopted by the Bankruptcy Court is not the only possible interpretation of the Engagement Agreement which a reasonable person could have reached, the Bankruptcy Court should have admitted parole evidence in the form of Mr. Reynertson's testimony to shed light on the meaning of the words employed by the parties. *See In re Fireman's Fund Ins. Cos.,* 948 F. Supp. 1227, 1234 (S.D.N.Y. 1996) (applying NY law and noting that parole evidence may be introduced to determine the parties' intent when interpreting an ambiguous contract); *In re WorldCorp, Inc.*, 252 B.R. 890, 897 (Bankr. D. Del. 2000) (Walrath, J.) (same);  *Posh Pillows*, 525 N.Y.S.2d at 878.

Had the Bankruptcy Court admitted Mr. Reynertson's testimony, Mr. Reynertson would have testified, first, that the reading of the Engagement Agreement proposed by the Chapter 11 Trustee created a "contingent" valuation fee arrangement which was completely unheard of in the investment banking industry and second, that all of the parties to the Engagement Agreement understood that creating a contingent valuation fee arrangement would arguably have undermined the independence of the valuation being performed by UBS, and thus would have been contrary to the interests of all parties to the Engagement Agreement.  The Bankruptcy Court could thus have quite easily resolved any supposed ambiguity by reference to testimony concerning the parties' intent.  *See Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998) ("while extrinsic evidence cannot create an ambiguity in an agreement the plurality properly looked to [extrinsic evidence] to resolve any ambiguity in the stated sentence.");  *Schecter  Assoc., Inc. v. Major League Baseball Players Assoc.*, 681 N.Y.S.2d (N.Y. App. Div. 1st Dep't) (approving

trial court's use of parties history of dealing to resolve ambiguity in contract). The Bankruptcy

Court's failure to admit Mr. Reynertson's testimony to resolve this ambiguity was clear error.

## <u>CONCLUSION</u>

For the foregoing reasons, the Appellant respectfully requests that this Court reverse the

Bankruptcy Court's Fee Application Order, and direct the Chapter 11 Trustee to make payment

to UBS of the full amount of its earned fees totaling $1,150,000.

Dated: October 11, 2005 Wilmington,    Respectfully submitted,
       Delaware

By:   s/ Neal J. Levitsky

FOX ROTHSCHILD LLP
Neal J. Levitsky (DE Bar No. 2092)
L. Jason Cornell (DE Bar No. 3821)
919 N. Market Street
P.O. Box 2323
Wilmington, DE  19899-2323
Phone:  (302) 654-7444

Fax:  (302) 656-8920

-and-

COVINGTON & BURLING
Susan Power Johnston
Charles H. Jeanfreau
Martin E. Beeler
1330 Avenue of the Americas
New York, New York 10019
212-841-1000

Attorneys for UBS Securities LLC