valuation fee of $700,000, the order and the agreement are clear. They provide that payment of $700,000 was to be made at the time of the effective date of the debtor's plan of reorganization --

THE COURT: Well, it doesn't say that, and I think they point that out. It says on the effective date of the company's plan of reorganization.

MR. BARKASY: And the order says the same thing except it says effective date of the debtor's plan of reorganization. The company's plan and the debtor's plan that UBS provided testimony in, in connection with were not confirmed. Both plans were rejected by the Court. As to -- I think there's an issue as to how necessary and reasonable work was in connection with particularly the second hearing where there was Chanin (phonetical) testifying on behalf of the debtor. There was Harrison Golden testifying on behalf of the debtor's plan essentially with his own valuation. The UBS valuation was a third valuation in support of the debtor's plan. It's not to say that UBS is not entitled to some valuation fee for the work performed, but the condition precedent to the recovery of the $700,000 did not happen, and I think that UBS is left to an application under § 330 of the Code where they would establish the reasonableness and necessariness of the services as opposed to just a fixed fee of $700,000.

A-686

5

THE COURT:  Thank you.

MR. BARKASY:  Thank you, Your Honor.

MR. LEVY (TELEPHONIC):  Your Honor, Richard Levy for the Equity Committee.  May I be heard briefly?

THE COURT: Yes, you may.

MR. LEVY (TELEPHONIC):  Thank you.  First, the Equity Committee did join in the Trustee's objection.  I will not repeat any of that.  I would just add to what Mr. Barkasy said that here we have an agreement drawn by extremely competent counsel who are now attempting to put in parol evidence of what was intended in the form of an affidavit from Mr. Rinardson (phonetical).  This is a large amount, all of which will be paid by the stockholders.  We agree with Mr. Barkasy that it should not be granted in this form but rather be heard at a later date as he requested.  Thank you.

THE COURT:  All right.  I'll hear a reply.

MR. HALLER:  If I may reply briefly?

THE COURT:  Yes.

MR. HALLER:  Thank you.  On the $700,000 fee --

MR. LEVY (TELEPHONIC):  I'm sorry, a little louder please.

MR. HALLER:  Yes, certainly.  On the $700,000 fee I think Your Honor understands the issue there.  Any of the plans of reorganization proposed by the various parties were going to be the company's plan of reorganization.  The

A-687

question is who proposed it and the agreement certainly
doesn't provide that the fee would be due and payable
dependent on who proposed a particular plan of
reorganization.

        THE COURT:  Well, is it that clear from the -- Is
it that clear?  The company's plan of reorganization?

        MR. HALLER:  I do think it is clear, Your Honor,
for a variety of reasons, and I'm also prepared and Mr.
Rinardson is in the courtroom and could testify, and I can
make a proffer as to what his testimony would be, but I think
that there's no question in anybody's mind that the date on
which the fee would become payable was simply a question of
timing as to not requiring the company to fund the fee until
the plan of reorganization went effective.  It was never a
question of making the fee contingent on whose plan won, and
I think it's important, Your Honor, that, you know, that we
also take note of the fact that UBS's valuation work was
consistent with the valuation work that Your Honor ultimately
credited and exactly contrary to the valuation work that the
Lloyd & Touche proposed.  So that the work was done.  It was
important work for the Committee.  The Committee needed that
work done, and I think it would be an incredibly unfair
reading to suggest that this agreement says whether or not
they get paid depends on who proposed the plan, and it would
also --

THE COURT:  Well, I think what you need to do is --
I won't hear parol evidence, but I think that the second
sentence of § 3(a) supports your reading which says the
company's obligation to pay the valuation fee shall arise
upon execution of this agreement.

MR. HALLER:  I would agree with that, Your Honor.

THE COURT:  That lends credence to your argument
that the payment on the effective date is simply the timing
of the fee not whether or not the fee was incurred.

MR. HALLER:  Correct.

THE COURT:  What about the argument on the monthly
fee though?

MR. HALLER:  The monthly fee, Your Honor, is a --
the monthly fee similarly, the arrangement was that this
provided a way for the debtor to make a relatively modest
payment, to spread its payments over a significant period of
time.  It turns out that UBS --

THE COURT:  Well, did you know that it was going to
be December of '01 before we had the second confirmation
hearing?

MR. HALLER:  Nobody knew -- Well, UBS knew that it
was contacted in about October of so of 2001 and that the
additional services were needed, and that they needed another
valuation.  A valuation is a lot of work, and the first one
cost $700,000 to perform, and so the question there was -- it

certainly was not anticipated at the time the initial
engagement was signed.  It was anticipated that there might
be some additional work, but the nature of that work wasn't
anticipated.  And so when an entire valuation was needed, the
question arose, does our -- you know, does the fee agreement
cover it, and the parties all agreed that the fee agreement
did cover it, that it would be paid, you know, that the
payment could be spread over that period of time, but the
calculation of what the total amount was, was dependent on
the fact that several months had transpired.  I suppose if
only one month had transpired since the first valuation,
there may have been a discussion as to whether that second
valuation really could be covered for $50,000.  Now, UBS in
October and November and December of 2001 did an awful lot of
work to prepare the second valuation as much really as the
first, and it certainly wasn't contemplated by anybody that
that work was going to be done for the 50,000 or 100,000 or
the 150,000 that was covered by those three monthly payments.
 It was clearly -- I mean interestingly the initial
engagement letter worked out really well, I think, on this
front.  It provided what may look unfair in a given month as
fair overall.  Taken as a whole, the agreement provided that
if a significant amount of work was needed to be done at some
point in the future, that the way that that was going to be
covered and the agreement couldn't be clearer on it, it was

going to be covered by a monthly fee from the fourth month
after the initial engagement through the date that the
initial services were required.  A parenthetical is put
forward, Well, what if only one hour of work had been done?
That's not really the facts that we're here before the Court
with.  The facts before the Court are that in October and
November and December of 2001, an awful lot of work was done
on a valuation, and that in a rough way, the monthly fee
aggregating $450,000 works out right if not slightly below
what it might have been if it had been compensated similarly
to the first fee.

        THE COURT:  I didn't do the math.  What is the
hourly rate?

        MR. HALLER:  The hourly rate -- I did rough math on
the entire -- the work done for the first valuation, the work
done for the second valuation at a million dollars, and it
was about $700 an hour.  I didn't try to break apart the work
-- but there was actually as much or more work done for the
second valuation, so the hourly rate for the second valuation
would be slightly less than that.

        THE COURT:  All right.

        MR. HALLER:  And as I said, if Your Honor would
like to hear testimony on the negotiation of the first
agreement and the negotiation of the second agreement --

        THE COURT:  No, I won't.      **A-691**

MR. HALLER:  -- we're pleased to do it.

THE COURT:  I won't consider it.  Let me hear about the attorney's fees though.

MR. HALLER:  I think on the attorney's fees, Your Honor, we -- UBS as an expectation at the outset of this case was not that there would be a significant amount of legal work required, and they thought they were engaged to do a valuation.  They'd be in and out, and there wouldn't be ongoing work.  As it turned out, there was.  It was out of -- They were out of pocket those dollars, and I think they thought it was a fair and right thing to put in an application for those.  We do concede that there was not approval in advance, and there should have been on that.

THE COURT:  Well, aren't you bound by the terms of the agreement?

MR. HALLER:  I think we are, Your Honor, yes.

THE COURT:  All right.  Any response?

MR. BARKASY:  Thank you, Your Honor.  I just would like to make a couple of quick points.  One is, the statement in the papers didn't say that all the parties agreed in October 2001.  The parties who agreed were the Committee and the Committee's counsel.  The letter that's referenced is a confirming clarifying letter from UBS, the Committee's counsel saying sign and return this.  If there was no question about the specificity of the original agreement, I

don't know that there would be a need for a confirming

letter, and I don't know that the confirming letter has any

legal effect here because it was not brought before the Court

for any kind of approval in October 2001.  So I don't know

that that could be relied on.  In terms of the fee and the

condition precedent that the debtor's plan of reorganization

be confirmed, like I said, I think -- we think that the

language is clear.  To the extent that there's any ambiguity

in it, it should not be constructed, construed against the

estate.  It should be construed against UBS and the

Committee's counsel  --

   THE COURT:  Well, it is ambiguous?  It says that

the company's obligation to pay the fee arises on execution

of the agreement.  So a fee is due.

   MR. BARKASY:  But then it says it's not to be paid

until the effective date of the debtor's plan of

reorganization and what was intended at the time was clearly

-- it was clearly contemplated by the debtors and the

Committee that the plan that they were supporting was going

to be confirmed, and they didn't provide for a contingency in

the agreement as to what would happen if it wasn't confirmed

and what would happen if the Equity Committee proposed a

plan?  What would happen if there was a Chapter 7

liquidation?  Those issues are not addressed.  So, although

the language arising might create the initial kind of

obligation for a fee to be paid, there is another condition precedent in the agreement, and there must have been some ambiguity in the minds of the folks at UBS because they required -- before they did work in October and November, they required apparently this letter to be signed, and as we've said, it's not as if the Trustee believes that there should be no consideration of award of a fee for UBS here, but there should be proof and analysis as to a reasonable fee for the work performed under the circumstances.

THE COURT:  Well, is $700 an hour reasonable?

MR. BARKASY:  I don't know that there's anything in the record that suggests that it's reasonable.  And it's -- it sounds like a big number to me, but, you know, what do I know?

THE COURT:  What's your hourly rate?

MR. BARKASY:  My hourly rate is less than $300 an hour, so, maybe from that perspective it seems like a big number.  Thank you, Your Honor.

MR. CIANCIULLI:  Your Honor, Jeff Cianciulli from Weir & Partners on behalf of the Chapter 11 Trustee.

MR. LEVY (TELEPHONIC):  A little louder, again, please.

MR. CIANCIULLI:  Jeffrey Cianciulli on behalf of the Chapter 11 Trustee.  I just wanted to let Your Honor know that there are no other matters on the agenda that are going

13

forward, but I do believe Mr. Bressler has several issues
that he would like to discuss with the Court.

THE COURT:  Well, before we do that, let me make a
ruling on the fee issue.  Well, the easy part, I think the
attorney's fees cannot be paid under the clear terms of the
engagement letter.  No attorney's fees would be payable
unless a separate retention application was filed and none
was filed.  With respect to the valuation fee, I think that
I'll disallow the 700,000 valuation fee since there was a
condition precedent and that was the effective date of the
debtor's plan of reorganization.  I don't think despite the
way the language is written, although a fee arose, is not
payable unless the effective date occurs and the effective
dates has not occurred and presumably won't occur.  But I
think the monthly -- notwithstanding that, I think the
$50,000 monthly fee is due and payable.  There is no similar
condition precedent to that only that additional work be
required, additional work was required and was in fact
performed, and the parties' agreement was that if any work
was required after that that it would be paid by the payment
of a monthly fee of 50,000 a month and that's not unusual in
the retention of valuation experts or investment bankers.  So
I'll allow the 450,000 but not the 700,000.

MR. BRESSLER:  Good morning, Your Honor.  May it
please the Court, Barry Bressler for the Chapter 11 Trustee.

A-695

We had filed on Friday, Your Honor, a certification of counsel regarding modification of the Chapter 11 Trustee's second amended joint plan of reorganization in accordance with Your Honor's opinion and order.  I have another copy if Your Honor would like it.

THE COURT:  No, I have it, thank  you.

MR. BRESSLER:  Okay.  We also have prepared a long-form order confirming the Trustee's plan and a disc with same.  We have circulated that to the parties in interest. We have some preliminary comments which we've tried to incorporate from the note holders' counsel.  Mr. Levy and I have spoken.  He had trouble getting this open before the weekend, and we were hoping for his comments today, and he has asked for some time to review it.  We are hopeful that that can be done in the next few days when the Trustee and counsel for the Trustee will actually be in Denver with the company and that Mr. Levy will have his comments to us by Thursday, and we're hoping that on Thursday and Friday we can resolve any remaining issues.  We didn't know if Your Honor intended to draft her own order, but we were hoping that this would certainly help the process, and we believe that by Friday or by next Monday at the latest, we could file cross-certifications.  Hopefully, one certification resolving all issues, but at the very least cross-certifications if there are any paragraphs that haven't been dealt with yet.

THE COURT:  All right.

MR. BRESSLER:  Mr. Levy, does that accurately reflect --

MR. LEVY (TELEPHONIC):  That exactly sets forth our agreement.  We're totally agreeable, and thank you.

THE COURT:  All right, well, I'll wait for counsel's --

MR. BRESSLER:  Would Your Honor like what we have now or would you prefer --

THE COURT:  Yes.  Give me what you have now, and then a certification will be fine.

MR. BRESSLER:  Thank you, Your Honor.  And the only other scheduling issue and this is sort of a technical one and I do not wish to intrude on Your Honor's schedule, but if we have the certifications filed there is an advantage to the company dollar-wise in a great way in having an order that would be effective as of the 31st or the first of the month rather than in the middle of the month because they wouldn't have to juggle certain accounting fees, and if it were entered before the 31st of October, if you could still make the effective date November the 1st even though that would be a few days more than the thirty days contemplated by the plan, we don't think that would prejudice anyone and in fact we think it would help people.

THE COURT:  Say that again, the effective date is

supposed to be thirty days after the confirmation?

MR. BRESSLER:  The effective date for some issues is thirty days after the confirmation order is entered including, I think, the fixing of certain amounts.  For other purposes it's sixty days later and for other purposes it's ninety days later.  But, for example, from going from a public to a private company it's thirty days later, and I am just beginning to understand all the securities and other issues that will be involved in that and the amount of expense that's been involved.  The Equity Committee has indicated to us that they will likely not only file a notice of appeal, but request a stay, and Your Honor will hear, I'm sure, additional testimony as to the costs both securities-wise and accounting-wise of the company remaining a public company when it comes to that issue.  This is just a date issue and it comes from the accounting folks at the company.  And of course, we've told them whatever the Court's date is the Court's date is, but obviously the last day of the month or the middle day of the month as an effective date is easier for them.

MR. LEVY (TELEPHONIC):  Your Honor, I'm not clear on these dates.  I don't object to anything, but I'm sure Mr. Bressler and I can talk about what he was talking about just now and get everything to you as he suggested by Friday or Monday at the latest.                    A-698

MR. BRESSLER:  We will do that, Mr. Levy, I was just asking the Court if the Court were inclined to enter an order before then.  If it were entered, for example, on Friday, October the 29th, instead of saying the thirty days later making the effective date November the 30th instead of November the 29th would be an accounting advantage for the company.

MR. LEVY (TELEPHONIC):  Okay.

THE COURT:  All right, why don't you spell that out then, and maybe the way it would simply be spelt out is that the effective date will be the end of the month following the month the order's entered on.  But I can certainly consider it.  If I get it by Monday, I have Tuesday sometime to review it.

MR. BRESSLER:  Thank you, Your Honor, we will do that.

MR. LEVY (TELEPHONIC):  Thank you, Judge.

THE COURT:  All right, that's it then?

MR. HALLER:  Your Honor, could I just request one clarification on your order.  With respect to the non-legal fees of $17,000 or so, I take it the --

MR. LEVY (TELEPHONIC):  Louder, please.

MR. HALLER:  I take it that the non-legal fees are approved?

THE COURT:  The expenses --

A-699

MR. HALLER:  Correct.

THE COURT:  -- you mean?  Yes.

MR. HALLER:  Thank you.

THE COURT:  Yes, other than the part of the monthly fee?

MR. HALLER:  Correct.

THE COURT:  Yes.  Thank you for that clarification, and I'll look for a form of order then.  All right, we'll stand adjourned then.

ALL:  Thank you, Your Honor.

THE COURT:  Thank you.

(Whereupon at 11:53 a.m. the hearing in this matter was concluded for this date.)

I, Elaine M. Ryan, approved transcriber for the United States Courts, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
In re: SMITH TECHNOLOGY CORPORATION,
Canonie Environmental Services Corp.,
Canonie Technologies, Inc., Plymouth Nine Hundred,
Inc., f/k/a BCM Engineers
Inc., a Pennsylvania corporation, Plymouth Engineers
Inc., a Delaware
corporation, Riedel Environmental Services, Inc., and
Smith International
Corporation,Debtors, Appellees and Cross-
Appellants,
BUCHANAN INGERSOLL PROFESSIONAL
CORPORATION, Appellant and Cross-Appellee,
v.
THE CHASE MANHATTAN BANK, et al.,
Appellee and Cross-Appellant.
No. Civ.A. 99-132 MMS.

Dec. 23, 1999.
Bruce Grohsgal, of Wolf, Block, Schorr and Solis-
Cohen LLP, Wilmington, Delaware, for Debtors.

Francis A. Monaco, Jr., and Joseph Bodner, of
Walsh, Monzack and Monaco, P.A., Wilmington,
Delaware, for Appellant and Cross-Appellee.

Kevin Gross, of Rosenthal, Monhait, Gross &
Goddess, Wilmington, Delaware, for Appellee and
Cross-Appellant.

*MEMORANDUM OPINION*

SCHWARTZ, Senior J.

I. Introduction

**\*1** This is an appeal from the Bankruptcy Court's
award, pursuant to 11 U.S.C. § 330, of fees and
expenses to Buchanan Ingersoll Professional
Corporation ("BI"), counsel to the Official
Committee of Unsecured Creditors ("Committee") in
the underlying bankruptcy action. In the underlying
action, Smith Technology Corporation ("Smith") and

six affiliated corporations (collectively, "Debtors")
filed for relief under Chapter 11 of the Bankruptcy
Code, *see* 11 U.S.C. § § 101-1330, in the United
States Bankruptcy Court for the District of Delaware
("Bankruptcy Court").

Appellant BI disputes the Bankruptcy Court's
disallowance of $74,357 of requested fees on its
Supplementary Second Fee Application. Debtors
cross-appealed the Bankruptcy Court's order making
final its interim award of $416,780.50 in fees and
expenses on BI's First Fee Application. [FN1] The
Court has jurisdiction over this appeal pursuant to 28
U.S.C. § 158(a). For the reasons set forth below, the
Court vacates the Bankruptcy Court's final order and
remands to the Bankruptcy Court for further findings
and explanation of the fee awards.

> FN1. Appellees/cross-appellants Chase
> Manhattan Bank and BTM Capital
> Corporation ("Secured Lenders") waived
> their right to file briefs in this matter and
> joined in the Debtors' brief.

II. Statement of Facts

Debtors (Smith and six affiliated corporations) filed
for relief under Chapter 11 of the Bankruptcy Code
on October 8, 1997. The Bankruptcy Court
administratively consolidated the seven Chapter 11
cases, and the United States Trustee appointed one
unsecured creditors' committee ("Committee") for the
consolidated cases. The Bankruptcy Court entered
orders employing BI as lead counsel and Walsh &
Monzack, P.A. ("W & M") as local counsel for the
Committee. Wolf, Block, Schorr & Solis-Cohen, LLP
("Wolf Block") served as counsel for the Debtors.

*ESOP and Insurance Trust Litigation*

The fee dispute centers largely on fees incurred by
BI in ligation initiated by the Committee against the
BCM Engineers Employee Stock Ownership and
Profit Sharing Plan ("ESOP") and a related insurance
trust. The background facts regarding the ESOP and
Insurance Trust litigation are as follows. Two of the
Debtors affiliated with Smith in this action were
Plymouth Nine Hundred, Inc ., f/k/a BCM Engineers,
Inc., a Pennsylvania corporation, and Plymouth Nine
Hundred, Inc., f/k/a BCM Engineers, Inc., a
Delaware corporation (hereinafter collectively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

"BCM"). In September 1994, pursuant to a merger agreement, Smith (known then as Canonie Environmental Services Corp.) purchased substantially all of the common stock of BCM from the BCM ESOP in return for payment of more than $3 million and the issuance of 78,000 shares of Smith preferred stock to the ESOP. Smith also paid $1.5 million plus accrued interest to satisfy a loan to the BCM ESOP which was guaranteed by BCM and was secured by the BCM common stock held by the ESOP. At the time of the Smith-BCM transaction, BCM transferred a pool of approximately 200 whole life insurance polices owned by BCM to a collateral insurance trust ("Insurance Trust"). The Insurance Trust was established as a fund to secure Smith's obligations to redeem and pay dividends on the preferred Smith shares which had been issued to the ESOP. After the BCM-Smith transaction, Smith operated BCM as a wholly-owned subsidiary and made payments to fund premiums on the life insurance policies held by the Insurance Trust.

*2 When the Debtors filed under Chapter 11 in October of 1997, the ESOP was still in effect and BI claims it held assets of approximately $7 million. BI also states that the Insurance Trust held assets in excess of $1 million at the time. In March 1998, the sole director of BCM terminated the existence of the ESOP, thereby triggering an obligation to liquidate the ESOP and distribute its assets to the approximately 700 ESOP participants. [FN2] Under the terms of the Insurance Trust, when the ESOP liquidation was completed, the Insurance Trust would be liquidated and distributed to participants.

> FN2. The parties agree the ESOP was covered under the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001 et seq., and, therefore, was required to liquidate and distribute all of its assets to participants within one year of the date of termination.

During mediation within the Bankruptcy Court, and while bankruptcy proceedings were stayed, BI had researched some issues concerning the Smith-BCM transaction and potential avoidance actions against the ESOP and Insurance Trust. BI had prepared a position paper, which was distributed to all concerned, including the Bankruptcy judge, in June 1998. Settlement mediation with the bankruptcy judge ended in September 1998. Debtors contend that Debtors' counsel suggested during discussions in June 1998 that counsel for the Committee, the Debtors, the ESOP, and the Insurance Trust meet and

exchange positions in an effort to settle the ESOP claims and avoid costly litigation. Debtors maintain representatives for the ESOP and Insurance Trust indicated that they were willing to engage in such an effort prior to making any distributions from the ESOP or Insurance Trust if BI provided an outline of claims prior to the meeting. Debtors assert that despite repeated requests to BI to prepare an outline of claims, BI did not do so until October 8, 1998, a week after the ESOP set a deadline of October 12, 1998 for distribution of assets to ESOP participants.

BI contends the Committee did not learn of the March 1998 decision of BCM's director to terminate the ESOP until October 2, 1998, in a letter from the Chairman of the ESOP to counsel for the Committee which indicated that the ESOP intended to proceed with distribution of all of its assets. In an October 8, 1998 letter, the Committee demanded the Debtors take action to protect the assets in the bankruptcy estate held by the ESOP and the Insurance Trust.

Counsel for the Debtors arranged a meeting with lawyers of the ESOP, the Insurance Trust, and the Committee on October 22, 1998. The meeting was unsuccessful in establishing a framework for resolving the dispute. By letter of October 23, 1998, the ESOP voluntarily extended the liquidation date until October 30 and also noted that the earliest funds could be distributed to retirees was November 10, 1998.

On October 27, 1998, after being informed that the Debtors would not take action against the ESOP and the Insurance Trust, the Committee filed a motion for authority in lieu of the Debtors to investigate, institute, and prosecute avoidance actions against, among others, the ESOP, the Trustee of the Insurance Trust, and the Secured Lenders ("Motion for Authority"). On October 29, 1998, BI on behalf of the Committee filed an adversary complaint for injunctive relief against the ESOP and Insurance Trust and a motion for a preliminary injunction pending resolution of the injunction complaint. The Debtors filed a limited exception to the Motion for Authority, expressing their concern that the lawyers and other professionals would be the primary or sole beneficiaries of such litigation to the detriment of pension beneficiaries under the ESOP and other creditors of the Debtors, and sought imposition of a contingency fee arrangement on the Committee's counsel for the prosecution of the action. The Debtors also reiterated that one of the Debtors, Plymouth Nine Hundred, Inc., had a potential conflict of interest because the Debtor would become the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

Page 3

fiduciary under the ESOP if the sole remaining member of the ESOP committee resigned.

**\*3** At a November 3, 1998 hearing before the Bankruptcy Court, the judge scheduled an evidentiary hearing on the injunction actions for November 7, 1998 and temporarily restrained any distribution by the ESOP or Insurance Trust. The temporary restraining order was conditioned, over the Committee's objection, on the Committee posting a $100,000 bond by November 10, 1998. The Secured Lenders intervened in the injunction adversary action as defendants in order to participate in discovery and dispute factual and legal issues regarding the alleged avoidability of the Smith-BCM transaction. The court ordered expedited discovery to be completed by November 20, 1998.

On November 9, 1998, the Committee filed a motion for reconsideration of the court's order requiring the posting of the $100,000 bond. The Bankruptcy Court denied the motion for reconsideration on November 18, 1999 but extended the time to post the bond until the close of business that day. The Committee did not post the bond and, on November 18, 1998, the Committee filed a notice of dismissal of the ESOP from the injunction adversary complaint. The Committee continued to take discovery and prepare for the preliminary injunction action against the Insurance Trust.

Following dismissal of the action against the ESOP by the Committee, the Debtors reached a settlement in principle with the ESOP and Insurance Trust to settle potential claims for $300,000. The proposed settlement was discussed at a November 24, 1998 hearing. Based on the agreement of the ESOP and Insurance Trust that no funds would be distributed pending a hearing on the proposed settlement, scheduled for December 15, 1998, the Bankruptcy Court agreed to stay discovery, briefing, and trial in the injunction actions. A proposed joint liquidation plan of the Secured Lenders and Debtors was also discussed at the November 24 hearing.

On December 3, 1998, the Debtors filed a motion for an order approving the settlement with the ESOP and Insurance Trust. The Committee, noting that because the suit against the ESOP had been dropped, the potential for any recovery from the ESOP was remote and that assets in the Insurance Trust were approximately $700,000, supported approval of the settlement. *See* R.Exhibit Q,  [FN3] at 5-6. The Bankruptcy Court approved the settlement on December 15, 1998.

> FN3. "R" refers to the record on appeal with the exhibits to the record noted as "Exhibit_."

*Fee Applications and Awards*

At a November 3 hearing, the Bankruptcy Court reviewed BI's First Fee Application, for the period October 20, 1997 through May 31, 1998. In response to objections to the fee application by both the Debtors and the Secured Lenders, the Bankruptcy Court made the following statements on the record:

> ... I have reviewed the objections. I am concerned about the costs to the estate for all counsel. Nonetheless, it seems to me that the services articulated in this fee petition have been provided.
> ... I am inclined to say that in this first application of interim compensation and reimbursement of expenses that the fee should be allowed.
> **\*4** ...
> Whether the services will be beneficial to the estate is not something I can determine now because I have been keeping everything on hold specifically so I don't have to determine that at this point in time.

R. Exhibit M, at 152-53. The Bankruptcy Court entered an interim order on November 6, 1998, allowing BI $416,780.50  [FN4] in fees and expenses on its First Fee Application.

> FN4. This amount represents total fees requested of $421,056.50 less the amount of $4,276 for fees previously disallowed by a prospective order of the Honorable Helen S. Balick, who was assigned to these cases prior to her retirement. R. Exhibit L.

On December 3, 1998, BI filed its Second Fee Application, requesting $109,419 in professional fees for service rendered during the period June 1, 1998 through September 30, 1998. BI filed a Supplemental Second Fee Application, requesting $119,357 in professional fees for the period October 1, 1998 through November 30, 1998. In the supplemental application, services relating to the ESOP and Insurance Trust litigation were set forth totaling 462.6 hours of time and $94,316.50 in fees.

Hearings on pending fee applications took place on December 21, 1998, the day prior to the confirmation hearing on the second amended joint liquidation plan. The plan at section 9(b) provided as a precondition to confirmation that the total allowed fee claims not exceed $1.2 million. At the December 21 hearing,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

Page 4

counsel for the Debtors and the Secured Lenders objected to BI's fee requests on the ground that the ESOP litigation was unnecessary and costly and resulted in a reduction of approximately $100,000 in the settlement with the ESOP and Insurance Trust, because the ESOP and Insurance Trust had to pay legal fees in this range trying to fend off the Committee's litigation. The Debtors and the Secured Lenders also objected on the grounds that BI's fees throughout the litigation, greatly in excess of the fees of Debtors' counsel, were excessive and duplicative. On December 21, 1998, the Bankruptcy Court signed an interim order allowing BI's Second Fee Application in the amount of $82,419 in professional fees, a $27,000 reduction from BI's request. On December 21, the court also signed an interim order allowing BI's Supplemental Second Fee Application in an amount of $45,000 for professional fees, a $74,357 fee reduction from BI's request for $119,357. The order stated the following reasoning for its disallowance of the requested fees:

The reduction is based on excessive billing and unnecessary staffing for issues relating to the ESOP litigation, discussion of which began at least as early as 6/22/98 per time entries in the Committee's Second Application (ex. 4, p. 18). The litigation itself [sic] of questionable value to the unsecured, non-lender creditors, and [sic] of prior research previously approved on the BCM related issues.

R. Exhibit V. The Bankruptcy Court made no specific findings of fact, either written or on the record during the hearing, in support of its rationale for disallowing the bulk of the requested ESOP litigation fees, nor were any findings of fact made supporting the approximately $20,000 that was awarded for the ESOP litigation. [FN5]

FN5. On December 21, 1998, the Bankruptcy Court also entered an order disallowing approximately $29,000 of the fees requested by the Committee's accountants.

*5 At the confirmation hearing for the second amended joint liquidation plan held on December 22, 1998, the Bankruptcy Court addressed additional fee issues prior to confirmation. The Court allowed all professionals additional fees for the month of December 1998. No objections were raised to the December fee requests other than the Secured Lenders' general concern that the total for professional fees not exceed the $1.2 million precondition limit of the liquidation plan. The Bankruptcy Court also ordered a $23,000 reduction

in Wolf Block's pending fee request due to a conflict of interest. Total aggregate fee claims at the time of plan confirmation on December 22 were $1,194,311.08, approximately six thousand dollars below the joint plan limit. The Bankruptcy Court approved the second amended joint liquidation plan in a December 22, 1998 final order.

The December 22, 1998 final order of the Bankruptcy Court also made final all interim fee orders, including interim orders allowing fees for the Supplemental Second Fee Application of BI and the court's November 6, 1998 interim award of $416,780.50 in fees and expenses to BI on the First Fee Application. These two fee awards are the subject of this appeal and cross-appeal. [FN6]

FN6. In its opening brief, BI states, "It is the Bankruptcy Court's disallowance of certain fees requested by Buchanan Ingersoll in the Second Fee Application and the Supplemental Second Fee Application that is the subject of the present appeal. The Bankruptcy Court denied Buchanan Ingersoll $27,000 in fees on the Second Fee Application and $74,357 of fees on its Supplemental Second Fee Application for a total of $101,357." D.I. 14 at 4. This statement implies that BI is disputing the disallowance of both the $27,000 and the $74,357 in requested fees. However, in its reply brief, BI states that it did not appeal the reduction of $27,000 of fees requested on the Second Fee Application, based on the Bankruptcy Court's finding that the law firm spent too much time preparing a position paper ($25,000 reduction) and for some interoffice conferences ($2,000 reduction), because "the Bankruptcy Court exercised its discretion appropriately as to those reductions." D.I. 18, at 8. At argument, BI also confirmed that it was not appealing the $27,000 reduction.

III. Standard of Review

This Court reviews Bankruptcy Court fee awards for abuse of discretion. *See Zolfo, Cooper & Co. v. Sunbeam-Oyster Co., Inc.,* 50 F.3d 253, 257 (3d Cir.1995); *In re Grand Union Co.,* 200 B.R. 101, 106 (D.Del.1996). An abuse of discretion "can occur 'if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." ' *Zolfo, Cooper & Co*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

Page 5

., 50 F.3d at 257 (citations omitted). This Court reviews the Bankruptcy Court's factual findings for clear error, and conclusions of law are subject to plenary review. See id.; *Meridian Bank v. Alten,* 958 F.2d 1226, 1229 (3d Cir.1992).

IV. Discussion

The Bankruptcy Code authorizes the Bankruptcy Court to award to attorneys "reasonable compensation for actual, necessary services." 11 U.S.C. § 330(a)(1)(A). In determining the amount of fees to be awarded, the court considers "(i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in nonbankruptcy cases." *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 840 (3d Cir.1994) (citing 11 U.S.C.A. § 330(a)). The statute further dictates that a court "shall not allow compensation for--(i) unnecessary duplication of services; or (ii) services that were not--(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C.A. § 330(a)(4)(A). A Bankruptcy Court has the authority and duty to review fee applications even when no other party objects. See *Busy Beaver,* 19 F.3d at 841. However, "[b]ecause its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled ." *Id.* at 845 (footnote omitted).

A. Disallowance of $74,357 in fees to BI related to ESOP and Insurance Trust litigation

*6 BI contends that the Bankruptcy Court abused its discretion by not awarding BI all of the more than $94,000 in fees relating to the ESOP and Insurance Trust litigation that BI requested in its Supplemental Second Fee Application. BI contends the Bankruptcy Court's reasoning for disallowing the requested fees-- excessive billing and unnecessary staffing for issues related to the ESOP litigation, including research on issues for which fees had been previously approved, and fact that discussions between Committee and Debtor on potential claims against the ESOP and Insurance Trust had commenced in June-- was not supported by specific findings of fact or reference to specific time entries and was based on erroneous findings. BI also asserts the Bankruptcy Court applied the wrong legal standard and arbitrarily disallowed fees of the Committee's attorneys and accountants in order to make the total of all fees conform to the limit imposed by the liquidation plan.

*1. Whether the Bankruptcy Court's disallowance of BI's requested fees is supported by the record*

In determining whether to allow BI's requested fees relating to the ESOP litigation, the Bankruptcy Court should have addressed whether, at the time BI's actions in the ESOP litigation were taken, they were reasonably likely to benefit the estate. See, e.g., *In re Auto Parts Club, Inc.,* 211 B.R. 29, 35 (B.A.P. 9th Cir.1997) ("... the standard is an objective one as to whether the fees were reasonable and necessary at the time they were incurred."); *In re Taxman Clothing Co.,* 49 F.3d 310, 313-15 (7th Cir.1995) (rejecting the argument that benefit to the estate be based on hindsight). In particular, did a time come in this case when BI should have scaled back its services related to the ESOP and Insurance Trust litigation "once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate [?]" *Taxman,* 49 F.3d at 315 (disallowing $85,000 in fees because attorney should have dropped litigation once he realized claim could not yield a net gain to the estate); see also *Auto Parts Club, Inc.,* 211 B.R. at 35 ("[O]nce it becomes reasonably obvious that further litigation would not benefit the estate, the attorney must scale back its services.")

BI argues that *Taxman* supports its request for fees in this case. Once it was clear that the Bankruptcy Court would not reconsider its imposition of the $100,000 bond requirement, the Committee dismissed the litigation as to the ESOP. Thus, maintains BI, it scaled back the ESOP litigation once it became reasonably obvious that further litigation would not benefit the estate. [FN7]

> FN7. BI argues that the approximately $94,000 in requested fees for the ESOP litigation was reasonable in relation to the $300,000 actual benefit to the estate from the settlement between the Debtors and the ESOP and Insurance Trust. This argument rests on BI's assertion that the $300,000 settlement was the result of BI's ESOP litigation efforts, an assertion which the Debtors' hotly contest. At the December 21, 1998 hearing, counsel for both the Debtors and the Secured Lenders objected to BI's fee requests for its work on the ESOP litigation as not necessary or beneficial to the estate and argued that the ESOP settlement would have been $100,000 higher were it not for BI's litigation, which they claimed drained

Not Reported in F.Supp.2d                                                                          Page 6
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

the ESOP and Insurance Trust of approximately $100,000 for legal fees in defending the litigation. In the record provided on appeal, there are no findings by the Bankruptcy Court regarding the relationship between the Committee's ESOP litigation and the ESOP settlement. (The transcript of the December 15, 1998 settlement hearing is not part of the record on appeal.) However, implicit in the decision to disallow the majority of BI's requested fees on the ESOP and Insurance Trust litigation was a conclusion that the settlement between the Debtors and the ESOP did not result from the ESOP litigation. Based on the record, this Court can not find that such a conclusion by the Bankruptcy Court would be clearly erroneous. The Committee was not a player in the settlement discussions, which took place between representatives of the Debtors, the ESOP, and the Insurance Trust. Moreover, the settlement was reached after the Committee had dropped its suit against the ESOP, the big pocket in this case. Thus, the Committee cannot credibly argue its litigation against the ESOP was a looming threat that caused the ESOP to settle. The Committee, in supporting approval of the settlement, noted that because its suit against the ESOP had been dropped, the potential for any recovery from the ESOP was "remote." R. Exhibit Q, at 5-6.

Debtors respond that *Taxman* supports its contention that the Bankruptcy Court's award of only $20,000 in fees incurred by BI on the ESOP litigation was not arbitrary or an abuse of discretion. Clearly, Debtors' assert, the Bankruptcy Court concluded that some of services BI performed in the ESOP litigation were reasonable and beneficial to the estate, but the disallowance of other requested fees indicates the Bankruptcy Court concluded that at some point BI should have scaled back its services with regard to the ESOP litigation because it became reasonably clear the costs outweighed the benefits. In support of their position, Debtors point to the Bankruptcy Court's expression of skepticism regarding the merits of the ESOP litigation during the December 21, 1998 hearing that discussed BI's second and second supplemental fee applications. The most detailed statement in the record of the Bankruptcy Court's view of the ESOP litigation generally, made during discussions about the requested fees of the Committee's accountants, Parente Consulting, is as follows:

*7 Well, the information at the settlement hearing[ [FN8]] seems to indicate--but that may not be a fair standard either, because I don't think the Creditor's Committee really responded on the merits at that time. So perhaps that's not a fair assessment. But just let me state for the record what my impression after the representatives of the insurance trust placed some information on the record at that hearing. That seemed to be pretty clear that after that transaction created the ESOP, there was no insolvency. It did not appear to be insolvent as a result of that particular transfer.

    FN8. The transcript for the settlement hearing is not part of the record on appeal.

And on top of that, I think there is a significant legal issue as to whether or not, because of ERISA, the assets could have been reconveyed outside that trust, especially the ESOP trust in this instance, in any event.
I don't know that the Committee, even if it could have proved insolvency, could have succeeded in that litigation. We didn't get that far because the action was dismissed.
But when I approach it from taking a look at the overarching legal issue and have some serious doubts as to whether or not that transaction could have been set aside, then I have to question whether the value of the services did anything for the benefit of this estate.
Obviously, Mr. Aaron, in your capacity as the attorney for the Committee and Parente's as the accountant for the Committee, you have the Committee's best interests at heart. But sometimes those best interests may not jibe with the evidence that can be presented. And I think in dealing with this ESOP, I think perhaps that was the case. Maybe I'm second-guessing in that situation because you have to investigate you know. But at a certain point in time, it seems to me that there has to be a rule of reason and I am having some difficulty with the accounting services figuring out what benefit they had at the time they were incurred with respect to the ESOP. I truly am.
I've heard your presentation. I understand what you've said. I'm still not convinced that they were necessary.
R. Exhibit ZZ, at 69-71.

Although the Bankruptcy Court raised justifiable concerns about the Committee's likelihood of success in the ESOP action, the record is not adequate to explain the disallowance of BI's requested fees. The

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

Page 7

Bankruptcy Court made no explicit finding that reasonably prudent counsel would not have undertaken such litigation. Unlike the *Taxman* case, here there was no finding by the Bankruptcy Court that there was a certain point when it should have become "reasonably obvious" to BI that the costs of pursuing the ESOP litigation outweighed possible recovery to the estate. [FN9] Moreover, based on the hearing, the Bankruptcy Court appears to have been most bothered by the fact that the professionals continued to incur fees regarding the ESOP litigation even after BI on behalf of the Committee dismissed the action against the ESOP on November 18. *See* R. Exhibit ZZ, at 64. However, a review of the time entries on BI's Second Supplemental Fee Application indicates that services related to the ESOP and Insurance Trust litigation, provided by BI after the ESOP had been dismissed as a defendant in the litigation, would account for only a portion of the disallowed fees. *See* R. Exhibit R, at 33-37.

> FN9. During discussions concerning the Debtors' and Secured Lenders' objections to BI's requested fees related to the ESOP litigation, the court made the statement, "I have no view as to whether the Committee's actions would, if prosecuted, be successful." *Id.* at 50.

*8 BI further argues that the trial court erred by disallowing the fee award on the basis that the application was for "excessive billing and unnecessary staffing for issues relating to ... prior research previously approved on the BCM related issues." BI argues that the Bankruptcy Court's conclusion was erroneous because new issues arose during the course of the ESOP litigation relating to whether an injunction could be issued to stop distribution by an ESOP under ERISA, whether a Bankruptcy Court must require a bond from a creditor's committee acting in lieu of a debtor, as well as statute of limitations and other issues raised in the answer to the Committee's motion. The statute provides that a Bankruptcy Court "shall not allow compensation" for "unnecessary duplication of services." 11 U.S.C. § 330(a)(4)(A)(i). A review of BI's First Fee Application, Second Fee Application, and Supplemental Second Fee Application, all of which include time entries for ESOP and Insurance Trust-related research, clearly provide some support for the Bankruptcy Court's conclusion in the December 21, 1998 order that some of this research was duplicative. Moreover, by granting $20,000 of the fees requested in regard to the ESOP litigation, the Bankruptcy Court must have concluded that there

was some merit to the Committee's investigation into possible claims against the ESOP and Insurance Trust, if not initiation in fact of such litigation, and the Bankruptcy Court may have allowed such fees for BI's research into these "new" issues. However, in the absence of specific findings, reference to time entries, and more detailed explanations by the Bankruptcy Court as to which elements of the fee request were allowed and which were not, this Court simply is unable to evaluate whether there is support for the Bankruptcy Court's conclusion that BI performed duplicative research with regard to the ESOP litigation. [FN10]

> FN10. Despite the correct assertion the Bankruptcy Court did not explain its reasoning, BI proceeds to argue that the Bankruptcy Court disregarded various considerations in reaching its conclusions. Many of BI's arguments are premised on factual conclusions that simply are not part of the record. Such factual determinations are for the Bankruptcy Court and are not within the purview of this Court, acting in an appellate capacity.

In sum, the Court can find nothing in the record indicating the Bankruptcy Court's conclusions as to which activities undertaken by BI in the ESOP litigation were reasonably likely to benefit the estate at the time they were undertaken and which were not. The fact that the Bankruptcy Court granted $20,000 of the fees requested for the ESOP litigation indicates that the court did not regard the entire effort as unnecessary; however, the court never specified which services were allowable as the basis for the $20,000 and which were excluded as duplicative or not beneficial to the estate and the precise reason for such a distinction. Although the Bankruptcy Court, in its experience and intuition, may have instinctively reached the correct result, in the absence of any specific findings or reasoning supporting the amount of the Bankruptcy Court's disallowance of the ESOP litigation fees, this Court simply is unable to review whether the Bankruptcy Court abused its discretion. *See, e.g., In re Orfa Corp.*, 170 B.R. 257, 271 (E.D.Pa.1994) ("While the amount [of fees] awarded in the Final Order may perhaps in the wisdom of an experienced bankruptcy judge approximate a fair result within the circumstances of this case, there simply is not enough of a record for this court to properly review the bankruptcy court's decision."); *In re Metro Transp. Co.*, 107 B.R. 50, 54 (E.D.Pa.1989) ("... in order for an appellate judge to determine whether there was a proper exercise of discretion,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
(Cite as: 1999 WL 1427681 (D.Del.))

some explanation of the reasons why the discretion was exercised in the particular manner that it was ordinarily is required." (internal quotation marks and citation omitted)); *cf. Dardovitch v. Haltzman,* 190 F.3d 125, 148-49 (3d Cir.1999) (The trial court "was fully familiar with the record and perhaps instinctively reached the correct result; because it did not ... set forth an adequate explanation of its calculations, however, we cannot be sure that its award of attorney's fees was consistent with the exercise of sound discretion." (non-bankruptcy case applying Pennsylvania law regarding exercise of discretion in award of attorney's fees)). Therefore, the Court will vacate the final order and remand to the Bankruptcy Court for specific findings and reasoning on the allowability of BI's requested fees for the ESOP litigation, [FN11] recognizing that it need "not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Busy Beaver,* 19 F.3d at 845.

> FN11. Another explanation in the Bankruptcy Court's order for disallowing BI's requested fees regarding the ESOP litigation was that counsel for the Committee and Debtors had discussions related to claims by the Debtors against the ESOP as early as June 22, 1998. BI further contends there is no explanation or findings of fact by the Bankruptcy Court that indicate why this justifies a reduction in fees or by how much. The Court agrees and, on remand, the Bankruptcy Court should clarify and provide support for its reasoning.

*2. Whether the Bankruptcy Court applied the wrong legal standard*

**\*9** BI also argues the Bankruptcy Court abused its discretion in disallowing requested fees for the ESOP and Insurance Trust litigation because it applied the wrong legal standard. BI argues that the wording of the December 21, 1998 order denying fees ,in part because "[t]he litigation itself [was] of questionable value to the unsecured, non-lender creditors," indicates the Bankruptcy Court erred because the statute requires the court to determine benefit with respect to the "debtor's estate," not with respect to the unsecured, non-lender creditors. *See* 11 U.S.C. § 330(a)(4)(A)(ii)(I). In the December 21, 1998 hearing on fees, when discussing whether the ESOP litigation was beneficial, the Bankruptcy Court clearly was evaluating benefit to the estate. *See* R. Exhibit ZZ, at 68 (asking "how does this benefit the estate at all?"); *id.* at 70 ("... I have to question

whether the value of services did anything for the benefit of the estate."). Thus, the reference to "unsecured, non-lender creditors," not using the precise statutory language of "debtors' estate" in the December 21, 1998 fee order, appears to be nothing more than a slip of the pen. Moreover, the Court is confident the Bankruptcy Court will apply the correct standard on remand.

*3. Whether the Bankruptcy Court arbitrarily disallowed fees to bring total professional fees below the cap required for confirmation of liquidation plan*

BI also contends the Bankruptcy Court arbitrarily reduced its fee award, as well as that of the Committee's accountants, to make total professional fees fall under the $1.2 million cap set in the liquidation plan. [FN12] The court agrees that it would be an abuse of discretion for a Bankruptcy Court to arbitrarily reduce fees to a certain externally-imposed level without undertaking an analysis of the reasonableness or necessity of such fees as required by § 330 of the Code. *See, e.g., In re Auto Parts Club,* 211 B.R. 29 (holding that Bankruptcy Court was justified in concluding Committee's attorneys should have scaled back efforts based on reasonable expected recovery to estate, but remanding for specific findings as to amount of fee award where Bankruptcy Court awarded fees in sum equal to amount the estate's primary creditor agreed to subordinate its liens in favor of law firm); *In re Metro Transp. Co.,* 107 B.R. at 53 (abuse of discretion to automatically halve fees for intra-office conference time). However, the Bankruptcy Court never stated that one of the reasons for disallowing part of BI's requested fees was to meet the fee cap. BI asks this Court to infer the Bankruptcy Court arbitrarily reduced BI's fees based on the fact that the total fees awarded were barely below the $1.2 million cap, and a statement by the bankruptcy judge during the December 21, 1998 hearing that she should look at the fee totals before making final fee determinations. BI's argument is not persuasive. The Bankruptcy judge in briefly stating her rationale for reducing BI's fee requests gave no indication that the cap played any role in her decision. Without any statement by the Bankruptcy Court that the fee cap was even one of the bases for the decision to reduce BI's fees, this Court is loathe to conclude that it was.

> FN12. BI's brief phrases the issue as whether the Bankruptcy Court erred "by disallowing portions of the professional fee requests of the counsel and *accountants* for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
**(Cite as: 1999 WL 1427681 (D.Del.))**

Page 9

the Committee." D.I. 14, at 3 (emphasis added). However, the accountants are not a party to this appeal. Therefore, the Court will not address any issues related to the accountants' fee award.

**B. Cross-appeal: Court's failure to review interim award on BI's First Fee Application prior to making such award final**

**\*10** In their cross-appeal, Debtors contend the Bankruptcy Court abused its discretion by failing to review BI's first fee award prior to making such award final. This Court must initially address the question of whether this issue can properly be raised on appeal. Issues never presented to a Bankruptcy Court are not properly preserved for appeal. *See In re Grand Union Co., 200 B.R. at 106.* Debtors framed the issue on appeal as whether the trial court erred in not revisiting the interim fee award before making it final. The record reflects, and Debtors' counsel conceded at argument, that the Bankruptcy Court was never asked to revisit its November 6 interim award on BI's first fee application prior to the Bankruptcy Court's issuance of its December 22 order making all interim fee awards final. Counsel for both the Debtors and the Secured Lenders made initial objections to BI's First Fee Application. Ordinarily, such objections without more would not preserve the issue for appeal. The duty is upon counsel to make sure objections to be preserved are brought to the attention of the bankruptcy judge, lest they get buried in a mound of paper. However, the Bankruptcy Court has an independent duty to scrutinize fee applications under *Busy Beaver, see supra*, and in this case the Bankruptcy Court appeared to explicitly hold off on making part of the necessary fee analysis at the time the interim award was made. Under these circumstances, this Court concludes the issue was properly preserved for appeal.

During the portion of the November 3, 1998 hearing regarding BI's first fee application, the Bankruptcy Court expressly found "that the services articulated in this fee petition have been provided." R. Exhibit M, at 152. However, at the time the court also stated:

> Whether the services will be beneficial to the estate is not something I can determine now because I have been keeping everything on hold specifically so I don't have to determine that at this point in time.

*Id.* at 153. Although the bankruptcy judge made a finding that BI actually provided the services set forth in the fee petition, at the time she explicitly did not pass on whether such services were in fact

"necessary" or beneficial to the debtors' estate, a required part of the fee analysis. *See* 11 U.S.C. § 330(a)(1) (court may award professional person compensation for "actual, necessary services"); *id.* § 330(a)(4)(A)(ii) (court shall not award fees for services not reasonably likely to benefit the debtor's estate or necessary to the administration of the case); *see also, e.g., In re Engel,* 190 B.R. 206, 209 & n. 3+ (Bankr.D.N.J.1995) (" 'A preliminary determination must be made that fees are in fact for "actual, necessary services[,]" ' and "[t]he majority of courts which have interpreted [§ 330(a)(1) ] have held that an element of whether such services are 'necessary' is whether they have benefitted the bankruptcy estate." (citations omitted)). A failure to do such required analysis, even absent objection, would be an abuse of discretion. *See Busy Beaver,* 19 F.3d at 841. Because the bankruptcy judge expressly held off conducting this required analysis of determining whether the fees were necessary or beneficial to the estate prior to the interim award on BI's First Fee Application, and because there is no indication in the record that the Bankruptcy Court ever revisited this issue and made the required analysis prior to making the interim award final, on remand the Bankruptcy Court should make such an evaluation and explain the resulting fee award. [FN13]

> FN13. In their brief, Debtors further contend that the Bankruptcy Court erred in granting the level of fees that it did on BI's Second and Supplemental Second Fee Applications because such fees were based on "excessive, unnecessary and duplicative billing practices and other services neither reasonably likely to benefit the Debtors' estates nor necessary to the administration of these bankruptcy cases." However, Debtors' fail to flush out this argument. Absent a more precise claim of error, this Court will not remand for the Bankruptcy Court to reconsider generally the entire second and supplementary second fee awards to BI.

**V. Conclusion**

**\*11** The current record, which lacks findings supporting the Bankruptcy Courts reasons why it was allowing BI only approximately \$20,000 out of more than \$94,000 in requested fees on its Supplemental Second Fee Application for work on the ESOP and Trust litigation, is inadequate for this Court to review. Therefore, the December 22, 1998 final order will be vacated and remanded to the Bankruptcy Court to make findings and provide further

Not Reported in F.Supp.2d                                                          Page 10
Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)
**(Cite as: 1999 WL 1427681 (D.Del.))**

explanation to support its reasoning to disallow any portion of requested fees on BI's Second Supplemental Fee Application. Although the Bankruptcy Court has already determined that BI actually performed the work for which it was awarded fees on its First Fee Application, the Bankruptcy Court expressly reserved making findings as to whether such services were beneficial to the debtor's estate at the time incurred. Therefore, on remand, the Bankruptcy Court shall make appropriate findings as to whether the services in the First Fee Application were necessary or reasonably likely to benefit the estate, and to determinate an appropriate award based on such findings.

Not Reported in F.Supp.2d, 1999 WL 1427681 (D.Del.)


**Motions, Pleadings and Filings (Back to top)**

- _____1:99cv00132_____ (Docket) (Mar. 09, 1999)

END OF DOCUMENT

A-710

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 1

☞

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
FOLKSAMERICA REINSURANCE COMPANY,
Successor-in-interest of Mony Reinsurance
Corporation, Plaintiff
v.
REPUBLIC INSURANCE COMPANY, Defendant.
REPUBLIC INSURANCE COMPANY, Third-Party
Plaintiff,
v.
AON CORPORATION, Aon Re Worldwide, Inc.,
Aon Services Group, Inc. and Aon
Specialty Re, Inc. Third-Party Defendants.
**No. 03 Civ. 0402(HB).**

Dec. 2, 2003.

**Background:** Reinsurer sought declaration of its
contractual obligations to insurer for insureds'
asbestos and silicosis-related injuries. Parties cross-
moved for summary judgment.

**Holdings:** The District Court, Baer, Jr., J., held that:
(1) New York law applied;
(2) reinsurer was not relieved from liability, despite
insurer's alleged breach of contractual obligation to
provide prompt notice when it raised its loss reserves
over fifty percent, absent showing of prejudice; and
(3) fact issue existed as to whether insurer acted
with requisite promptness when providing reinsurer
with definitive statement of loss.
Plaintiff's motion denied; defendant's motion granted
in part and denied in part.

West Headnotes

**[1] Insurance ☞1091(14)**
217k1091(14) Most Cited Cases
Under New York choice of law rules, New York law
was applicable to dispute over whether insurer had
provided reinsurer with requisite notice of claims;
though insurer and insured risk were in Texas,
reinsurance certificates had been issued in New York
and any demand for payment had to be made there.

**[2] Insurance ☞3624**
217k3624 Most Cited Cases
Provision in reinsurance certificate, requiring notice
to reinsurer when insurer raised its reserves over fifty
percent, was not condition precedent to reinsurer's
liability; provision did not set out number of days that
sufficed for prompt notice, did not expressly state
that reinsurer did not have to establish prejudice, and
did not clearly provide that reinsurer would be
relieved of liability should prompt notice not be
provided.

**[3] Insurance ☞3624**
217k3624 Most Cited Cases
Under New York law, reinsurer was not relieved
from liability, despite insurer's alleged breach of
contractual obligation to provide prompt notice when
it raised its loss reserves over fifty percent;
obligation was not condition precedent, and there was
no showing that alleged breach caused reinsurer to
suffer any actual prejudice in form of tangible
economic harm.

**[4] Insurance ☞3624**
217k3624 Most Cited Cases
Under New York law, condition precedent in third
tier reinsurance certificate,
that insurer promptly provide reinsurer with
definitive statement of loss, only applied when claim
loss became so significant that reinsurance was
actually invoked.

**[5] Federal Civil Procedure ☞2501**
170Ak2501 Most Cited Cases
Issue of material fact as to whether insurer acted with
requisite promptness when providing reinsurer with
definitive statement of loss precluded summary
judgment in suit to determine whether reinsurer was
relieved of its liability to insurer.

AMENDED

BAER, J.

*OPINION & ORDER*
**\*1** Plaintiff Folksamerica Reinsurance Co.
("Folksamerica"), in its action for a declaratory
judgment, moves pursuant to Federal Rule of Civil
Procedure ("Fed. R. Civ.P.") 56(c) for summary
judgment against defendant Republic Insurance Co.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 2

("Republic"). Republic cross-moves for summary judgment against Folksamerica. Third party defendants Aon Corp., Aon Re Worldwide, Inc., Aon Services Group, Inc., and Aon Specialty Re, Inc. [FN1] (collectively "Aon") move for summary judgment against Republic and Folksamerica. Republic also moves to strike certain paragraphs of Folksamerica's summary judgment declarations and Folksamerica's entire Rule 56.1 statement in opposition to Republic's motion for summary judgment, and for sanctions with regard to Folksamerica's violations of Fed.R.Civ.P. 36(b). For the foregoing reasons, Republic's motion for summary judgment is granted-in-part and denied-in-part, and all other motions are denied.

> FN1. On October 8, 2003, the parties stipulated to a dismissal of all claims asserted by Folksamerica and Republic against two of the four Aon entities: Aon Corporation and Aon Services Group. Therefore, future references to Aon only concern the remaining two entities, Aon Re Worldwide, Inc. and Aon Specialty Re, Inc.

## I. BACKGROUND
A. Overview of Reinsurance

As an understanding of reinsurance, and the way in which it differs from insurance, is central to this case, before turning to the facts of the instant matter, it may be worthwhile to summarize the basic tenets of reinsurance, borrowing liberally from the clearly stated introduction contained within the decade old but oft-cited Second Circuit opinion in *Unigard.*

Reinsurance occurs when one insurer (the "ceding insurer" or "reinsured") "cedes" all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. *See* 13A John A. Appleman & Jean Appleman, Insurance Law and Practice § 7681, at 480 (1976); 19 George J. Couch, Cyclopedia of Insurance Law § 80:1, at 624 (2d ed.1983). The reinsurer agrees to indemnify the ceding insurer on the risk transferred.

* * *

There are two basic types of reinsurance policies--facultative and treaty. *See generally* 1 Klaus Gerathewohl, Reinsurance Principles and Practice 64-128 (1980) (discussing various types of reinsurance coverage). In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy. Treaty reinsurance covers specified classes of a ceding insurer's policies. As the district court explained, a "typical treaty reinsurance agreement might reinsure losses incurred on all policies issued by the ceding insurer to a particular insured, while facultative reinsurance would be limited to the insured's losses under a policy or policies specifically identified in the reinsurance agreement." *Unigard,* 762 F.Supp. at 572 n. 2.

The reinsurer is not directly liable to the original insured. *See Unigard,* 79 N.Y.2d at 582, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurance involves contracts of indemnity, not liability. *Id.* at 582-83, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. *Id.* at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571. In practice, the reinsurer has no contact with the insured.

Reinsurance works only if the sums of reinsurance premiums are less than the original insurance premium. Otherwise, the ceding insurers will not reinsure. For the reinsurance premiums to be less, reinsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims. Reinsurers may thus not have actuarial expertise, *see Delta Holdings,* 945 F.2d at 1241, or actively participate in defending ordinary claims. They are protected, however, by a large area of common interest with ceding insurers and by the tradition of utmost good faith, particularly in the sharing of information.

*2 *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1053-54 (2d Cir.1993). The parties to this action intended to interact consistent with this general policy of good faith; however, a computer coding error made by Aon's predecessor, RFC, and perpetuated by Aon, resulted in Aon's inadvertent failure to recognize Republic's third-layer of reinsurance. Haley Decl. Exh. F ("RFC converted claims to its sister company's (Intere's [computer] ) system. For some unknown reason, *the third layer of* the contract for this account *did not convert. Only the first and second layers converted."* ) (emphasis added). As a result, although Republic forwarded notices to Aon, with the instruction that such notices be sent to all reinsurers, Aon failed to transmit these notices to Folksamerica. Consequently, the parties now ask the Court to interpret the reinsurance contracts that define their relationship in order to determine the consequences of these mishaps.

B. Factual Background

This dispute involves the repercussions of late notice of claims or occurrences under three identical

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 3

facultative reinsurance certificates ("the Certificates"). This Court must determine whether Folksamerica should be released from its obligation to reinsure Republic due to Republic's alleged failure to provide "notice," [FN2] as mandated by the Certificates.

> FN2. While Folksamerica characterizes all deficiencies by Republic as failures to provide timely notice, a large part of this dispute involves a determination as to which of these alleged violations in fact pertain to notice.

Folksamerica acquired its reinsurance obligations to Republic, pursuant to a transfer and assumption agreement, effective December 31, 1991, wherein Folksamerica assumed the assets and liabilities of Mony Reinsurance Corporation ("Mony Re"). The assets and liabilities that are relevant to this dispute consist of (1) two facultative reinsurance certificates covering Republic's policies of insurance with J.T. Thorpe Co., Inc. ("Thorpe"), a masonry and insulation contractor, [FN3] and (2) one facultative reinsurance certificate covering Republic's policy of insurance with Clemtex, Ltd. ("Clemtex"), a supplier and/or manufacturer of sandblasting products. [FN4] Notably, Mony Re, not Folksamerica, negotiated these three contracts - Folksamerica simply acquired the obligations that had been crafted by its predecessor.

> FN3. The applicable facultative reinsurance certificates are Facultative Casualty Reinsurance Certificate Number C13043, covering a Thorpe policy, for the period July 1, 1982 through July 1, 1983, and Facultative Casualty Reinsurance Certificate Number C14009, covering a Thorpe policy for the period July 1, 1983 through July 1, 1984.

> FN4. The applicable facultative reinsurance certificate is Facultative Casualty Reinsurance Certificate Number C10987, covering a Clemtex policy, for the period February 14, 1979 through February 14, 1980.

As a result of personal injury suits filed against both Thorpe and Clemtex, arising out of asbestos and silicosis-related injuries, Republic, the primary insurer of Thorpe and Clemtex, became exposed to millions of dollars in potential liability. Republic had several layers of reinsurance to cover its losses - with

Folksamerica at the highest level - liable only after Republic's losses reached pre-proscribed catastrophic levels. Therefore, Folksamerica was not liable when suits first commenced--its exposure arose years later when in the aggregate the losses attained significant levels. However, before the time that Folksamerica's reinsurance obligation attached, Republic sent notices, including further documentation to all reinsurers, with regard to claims under both the Thorpe and Clemtex policies, regardless of whether such submissions were required under the specific language of each reinsurance contract. Although notice at that time was likely mandatory under some agreements, Republic's notice obligation to Folksamerica, had not yet accrued, as Republic only had the duty to notify Folksamerica when it raised its reserves, with respect to these policies, above fifty percent. Unlike primary insurers or even lower level reinsurers, entities such as Folksamerica, who indemnify upper levels of loss, typically require notice only after certain trigger events have occurred, which signal to them that indemnification is imminent. Such notice serves as a forecast of potential liability and allows the reinsurer to plan and allocate properly.

*3 The Certificate language also mandates that the insurer provide the reinsurer with a definitive statement of loss ("DSOL") on all serious claims and occurrences, brought under the Certificates. The DSOL consists of particular documents from the claims file, that substantiate that the aggregate of claims warrants reinsurance, and allows the reinsurer to investigate the claims if it so chooses. The parties disagree as to how to classify the DSOL provision - either as a notice clause or as a billing supplement, and therefore also dispute when Republic acquired the obligation to submit the DSOL under each Certificate.

Republic's obligations to Folksamerica under the Certificates are further complicated by the involvement of a reinsurance broker or intermediary, who facilitated both the execution of the reinsurance and the transmission of claim documentation. The broker hired by Republic for these purposes was RFC Intermediaries, Inc. ("RFC"). Aon later succeeded to RFC's obligations, including RFC's duty to transmit reports to reinsurers, as per Republic's instructions-- instructions which included orders to transmit notices to all reinsurers at several points over the years, regardless of the particular agreements in place with each reinsurer. In several instances, with regard to Folksamerica, despite orders from Republic, Aon failed to carry out this command, due to a glitch in its

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

computer system, which hid the third layer (Folksamerica's layer) of reinsurance from Aon's view. Nonetheless, because Folksamerica also held a treaty reinsurance policy, previously maintained by Great Lakes American Reinsurance Company ("GLARC"), to indemnify Republic's Thorpe liability, Folksamerica received, in a timely fashion, certain documentation relevant to claims against Thorpe. However, these documents only referenced Folksamerica's treaty reinsurance, not its facultative reinsurance.

Exactly when Republic's notice and DSOL obligations attached, whether Republic properly discharged such obligations, and if not, what the appropriate result should be, are the points of contention in this case--all of which depend upon a determination of the proper interpretation of the Certificates' language.

C. Procedural History

Folksamerica filed its complaint in this action on January 17, 2003, seeking a declaratory judgment as to its liability under the Certificates. On May 23, 2003, Republic filed a third-party complaint against the four Aon entities. Aon filed its answer on August 22, 2003, claiming, among other things, that it served as Folksamerica's agent for purposes of delivering notice, whereupon Folksamerica amended its complaint to assert claims against Aon as a result of Aon's alleged breach of such duty. Republic filed its motion for summary judgment on August 29, 2003, Folksamerica followed suit on September 22, 2003, and Aon completed the circuit on September 26, 2003. On October 8, 2003, the parties stipulated to the discontinuance of all claims against Aon Corp. and Aon Services Group, Inc., which left only two Aon entities in the suit. On October 20, 2003, Republic filed a motion to strike portions of various declarations submitted by Folksamerica in addition to Folksamerica's Rule 56.1 statement in opposition to Republic's motion for summary judgment, and for sanctions. [FN5] This Court heard oral arguments on October 24, 2003.

FN5. The Court informed the parties at oral argument that it would not resolve these motions prior to a determination on the underlying summary judgment motions. This seemed the prudent course both because the motions were late and because it was my hope that for the most part the concerns voiced would be resolved by the Opinion. This proved to be correct with

regard to the prejudice issue. A review of the papers does not alter my views as expressed herein with regard to the choice of law issue. The prong that urges the imposition of sanctions is denied.

II. DISCUSSION
A. Summary Judgment Standard of Review

*4 Pursuant to Fed.R.Civ.P. 56(c), a district court must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action." ' *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),* quoting Fed.R.Civ.P. 1.

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all inferences against the moving party. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam ); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1947).* However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).* The disputed issues of fact must be "material to the outcome of the litigation" (*id. at 11*), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson, 477 U.S. at 248.*

"Summary judgment is particularly appropriate in resolving insurance coverage disputes, because the interpretation of an insurance policy presents a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 5

question of law." *Constitution Reins. Corp. v. Stonewall Ins. Co.,* 980 F.Supp. 124, 127 (S.D.N.Y.1997), *aff'd without opinion* 182 F.3d 899 (2d Cir.1999), *citing Freedom Gravel Prods., Inc. v. Michigan Mut. Ins. Co.,* 819 F.Supp. 275, 277 (W.D.N.Y.1993) (citation omitted). *See also Flair Broad. Corp. v. Powers,* 733 F.Supp. 179, 184 (S.D.N.Y.1990).

## B. Choice of Law

[1] The parties disagree as to which state's law should apply to the present dispute; Folksamerica argues for the application of New York law, and Republic and Aon lobby for Texas law. In diversity actions, when conflicts exist between the rules of two states, courts apply New York's choice-of-law rules to resolve the conflicts. *See Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). With regard to contract cases, New York courts determine which state's law to apply using a "center of gravity" or "contacts" test that resolves the conflict based on which state has the greater interest in the litigation, as evident from factors such as "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997). An examination of these factors suggests the application of New York law.

*5 Because reinsurance is a specialized form of business, contacts pertinent to reinsurance agreements differ from those that control with regard to other contracts, and even to those found to be most important in insurance disputes. With regard to reinsurance agreements, the state where the reinsurance certificate issued and the location where performance is expected, i.e. the place to which the ceding insurer must make its demand for payment, typically control for purposes of choice of law. *See Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 274 (2d Cir.1992) (affirming district court's application of New York law, when district court based its determination on the fact that "the reinsurance contracts were negotiated, issued, and made in New York by a New York reinsurance company ... [and] New York would be the place of performance under the contracts.") (district court quotations from *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 745 F.Supp. 150, 157 (S.D.N.Y.1990)); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co. et al.,* 887 F.2d 437, 439 (2d Cir.1989) (North Carolina law applied because reinsurer was

organized in North Carolina and "any obligation to perform on the reinsurance contract would seem to arise in North Carolina upon presentation of a claim to [the reinsurer]."); *Jefferson Ins. Co. of New York v. Fortress Re, Inc. et al.,* 616 F.Supp. 874, 877 (S.D.N.Y.1984) (Court applied law where Certificate was issued, obligation to perform arose, and offices of reinsurer were located, despite ceding insurer and location of risk in another state).

The contacts most relevant to the Certificates in this case mandate the application of New York law. First, Republic concedes that all three Certificates were "issued" in New York, when Dave Jessup, the Mony Re representative who handled the policies, counter-signed the Certificates that had already been signed by Republic's representative. Schultz Decl. ¶ 8; Jessup Decl. ¶¶ 2, 15. Additionally, the underwriting for the Certificates was performed out of Mony Re's New York office. Jessup Decl. ¶¶ 2, 13. Mony Re received payments of premiums for the reinsurance in its New York office. Jessup Decl. ¶ 10. Further, any claim for payment under the Certificates would have been presented to Mony Re's New York claim department, and payment would have been issued from there. Id. at ¶ ¶ 3, 11; see *Arkwright-Boston Mfrs. Mut. Ins. Co.,* 887 F.2d at 439. Further, as notice is the sum and substance of this case, the fact that the Certificates mandate that notice be given to "the Reinsurer," which, practically speaking, translates to the provision of notice in New York, underscores the centrality of New York to the present dispute. [FN6] Finally, while Republic underscores that negotiations concerning the layers of reinsurance and the amount of premiums occurred in Texas (Schultz Decl. ¶¶ 8-9), an assertion hotly debated by Folksamerica (Jessup Decl. ¶ 16), any negotiations concerning the Certificates themselves, which would necessarily include negotiations regarding the notice provisions, occurred at Mony Re's offices in New York (Jessup Decl. ¶ 13). As Folksamerica inherited the reinsurance obligations under the Certificates, it is noteworthy, though arguably not controlling, that Folksamerica is also a New York corporation. Am. Compl. ¶ 5.

> FN6. Republic counters almost all of Folksamerica's assertions of pertinent contacts through its presentation of the flip-sides of each claim. In this case, Republic asserts that "[i]f Republic failed to provide prompt notice (which is an allegation that it vigorously disputes), then any such failure occurred in Texas where the notices and other loss information were generated and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

sent to the reinsurance intermediary for transmission to Folksamerica." Memorandum of Law In Support of Republic's Motion For Summary Judgment ("Rep.Mem.") at 16. This Court disagrees. Where Republic generated the "notices and other loss information" is irrelevant because the Certificates mandate that Republic "notify the Reinsurer."

**\*6** Despite these obvious contacts with New York, Republic argues that Texas has a more significant interest in the present suit. In support, in addition to raising the counter-suppositions referenced *supra*, note 6, Republic argues that its office responsible for handling these Certificates was in Texas (Schultz Decl. ¶ 5), as was it's broker, RFC's office (id.¶ 6). These contacts are not controlling in this dispute. First of all, the mere fact that Republic's offices are in Texas, when premium payments as well as notice of claims were to be sent to New York, is secondary. Further, while Republic's broker was located in Texas, and Republic may have negotiated with RFC in Texas, these negotiations are less central to the main dispute. [FN7]

> FN7. While these contacts are relevant to Republic's claim for indemnification against Aon, from Aon's failure to transfer prompt notice to Folksamerica, since Republic's claim against Aon is secondary to the dispute between Republic and Folksamerica, and may never be adjudicated if Folksamerica is held liable, contacts relevant to the primary claim between Folksamerica and Republic are controlling. Further, as none of the parties has asserted that a conflict exists between New York law and Texas law with regard to agency, and in particular, a reinsurance broker's potential liability stemming from its agency role, this Court need not conduct a conflict of law analysis on the issue of third-party liability. *See B. Lewis Prods. v. Angelou*, 01 Civ. 0530, 2003 U.S. Dist. LEXIS 12655, at \*18 (S.D.N.Y. July 23, 2003) ("If there is no material conflict, a court is free to bypass the choice of law analysis and apply New York law.") (internal quotations and citations omitted).

In order to support its assertion that Texas law should apply, Republic relies most heavily on the fact that the location of the risk was in Texas. [FN8] Rep. Mem. at 1314. Republic stresses that "insurance

involves a 'special subset of contracts' and that the applicable law in insurance contract cases 'is the local law of the state which the parties understood was to be the principal location of the insured risk ...' ' Rep. Mem. at 13, quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 318, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994). While Republic is correct that the location of the risk is a critical element in a dispute over *primary insurance*, this factor is of significantly less relevance with regard to a reinsurance dispute--which involves the indemnification of the insurer by the reinsurer, and which is not directly affected by the underlying insured's location. *See Jefferson Ins. Co. of New York*, 616 F.Supp. at 877 ("If this was a suit on the underlying contract of insurance, this factor [place of risk] would weigh heavily. However, the interest of New York becomes more attenuated when the suit is premised solely on the reinsurance contract."). Because this case concerns reinsurance, not insurance, the location of the risk and locale of the claims or suits asserted against the underlying insured, are not dispositive. Therefore, between the New York contacts and greater interest, New York law must govern. [FN9]

> FN8. Republic asserts that because Clemtex and Thorpe are both "Texas insureds," "[t]he underlying claims made against Thorpe and Clemtex, which form the basis of Republic's reinsurance claim against Folksamerica, are predominantly in Texas. Rep. Mem. at 14, citing Schultz Decl. ¶ ¶ 5, 7.

> FN9. The parties go to great lengths-- Republic even devoting half of its argument on summary judgment--to argue the choice of law issue because of its potential to proscribe the outcome of this declaratory judgment. Texas law and New York law potentially diverge on an important issue-- whether a party must show prejudice from late notice when a reinsurance policy requires prompt notice as a condition precedent. New York does not require reinsurers to prove prejudice in such cases (*see Christiana Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 272 (2d Cir.1992); *Unigard Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576, 582, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992)), while Texas does (at least in the insurance context) (*see Ins. Co. of No. Am. v. McCarthy Bros. Co.*, 123 F.Supp.2d 373, 379 (S.D.Tex.2000)). For purposes of this analysis, I have

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 7

assumed that Texas would adopt its insurance rule in the reinsurance context (as it would make little practical sense for the repercussion of late notice to be more lax in the reinsurance context, where notice is far less critical), and have concluded that New York law should apply.

C. "Notice" Provisions

While no one disputes that this case is about alleged late notice, Folksamerica posits an additional provision to be included under the notice umbrella that Republic and Aon classify otherwise. Therefore, the role of this Court is four-pronged: (1) to determine which provision(s) are notice provisions, (2) to determine whether those provisions require notice as a condition precedent to Folksamerica's duty to be bound by its reinsurance obligations, (3) to analyze the remainder of the contested provisions, even if not notice provisions in the prior sense, to determine whether Republic breached its duty to Folksamerica, and if so, (4) to determine the repercussions of any such violation.

Not only do the parties dispute whether one particular provision pertains to notice, but they also disagree as to whether the undisputed notice provision requires prompt notice as a condition precedent to liability. As a preliminary matter, the fact that the parties are not in accord as to whether a specific provision requires notice as a condition precedent, does not necessarily render the contract ambiguous. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan et al., 7 F.3d 1091, 1094 (2d Cir.1993)* ("Ascertaining whether or not a writing is ambiguous is a question of law for the trial court.") (citations omitted). Although it is true that "a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning" (*id.*) (internal quotations and citations omitted), "a court may not [ ] find ambiguity" in a reinsurance contract "where none exists" (*United Capital Corp. v. Travelers Indem. Co. of Il., 237 F.Supp.2d 270, 274-75 (E.D.N.Y.2002)*). And, as the "interpretation or construction of an insurance policy presents a question of law to be decided by the court" (*McGinniss v. Employers Reins. Corp., 648 F.Supp. 1263, 1266 (S.D.N.Y.1986)*), this Court has authority to determine, as a matter of law, the appropriate interpretation and construction of the language at issue.

1. Notice Provisions

*7 [2] The notice provisions (in bold) contained within the three relevant Certificates are identical, and include the following language relevant to Republic's obligations:

A....The Company shall furnish the Reinsurer with a copy of its policy and all endorsements thereto and as a condition precedent agrees to notify the Reinsurer promptly of all changes which in any manner affect this Certificate of Reinsurance....
* * * *
C. As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit. [FN10] The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to fifty (50) percent of the Company's retention specified in item 3 of the Declarations....

> FN10. Because of Folksamerica's reliance on the connection between the "as a condition precedent" language in the first sentence and the "also" connector in the second sentence, the first sentence, although not a notice provision, is quoted in this section for purposes of clarity.

Haley Decl. Ex. A. As is clear from reading the above language, although the Certificates explicitly require notice of changes in the policy *as a condition precedent,* [FN11] the Certificates do not expressly require prompt notice of a claim or occurrence where the Company created a loss reserve of fifty percent, *as a condition precedent.* However, despite the lack of textual support, Folksamerica asserts that the second provision also requires notice *as a condition precedent.* [FN12]

> FN11. Although Folksamerica asserts in its moving papers, that Republic did not provide prompt notice of changes to the policy, and lists the following events, which allegedly triggered this duty: (a) Republic's "drop down" in 1990 and alleged assumption of the coverage for one of Clemtex's insolvent primary insurers; (b) Republic's settlement of the declaratory judgment action against Thorpe in January 2001; and (c) the earlier than anticipated payout of funds, in 2001, under this settlement, with regard to Republic's settlement of the declaratory judgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 8

action against Thorpe, Folksamerica fails to identify how any of these events served to "change" the policy. Folk. Mem. at 6, 9-10, 12, 16. Further, at oral argument, Folksamerica's counsel conceded, with regard to the "changes" provision, that "in the context of the issues on late notice under the facultative certificates it is irrelevant." Oral Arg't, 10/24/03, at 14:15-25–15:4. Therefore, as Folksamerica has rescinded its assertion that Republic breached this provision, this Court need not analyze this clause any further.

FN12. Folksamerica relies heavily on Judge Leisure's decision in *Constitution Reins. Corp., 980 F.Supp. 124,* to support its theory that the provision about notice of loss reserves increases is a *condition precedent.* Folk. Mem. at 17. However, while the reinsurance Certificate there contained the identical notice provision, the issue of how to interpret the notice clause was never raised, nor did the Court discuss this issue in its Opinion. Rather, the Opinion centered largely on the provision requiring submission of a definitive statement of loss ("DSOL"), an issue about which there was no dispute. Therefore, *Constitution Reinsurance* lends no support to Folksamerica's argument that the notice clause is also a condition precedent.

Folksamerica supports its interpretation by asserting that the "as a condition precedent" language in the first sentence modifies the second sentence as well– as it contends is clear from the use of the word "also." [FN13] Folk. Reply Mem. at 7-8 ("... we return to the text of the Mony Re certificates, which each establish, as a condition precedent for coverage, prompt notice under two circumstances, set forth in two adjoining sentences. [As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit. The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to fifty (50) percent of the Company's retention specified in Item 3 of the Declarations."] ) (bracketed language in block quote) (footnotes omitted). Folksamerica's reading simply defies basic rules of sentence construction. Although it is true that the word "also," signifies another responsibility, it is not the case that

the connector makes evidence that the responsibility is also a condition precedent. And, because "[c]ourts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition" (*see Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 691, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995); Restatement [Second] of Contracts § 227(1), (3)), any doubt must be resolved against a finding of a condition precedent. "This interpretive preference is especially strong[,]" in cases such as this one, "when a finding of express condition would increase [and in this case mandate] the risk of forfeiture by the obligee." *Id.* Therefore, the general policy disfavoring forfeiture of contractual responsibilities dictates that this second sentence not be treated as a condition precedent.

FN13. Remarkably, at oral argument, Folksamerica even asserted that the first two sentences comprise one sentence–despite the fact that this reading is contrary to both the express language and the punctuation. Oral Arg't, 10/24/03, 3-4 (THE COURT: But what I would like you to tell me if you would is what evidence [that] [sic] you presented to show that the sentence which seems to and [sic] [be a] central issue here about the "company shall also notify the reinsurer promptly of any claim or occurrence" would be read as a condition precedent by ceding companies entering into contracts with you or your predecessor.. MR. CAPUDER: Because, your Honor, the sentence that contains that language begins with the wording that a condition precedent-–THE COURT: That sentence begins. I think I read you that sentence. I didn't see that. MR. CAPUDER: The sentence itself begins with the phrase that it is a condition precedent to hold to coverage.)

*8 Further, the fact that Mony Re, when drafting this Certificate, expressly made certain requirements condition precedents, implies that provisions that do not contain such express language should be interpreted differently. *See, e.g. Int'l Fid. Ins. Co. v. Rockland,* 98 F.Supp.2d 400, 412 (S.D.N.Y.2000) ("Sophisticated lawyers, such as those drafting standard forms ... must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning."). When so much turns on how this second sentence is read, I cannot

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 9

now add language that was not apparent upon signing. [FN14] *Millgard Corp. v. Cruz,* 99 Civ. 2952, 2003 U.S. Dist. LEXIS 20928, at *11 (S.D.N.Y. Nov. 18, 2003) ("courts may not by construction add or excise terms ... and thereby make a new contract for the parties under the guise of interpreting the writing.").

> FN14. It would be unfair for the Court now to interpret the Certificates to require notice of reserves increases as a condition precedent, when the Certificates did not clearly express such a requirement to Republic and to any other companies that have contracted with Folksamerica under similar language. While Republic certainly knew of its duty to provide notice, it did not, and should not have understood this requirement to be backed by such draconian consequences should it fail, even through no fault of its own, to comply. Clearly, a reinsurance contract that expressly provides for prompt notice as a condition precedent would be far less marketable to sophisticated players than the one utilized by Folksamerica, as under the former, ceding companies would be well-aware that the consequences of inadvertent late notice would be catastrophic. Folksamerica may not have it both ways.

Not only is Folksamerica's interpretation defied by basic tenets of contract law, but it also runs contrary to instructions contained within what appears to be a well-known treatise--one whose editor Folksamerica respects enough to quote. [FN15] According to that author, the following language should be utilized to achieve prompt notice as a condition precedent to recovery:

> FN15. Folksamerica block cites a passage contained within what it deems "a leading reinsurance text--Strain's, *Reinsurance,* (The College of Insurance, 1980). *See* Pl. Mem. at 22 (citing discussion of the intermediary's role).

As a condition precedent to recovery under this Contract, the Company shall advise the Reinsurer promptly (within 30 days of notice to Company) of all losses that may result in a claim under this Contract and of all subsequent developments thereto which may materially affect the position of the Reinsurer. The Company acknowledges that it is not necessary for the Reinsurer to establish

prejudice resulting from any late notice of claim or loss and noncompliance by the Company with its obligations to notify the Reinsurer of any claim or loss, whether prejudicial or not, shall automatically relieve the Reinsurer of any liability with respect to that loss. [FN16]

> FN16. While this Court does not hold that language short of this exemplary clause will be insufficient to achieve a condition precedent, this clause helps to uncover the numerous inadequacies in Folksamerica's assertion that the notice provision in the Certificates is a condition precedent.

Robert W. Strain, *Reinsurance* 344 (Revised ed., Strain Publishing & Seminars, Inc.1996). Unlike the provision utilized by Folksamerica (which Strain explains is not to be construed as a condition precedent), the above provision (1) specifies to what the condition precedent refers, (2) sets out the number of days that suffice for prompt notice, (3) expressly states that the Reinsurer need not establish prejudice, and (4) clearly provides that the Reinsurer will be relieved of liability should prompt notice not be provided. A sophisticated corporation such as Mony Re would have, or at least should have, known how to make its notice provision a condition precedent, and indeed did so in the same Certificates, but either failed, or chose not to do so, with regard to this particular notice requirement. *See, e.g. In re Jacobowitz,* 296 B.R. 666, 672 (Bankr.S.D.N.Y.2003) ("business persons are generally held to a high level of accountability in record keeping"); *Talcott Natl. Corp. v. North St. Assocs.,* 77 Civ. 5859, 1979 U.S. Dist. LEXIS 9565, at *26 (S.D.N.Y. Sept. 26, 1979) (In the context of determining whether failure to disclose was material, court considered the conduct of defendants "in light of the fact that they were both sophisticated businessmen."). Therefore, this Court concludes as a matter of law that the provision requiring notice to the reinsurer when Republic raised its reserves over fifty percent, is not a condition precedent to Folksamerica's liability.

2. Prejudice Suffered From Failure to Provide Prompt Notice

*9 [3] Because the Certificates do not require prompt notice as a condition precedent, assuming that Republic violated the notice provision, in order to succeed on its claim for forfeiture under New York law, Folksamerica must prove that it suffered prejudice from the unreasonable delay in notice. New

Not Reported in F.Supp.2d                                                                                Page 10
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

York law provides an escape hatch for *insurers* when policy holders do not strictly follow notice provisions proscribed in contracts; this is so even when such contracts do not require prompt notice as a condition precedent. *See Unigard Sec. Ins. Co., Inc.,* 79 N.Y.2d at 581, 584 N.Y.S.2d 290, 594 N.E.2d 571 ("It is settled New York law that the notice provision for a primary insurer operates as a condition precedent and that the insurer need not show prejudice to rely on the defense of late notice"), citing *Sec. Mut. Ins. Co. v. Acker-Fitzsimons Corp.,* 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). New York law however drastically limits the availability of this remedy in the *reinsurance* context - only offering such relief when the provision clearly and expressly requires notice as a condition precedent. *See Unigard Security Ins. Co., Inc.,* 4 F.3d at 1063 ("we certified to the New York Court of Appeals the following question: 'Must a reinsurer prove prejudice before it can successfully invoke the defense of late notice of loss by the reinsured?' The Court of Appeals answered in the affirmative."); *Unigard Security Ins. Co., Inc.,* 79 N.Y.2d at 582, 584 N.Y.S.2d 290, 594 N.E.2d 571 ("There is nothing in this provision or elsewhere in the North River certificate indicating that the parties intended that the giving of notice should operate as a condition precedent"), comparing *Liberty Mut. Ins. Co. v. Gibbs,* 773 F.2d 15, 16-17 (1st Cir.1985) (certificate specifically provided that notice "is a condition precedent to any liability under this policy."). Such treatment makes complete sense as a result of the difference between the positions of the reinsurer and the primary insurer.

These differences in the contractual undertakings of reinsurers and primary insurers have consequences of critical importance, as courts in other jurisdictions have found. A reinsurer is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement. Unlike a primary insurer, it may not be held liable to the insured for a breach of these duties. Settlements, as well as the investigation and defense of claims are the sole responsibility of the primary insurer; and settlements made by the primary insurer are, by express terms of the reinsurance certificate, binding on the reinsurer. Thus, failure to give the required prompt notice is of substantially less significance for a reinsurer than for a primary insurer.
*Unigard Sec. Ins. Co., Inc.,* 79 N.Y.2d at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571 (internal citations omitted) (emphasis added).

As discussed above, the notice provision in the

Certificates does not require notice as a condition precedent, and therefore, if breached, [FN17] Folksamerica is required to prove prejudice in order to be relieved from its reinsurance obligation. Any relevant prejudice as a result of late notice must take the form of *tangible economic* injury. The loss of the right to associate does not suffice. *Unigard Sec. Ins. Co., Inc.,* 4 F.3d at 1068-69.

> FN17. Because Folksamerica has not proven prejudice from Republic's alleged failure to provide prompt notice under the Certificates, it is unnecessary for this Court to determine, as a matter of law, whether Republic's notice was indeed late - the result under either answer is the same - Folksamerica is liable to Republic. If Republic provided prompt notice, Folksamerica is obviously tied to its obligation to remit payment. And, even if Republic grossly violated its notice obligations, because Folksamerica has not proven prejudice, Folksamerica must still indemnify Republic.

*10 Despite notice of the possibility that it would have to assert prejudice in order to be relieved from its obligations to Republic, as early as the interrogatory stage, when Republic expressly questioned Folksamerica with regard to the prejudice it suffered, [FN18] and throughout the briefing of the three summary judgment motions that led up to this Opinion, Folksamerica has stood firm in its contention that it need not prove prejudice. Folksamerica has never even attempted to prove prejudice - its only submission with regard to prejudice was a declaration from its in-house counsel, that outlined potential prejudice claims, in order to substantiate its request to have an *additional opportunity* to prove prejudice should the Court deem it necessary. Haley Decl. ¶ 6. [FN19]

> FN18. Portions of Republic's Interrogatories and Folksamerica's Responses, contained within Van Tol Decl. Ex. A., Haley Decl. ¶ 3, are excerpted herein. (*INTERROGATORY NO. 5.:* Do you contend that Folksamerica suffered any prejudice as a result of the lack of notice alleged in Paragraph 16 through 29 of the Complaint? If so, identify any such prejudice that Folksamerica alleges it suffered as a result of late note under the Thorpe Reinsurance Certificates; *RESPONSE TO INTERROGATORY NO.5.:* Folksamerica objects to this interrogatory as requesting information not necessary or

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Page 11

material to the issues present in this litigation and not likely to lead to the discovery of admissible evidence. Subject to and not waiving such objection, under New York law, as stated in this Circuit, prejudice is irrelevant because the certificates at issue require prompt notice by Republic as a condition precedent to payment, and for that reason Folksamerica has not contended that it suffered prejudice. *INTERROGATORY NO.11.:* Do you contend that Folksamerica suffered any prejudice as a result of the lack of notice alleged in Paragraphs 40 through 53 of the Complaint? If so, identify any such prejudice that Folksamerica alleges it suffered as a result of late notice under Clemtex Reinsurance Certificate; *RESPONSE TO INTERROGATORY NO.11.:* Folksamerica objects to this interrogatory as requesting information not necessary or material to the issues present in the litigation and not likely to lead to the discovery of admissible evidence. Subject to an[d] not waiving such objection, under New York law, as stated in this Circuit, prejudice is irrelevant because the certificates at issue require prompt notice by Republic as a condition precedent to payment, and for that reason Folksamerica has not contended that it suffered prejudice.)

FN19. Despite the fact that Folksamerica had ample opportunity to assert and substantiate a showing of prejudice, in the three summary judgment motions and was provided an additional chance at oral argument, this Court even invited, well-nigh pleaded with Folksamerica to discuss prejudice in a post argument letter brief. In this letter, instead of highlighting its proof of prejudice in its submissions before the Court, Folksamerica again reiterated its request for yet another opportunity to prove prejudice. Folk. Post Argument Letter Brief ("Letter Brief") at 7. ("Folksamerica again requests the opportunity to prove prejudice if this court intends to hold that Folksamerica is required to prove prejudice. The paragraphs in the above referred to Haley Declaration that followed this request (paras.7-18) were not an attempt by Folksamerica to prove prejudice, as was apparent since they followed a request to be given the opportunity to prove prejudice, and rather were merely intended as a preliminary demonstration to show that the request had substance.").

This aside, the assertions of prejudice by Folksamerica have no basis in fact, and therefore, could not be substantiated by Folksamerica at trial. First, Folksamerica alleges that it suffered tangible economic harm from its inability to provide prompt notice to its retrocessionaires. Haley Decl. ¶ 12. However, Folksamerica fails even to allege (let alone substantiate) that any of its retrocessionaires have asserted late notice defenses themselves. Van Tol Decl. Ex. A, R at 105-09, 159-60, H at 127. [FN20] Second, Folksamerica points to the fact that the late notice caused it to post late reserves, and led to its being under-reserved for a period of time, and consequently caused it to lose tax deductions. Haley Decl. ¶ 12. However, Folksamerica fails to show how its limited period of being under-reserved caused it to suffer any economic harm. Van Tol Decl. Exh. O at 165, S at 141-42, 44. When compared to Folksamerica's overall reserves, any additional missed reserves are inconsequential (Van Tol Decl. Exh. O at 172-73), and when coupled with the fact that Folksamerica posts reserves in the asbestos arena for losses that are incurred but not reported ("IBNR"), any shortfalls would have been covered. (R. Mem. at 22; Van Tol Decl. Ex. W at 29, X at 43-44, Q at 12). Folksamerica itself concedes that "this factor standing alone might be argued not to satisfy a need to show prejudice." Haley Decl. ¶ 8. Further, any missed deductions for the Thorpe and Clemtex claims would only amount to about $1.5 million, hardly material when compared to the hundreds of millions that Folksamerica takes in loss deductions each year. R. Mem. at 23. And, Folksamerica also admits that it was never reprimanded or even contacted by any regulatory agency with regard to any reserve deficiencies. Van Tol Decl. Ex. W at 53. Folksamerica's third assertion, that it suffered prejudice because its relationship with Republic and Aon has been strained by this lawsuit, when it was Folksamerica that initiated the matter in the first place, is akin to the fellow who killed his parents and then pled for mercy because he was an orphan, and is too far-fetched to warrant further discussion. Lastly, [FN21] Folksamerica's assertion, without further explanation, that it has suffered "premium issues" (Van Tol Decl. Exh. S at 141:23-24), if meant to refer to its inability to raise Republic's premiums upon renewal, lacks merit, as the Certificates were never renewed.

FN20. Folksamerica also asserts that if and when it submits payment to Republic, its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-721

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

retrocessionaires may refuse indemnification because they deem Folksamerica's payment to be in bad faith. Even prior to this Court's Opinion and Order, mandating payment to Republic, the retrocessionaires, in lieu of the "follow your fortunes" clause in all reinsurance contracts, would have likely been obligated to indemnify Folksamerica against its failure to challenge the payment. *See Unigard Sec. Ins. Co., Inc., 79 N.Y.2d at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571.* But, after this Opinion, any refusal on the part of Folksamerica's retrocessionaires to indemnify can most certainly be remedied by Court Order.

FN21. Additionally, Folksamerica's assertion that its lack of notice of claims against Thorpe and Clemtex caused it to pay an inflated price when it acquired Mony Re lacks merit as Folksamerica purchased Mony Re in 1991, when Republic's reserves for Thorpe and Clemtex were only $1 and $180,000, respectively - and therefore had not yet triggered Republic's notice obligations.

*11 Perhaps Folksamerica gambled it would never have to prove prejudice-- that it would prevail on both its contract interpretation arguments and on its choice of law assertion. While Folksamerica won the bet with regard to choice of law, it lost on its interpretation arguments. Had Folksamerica suffered actual prejudice in the form of tangible economic harm, it strains credulity to believe it would not have provided evidence of such prejudice, and instead sought an opportunity in the future to prove a material element of its claim. In lieu of Folksamerica's concession, and an unsurprising dearth of evidence of prejudice, this Court finds as a matter of law, that Folksamerica did not, and therefore could not, prove that it suffered prejudice from any alleged late notice on the part of Republic.

Folksamerica cites two cases in support of its position that it should be provided another opportunity to prove prejudice - both of which are inapposite. In *Christiania,* the Second Circuit held that the district court should have found that notice was due at an *earlier* date; therefore the reinsurer's concession that it did not suffer prejudice was no longer conclusive. *See Christiania Gen. Ins. Co., 979 F.2d 268, 278 (2d Cir.1992)* ("Although Christiania conceded it could demonstrate no prejudice as a

result of the two-month delay from April to June 1987, it does not follow that if it is determined after a trial that Great American's duty to provide notice arose at some point in time before April 1987, Christiania would not be able to demonstrate prejudice by virtue of the longer delay."). In this case, Folksamerica asserts that it should have received notice as early as 1991, when claims were first filed against the underlying insureds. While this Court need not calculate exactly when notice was due, it is beyond question, that under this Court's interpretation of the Certificates, notice was due long after 1991. [FN22] The fact that Folksamerica could not prove prejudice under its inflated interpretation supports the view that Folksamerica would most certainly be unable to prove prejudice under this Court's interpretation, which requires notice at a significantly later point in time. In the other case cited by Folksamerica, *Booking,* a case about late notice to the *primary* insurer, the Second Circuit reversed the district court's refusal to consider the choice of law issue, and determined that Texas law not New York law applied. Therefore, the Court remanded to provide the insurer with an opportunity to prove prejudice, as it was required to do under Texas law. *See Booking v.. General Star Mgmt. Co., 254 F.3d 414 (2d Cir.2001).* Because *Booking* involved insurance, where the law in New York is well-settled that whether or not a notice provision is a condition precedent, there is no obligation to prove prejudice, and the conflict of law question was not raised, the insurer had no duty to assert prejudice in the alternative. However, in this case, because it involves reinsurance, where even under New York law, prejudice must be shown if the provision is not a condition precedent, the status of the notice provision was directly at issue, and the conflict of law issue was raised and briefed extensively, Folksamerica was clearly "on notice" of the potential need to prove prejudice. Folksamerica has failed to provide any supportable ground to warrant yet another opportunity to prove prejudice. *See Fed.R.Civ.P. 1* (the federal rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). Therefore, Folksamerica has neither proven prejudice nor provided sufficient grounds to warrant yet another attempt. Consequently, Folksamerica may not escape liability by virtue of late notice.

FN22. As a general matter, reserves of fifty percent translate to the establishment of reserves above $4 million for Thorpe and $2 million for Clemtex, on any claim or occurrence. Aon Letter Brief at 2-3.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Republic raised its loss reserves to these heights, at the earliest, in 2000 for Thorpe and 2002 for Clemtex. Rep. Letter Brief at 3-4.

3. Definitive Statement of Loss

**\*12** [4] Unlike the notice provision, it is undisputed that the DSOL provision requires submission of the DSOL as a condition precedent to Folksamerica's duty to remit payment. However, Folksamerica and Republic/Aon have a vastly different view as to how to classify the DSOL requirement, and, more importantly, as to *when* the DSOL provision requires submissions to be made. For purposes of clarity, I will quote the DSOL provision again:

C. As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit

Folksamerica asserts that the DSOL provision requires notice [FN23] of all claims and occurrences that involve death, serious injury, or a lawsuit, relevant to the coverage year of the reinsurance, regardless of whether the claims are significant enough to invoke Folksamerica's third-tier reinsurance. [FN24] Folk. Letter Brief at 1-2. In contrast, Republic and Aon assert that the DSOL is not required until an advanced stage when the claims have amounted to such significant losses, that the reinsurance is actually invoked, and the ceding company has billed the reinsurer. Rep. Letter Brief at 1; Aon Letter Brief at 1. Because the meaning presented by Republic and Aon, unlike the proposal by Folksamerica, renders all provisions of the Certificate sensible, this Court finds that such reading must, as a matter of law, apply.

FN23. Folksamerica cites to *Constitution Reins. Corp.*, 980 F.Supp. 124, as authority for its assertion that the DSOL provision, as a notice provision, obligated Republic to provide *notice* in the form of the DSOL of all claims that involved death, serious injury or lawsuit, that pertained to the coverage years of its reinsurance. Although *Constitution Reinsurance* is indeed a case from this district that interprets similar Certificate language, there are several reasons why that Court's discussion of the DSOL provision under the heading of "Prompt Notice" is of little if any precedential value here. First, unlike this

case where lawsuits trickled in over the course of several years, and did not until a later date amass the aggregate loss to trigger Folksamerica's liability, *Constitution Reinsurance* involved a scenario whereby one catastrophic event occurred, arguably triggering the ceding company's duty to provide notice and the duty to submit the DSOL. Second, the *Constitution Reinsurance* Court's interpretation of the DSOL provision as a notice requirement was universally accepted and endorsed by the parties, and therefore was never challenged in the district court proceeding. Third, while Stonewall did challenge the district court's interpretation of the DSOL provision on appeal, Constitution Reinsurance attacked this challenge as improper as Stonewall had failed to raise this argument below. While it is impossible to divine the rationale behind the Second Circuit's affirmance - as it was without opinion - it is likely that the Court did not consider arguments raised for the first time on appeal (*see Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("a federal appellate court does not consider an issue not passed upon below.")) - and therefore there is no binding authority mandating a particular interpretation of the DSOL provision contained within the Certificates. Finally, and perhaps most importantly, as is discussed more fully *infra*, the Certificates at issue here contain an additional contractual requirement, not referenced by the *Constitution Reinsurance* Court, and therefore likely missing from the operative Certificate there, that makes the interpretation adopted by the *Constitution Reinsurance* Court inoperable here.

FN24. However, Larry Lande, an employee in Folksamerica's claims department, conceded at his deposition that a notice of loss and a DSOL are different, and that "the notice of loss necessarily does not contain all of the information that a definitive statement of loss will have." Lande Dep., 6/24/03 and 8/12/03, at 33; 13-22.

The DSOL comprises those materials that must be submitted to the reinsurer as a condition precedent to the reinsurer's duty to remit payment. Haley Decl. Exh. A ("DEFINITIVE STATEMENT OF LOSS Shall consist of those parts or portions of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Company's investigative claim file which in the Judgment of the Reinsurer are wholly sufficient for the Reinsurer to establish adequate loss reserves and determine the propensities of any loss reported hereunder."). By definition, "upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations." Rep. Mem. at 20-21. Obviously, Folksamerica's interpretation of the DSOL as a notice provision, [FN25] that requires substantiation of all claims and occurrences involving the reinsurance year makes the DSOL, as defined by the Certificate, inoperable. Under Folksamerica's interpretation, Republic was obligated to provide Folksamerica with prompt notice of all claims and occurrences, involving coverage years, substantiated by detailed reports from the claims files, *even if the claims or occurrences did not trigger the reinsurance,* and upon receiving the DSOL, Folksamerica would be bound promptly to remit payment to Republic, despite the fact that no payment was actually due under the Certificates. As a result of the interplay between the receipt of the DSOL and the duty to submit the reinsurance payment, the DSOL provision must, in order to have practical effect, be triggered at a later date than (or, in the case of catastrophic claims, simultaneously with) the notice provision. *See Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272 (2d Cir.1992) ("a court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms.") (citations omitted); Restatement Second of Contracts § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). The only viable reading of the DSOL mandates that it be read to require a detailed billing, promptly after submission of a summary invoice, as a condition precedent to Folksamerica's duty to remit its reinsurance payment. Folksamerica's attempt to transform the DSOL provision into a second notice provision is simply unworkable.

FN25. It is clear that Folksamerica would have preferred to have had a notice provision tied to claims or occurrences, not to the raising of reserves. The following provision, would have better achieved Folksamerica's wishes: "The Company shall advise the Reinsurer promptly of all losses which, in the opinion of the Company, may result in a claim under this Contract and of all subsequent developments thereto which may affect the position of the Reinsurer."

Richard M. Shaw, "Casualty Excess of Loss," in Robert W. Strain, ed., *Reinsurance Contract Wording* 345 (Revised ed.1996). However, as is conceded by Lande, the Certificates do not contain such a provision. Lande Dep. 6/24/03, 8/12/03, at 214:10-17 (Lande conceded that the Certificates did not require notice of a claim or occurrence at the time the claim or occurrence was brought or was made known to Republic).

*13 Because the DSOL provision, unlike the relevant notice provision, is drafted as a condition precedent, if violated by Republic, Folksamerica need not prove prejudice in order to avoid its reinsurance obligation. *See Unigard Security Ins. Co., Inc.,* 4 F.3d at 1063. Therefore, in order to determine whether Republic violated the DSOL requirement, it is necessary to discern when Republic first acquired the duty to submit the DSOL. [FN26] Although the parties do not specifically address the function of the word "promptly" in this context, this Court finds, by way of analogy to requirements of prompt notice, that the mandate of "prompt" submission limits the amount of allowable time between the ceding company's bill submission and its transmittal of the DSOL, to that of a reasonable time. *See, e.g., Christiania Gen. Ins. Co.,* 979 F.2d at 275. "New York courts have held that the question whether notice was given within a reasonable time may be determined as a question of law when (1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." *Constitution Reinsur. Corp.,* 980 F.Supp. at 130, citing *State of New York v. Blank,* 27 F.3d 783, 797 (2d Cir.1994). In the notice context at least, "it is only when no excuse is offered for delay, or when no credible evidence supports the proffered excuse, that notice will be held untimely as a matter of law." *Hartford Fire Ins. Co. v. Masternak,* 55 A.D.2d 472, 390 N.Y.S.2d 949, 952 (4th Dep't 1977).

FN26. It should be noted that had the provision not included the word "promptly," I would have determined that there was no date upon which Republic's duty to provide Folksamerica with the DSOL attached. Rather, any delay would just cause a similar delay in Republic's receipt of payment. However, because the provision includes the word "promptly," there is a requirement that the DSOL be submitted within a reasonable time after the bill has been issued.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

Because, at the time this action commenced, Republic had not yet billed Folksamerica under Clemtex, Republic's obligation to provide the DSOL had not yet arisen. Therefore, despite the fact that the parties dispute when the DSOL was provided (Folksamerica claims submission was made in November 2002 (Folk. Letter Brief at 5), Republic and Aon assert submission in July 2002 (Rep. Letter Brief at 2; Aon Letter Brief at 2)), as this submission was premature, this Court finds as a matter of law, that Republic did not violate the DSOL provision as per its obligations under Clemtex.

[5] On the other hand, it is undisputed that, at the time Folksamerica filed this action, Republic had already billed Folksamerica under Thorpe. Republic asserts that it sent initial bills to Folksamerica in March, April, and May 2002 (Rep. Letter Brief at 1); Aon states that Republic first billed Folksamerica in May 2002 (Aon Letter Brief at 1). Folksamerica asserts that Republic sent invoices in April 2002. Folk. Letter Brief at 5. While this factual dispute is not extensive, the parties are in greater disagreement over when the DSOL was submitted. Folksamerica asserts that the DSOL was never voluntarily provided, and was only made available during an audit in November 2002. Id. at 5, 390 N.Y.S.2d 949. Republic asserts that on May 3, 2002, it sent the DSOL, consisting of various reports and information, to Larry Lande of Folksamerica [FN27] (Rep. Letter Brief at 2), and Aon claims that Republic submitted the DSOL as early as April 2, 2002 (Aon Letter Brief at 1). The parties' varying assertions suggest that anywhere from no delay to an eight month delay in submission of the DSOL under Thorpe may have occurred. Therefore, the determination of (1) the length of Republic's delay, if any, in its submission of the DSOL for the Thorpe Certificates, and (2) whether such delay, if any, was reasonable, [FN28] involve material issues of fact, and may not be resolved on a motion for summary judgment.

FN27. It should be noted that Republic asserts as an excuse for any delay in submitting a DSOL, that it had been promptly submitting reports and files to Aon, who, because of a computer glitch, did not properly and promptly forward such documents to Folksamerica. The determination of whether this excuse is valid, along with the determination of whether the DSOL was indeed late, entails analysis of Aon's role as the agent of Folksamerica or Republic. Because it may first be determined that whatever delay (if

any) in submission of the DSOL to Folksamerica was not unreasonable, whereby obviating the need to conduct these inquiries, this Court deems it premature to undergo an analysis and determination of such issues at this time.

FN28. Republic asserts that because Folksamerica had notice of the Thorpe claims, and indeed had detailed reports regarding Thorpe, from its receipt of such documentation with regard to its separate treaty reinsurance policy, GLARC, for Thorpe. Folksamerica had constructive notice of the Thorpe claims, and therefore cannot assert any late notice defenses. If it is later determined that Republic's delay, if any, in submitting the DSOL under Thorpe was unreasonable, Republic may then raise this claim of constructive notice. Because the need to resolve this issue may never arise, it would be improper for the Court now to resolve this contingent issue.

III. CONCLUSION

*14 For the foregoing reasons, (1) Republic's motion for summary judgment is granted-in-part and denied-in-part, (2) Folksamerica's motion for summary judgment is denied, and (3) Aon's motion for summary judgment is denied. Republic's motion to strike portions of several of Folksamerica's Declarations in addition to its Rule 56.1 Statement and for sanctions for alleged violations of Fed.R.Civ.P. 36(b) is denied. This Court finds as a matter of law that Republic's violations of any notice provisions contained within the Certificates do not relieve Folksamerica of its obligation to indemnify Republic. Further, this Court concludes as a matter of law that with regard to Clemtex, Republic did not violate the DSOL provision. However, summary judgment on the following issues of fact, with regard to the Thorpe Certificates, is inappropriate: (a) whether Republic violated the DSOL provision in the Thorpe Certificates, due to untimely submission, (b) whether the untimeliness, if any, of Republic's submission of the DSOL under Thorpe was unreasonable, and (c) whether, if such violations are deemed unreasonable, Republic's proffered excuse that Aon is the party at fault or that Folksamerica had constructive notice as a result of GLARC, or any other defense, will be credited. The trial will commence on December 8, 2003. In anticipation of the trial, all voir dire, requests, and any in limine motions must be fully submitted by December 1, 2003, as explained in my scheduling notice of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 16
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
(Cite as: 2003 WL 22852737 (S.D.N.Y.))

November 6, 2003. The Clerk of the Court is ordered
to close all pending motions. Any request to adjourn
the trial will be entertained in a teleconference to
chambers today, November 25, 2003, or Monday
December 1, 2003.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 22852737
(S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

- _____1:03cv00402_____(Docket)
(Jan. 17, 2003)

END OF DOCUMENT

A-726

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.