# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

In re:                                              : CHAPTER 11
                                                    :
CORAM HEALTHCARE CORP. and                          : CASE NO. 00-3299 (MFW)
CORAM, INC.,                                         : (Jointly Administered)
                                                    :
      Debtors.                                    :
                                                    :
_____                     :
                                                    :
UBS SECURITIES LLC,                                 : CIVIL NO. 04-1558-SLR
                                                    :
      Appellant,                                  :
                                                    :
    v.                                               :
                                                    :
CORAM HEALTHCARE CORP., et al.,                     :
                                                    :
      Appellee.                                   :
                                                    :
_____                     :

---

## BRIEF OF APPELLEE, ARLIN M. ADAMS, CHAPTER 11 TRUSTEE OF CORAM HEALTHCARE CORP. AND CORAM, INC.

---

On appeal from the United States Bankruptcy Court for the District of Delaware.

Barry E. Bressler
Richard A. Barkasy
Michael J. Barrie
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA, 19103-7286
(215) 751-2000

and

Bradford J. Sandler (#4142)
ADELMAN LAVINE GOLD & LEVIN, P.C.
Suite 710
919 North Market Street
Wilmington, Delaware 19801-1292
(302) 654-8200

Attorneys for Appellee,
Arlin M. Adams, Chapter 11 Trustee

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES .............................................................................. iii

ISSUES PRESENTED ......................................................................................... 1

STANDARD OF REVIEW .................................................................................. 1

COUNTER STATEMENT OF THE CASE ...................................................... 2

ARGUMENT ...................................................................................................... 10

I.     THE BANKRUPTCY COURT'S INTERPRETATION OF ITS OWN
RETENTION ORDER SHOULD NOT BE DISTURBED ON APPEAL. ................ 10

II.    EVEN IF THE BANKRUPTCY COURT WAS NOT INTERPRETING ITS
OWN RETENTION ORDER, BUT WAS INSTEAD INTERPRETING THE
TERMS OF THE ENGAGEMENT AGREEMENT, ITS DECISION
SHOULD NOT BE OVERTURNED. ...................................................................... 11

    A.   UBS Is Not Entitled To The Valuation Fee Because, As The Bankruptcy Court
Ruled, The Effective Date Of The Debtors' Plan Of Reorganization Was A
Condition Precedent To Payment Of Such Fee. ..................................................... 11

    B.   The Language Of The Engagement Agreement Clearly Created A Condition
Precedent. ................................................................................................................ 13

    C.   The Bankruptcy Court Did Not Err By Refusing To Substitute
"Trustee" For "The Company" As Urged By The Committee. ............................... 14

    D.   The Bankruptcy Court's Ruling That Confirmation Of A Plan
Of Reorganization Proposed By The Debtors Was A Condition
Precedent To UBS's Right To A Valuation Fee Did Not Render
Any Provision Of The Engagement Agreement Meaningless. ................................ 15

    E.   The Retention Of A Financial Advisor On A Contingent Fee Basis Is Neither
Improper Nor Unusual. ........................................................................................... 16

    F.   UBS And The Committee's Subjective, Unexpressed Intent Is Irrelevant. .............. 17

III.  THE BANKRUPTCY COURT ENFORCED THE UNMISTAKABLE
LANGUAGE IN THE RETENTION AGREEMENT AND UBS DID NOT
SUFFER A DISPROPORTIONATE FORFEITURE. ......................................... 19

IV.  THE BANKRUPTCY COURT CORRECTLY DECLINED TO HEAR
PAROL EVIDENCE BECAUSE THE TERMS OF THE RETENTION
ORDER AND THE ENGAGEMENT AGREEMENT WERE
UNAMBIGUOUS. ................................................................................................... 23

V.    IF THE COURT DETERMINES THAT THE BANKRUPTCY COURT
ERRED, THE COURT SHOULD REMAND THIS MATTER TO THE
BANKRUPTCY COURT FOR FURTHER PROCEEDINGS. .......................... 24

**CONCLUSION** ......................................................................................................... **26**

PHDATA 1325318_1

## TABLE OF AUTHORITIES

**Cases**

. *In re Fed. Mogul-Global, Inc.*, 348 F.3d 390 (3d Cir. 2003)...................................................... 10

*Amies v. Wesnofske*, 174 N.E. 436 (N.Y. 1931) ......................................................................... 13

*Bernstein v. Sosnowitz*, 198 A.2d 204, 205 (N.Y. App. 1993) ..................................................... 24

*Casse v. Key Bank Nat'l Ass'n*, 198 F.3d 327 (2d Cir. 1999)....................................................... 11

*Deep v. Copyright Creditors*, 122 Fed. Appx. 530 (2d Cir. 2004) ............................................... 11

*Deutsch v. Kennsington Publishing Corp.*, 1982 U.S. Dist. LEXIS 15448 (S.D.N.Y. Oct. 5, 1982) ............................................................................................................................ 13, 14

*Greenfield v. Phillies Records, Inc.*, 98 N.YS. 2d 560 (2002)..................................................... 14

*Hanley v. Sevilla Restaurant & Bar*, 1997 U.S. Dist LEXIS 652 (S.D. N.Y. 1997).................... 18

*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911)....................... 18

*In re Bono Dev., Inc.*, 8 F.3d 720 (10th Cir. 1993)................................................................... 2, 10

*In re Cedar Chem. Corp.*, 294 B.R. 224 (Bankr. S.D.N.Y. 2003)........................................... 23, 24

*In re Commercial Fin. Servs., Inc.*, 298 B.R. 733 (10th Cir. B.A.P. 2003)................................... 25

*In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) ("*Coram I*") ...................... 3

*In re Coram Healthcare Corp.*, 315 B.R. 321, 327 (Bankr. D. Del. 2004) ("*Coram II*").. 3, 5, 6, 7

*In re County Seat Stores, Inc.*, 280 B.R. 319 (Bankr. S.D.N.Y. 2002)................................... 14, 15

*In re Farmland Indus., Inc.*, 397 F. 3d 647 (8th Cir. 2005)........................................................ 16

*In re Fed. Mogul-Global, Inc.*, 348 F.3d 390 (3d Cir. 2003)......................................................... 10

*In re Grand Union Company*, 200 B.R. 101 (D. Del. 1996) ......................................................... 2

*In re High Voltage Eng'g. Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004). ................................... 10

*In re Merry-Go-Round Enters., Inc.*, 400 F.3d 219 (4th Cir. 2005) ......................................... 2, 10

*In re Mount Laurel Res.*, 258 B.R. 652 (S.D. W. Va. 2001) ......................................................... 2

*In re Mount. Laurel Res.*, 258 B.R. 652 (S.D. W.Va. 2001) ................................................... 10, 11

*In re Zenith Elecs. Corp.*, 241 B.R. 92  (Bankr.D. Del. 1999); ............................................. 16, 17

*In re Zinchiak*, 406 F.3d 214 (3d Cir. 2005) ................................................................................ 10

*In the Matter of Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir. 1989).................................... 1

*In the Matter of Weber*, 25 F.3d 413 (7th Cir. 1994).................................................................. 11

*O'Boyle v. DuBose-Killeen Prop., Inc.*, 430 S.W.2d 273 (Tex. App. 1968) ............................... 13

*Oppenheimer & Co., Inc. v. Oppensheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995) ................................................................................................................................ 19

*Preferred Mortgage Brokers, Inc. v. Hevin Byfield, et al.*, 282 A.D.2d 589 (N.Y. App. Div. 2d Sept. 2001) ........................................................................................................... 22

*Prince George's Country Club, Inc. v. Carr*, 202 A.2d 354 (Md. 1964) ..................................... 13

Restatement (Second) Contracts § 277 ........................................................................................ 22

*Scheiderer v. Producers Credit Corp.*, 2005 Bankr. LEXIS 861 (6th Cir. BAP May 19, 2005) ........................................................................................................................................ 18

*Slamow v. Delcol*, 584 N.Y.S.2d 424 (N.Y. App. 1992) ............................................................ 18

*Utica Alloys, Inc. v. Alcoa Inc.,* 303 F. Supp. 2d 247 (N.D.N.Y. 2004) ...................................... 23

*Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253 (3d Cir. 1995) ....................... 1, 2

**Statutes**

11 U.S.C. § 330 ............................................................................................................................. 15

 **Other Authorities**

*Propsperity Partners, Inc. v. Bonilla*, 374 F. Supp.2d 290 (E.D.N.Y. 2005) .............................. 24

Restatement (Second) Contracts § 277 ........................................................................................ 22

PHDATA 1325318_1

## ISSUES PRESENTED

1.      Should the Bankruptcy Court's interpretation of its own order approving the retention of appellant be disturbed on appeal?

2.      Assuming *arguendo* that the Bankruptcy Court was interpreting the terms of an agreement and not its own order, should this Court overturn the Bankruptcy Court's decision that appellant was not entitled to the Valuation Fee (as defined below) because of a failure of occurrence of an unmistakable condition precedent?

3.      Assuming *arguendo* that the Bankruptcy Court was interpreting the terms of an agreement and not its own order, did the Bankruptcy Court err by not adopting an alternative interpretation for the condition precedent or excusing the condition precedent where the condition precedent was expressed in unmistakable language, appellant conceded on several occasions that a condition precedent existed, and appellant suffered no forfeiture because it was paid a blended rate of $334 per hour without the Valuation Fee?

4.      Assuming *arguendo* that the Bankruptcy Court was interpreting the terms of an agreement and not its own order, did the Bankruptcy Court err by not hearing parol evidence where the terms of the Engagement Agreement (as defined below) were unambiguous, and such language should be construed against the appellant-draftee?

## STANDARD OF REVIEW

The well-established standard of review adopted by appellate courts reviewing a bankruptcy court's award of professional fees is abuse of discretion.  *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 258 (3d Cir. 1995); *In the Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1325 (5th Cir. 1989) ("Since bankruptcy judges have discretion in

determining attorney and trustee's fees, we will reverse a determination of fees only upon abuse of discretion."). "A bankruptcy court has broad discretion to award fees." *In re Grand Union Co.*, 200 B.R. 101, 106 (D. Del. 1996) (applying abuse of discretion standard on appeal). An abuse of discretion occurs when a bankruptcy judge fails to apply the proper legal standard, fails to follow proper procedures in making fee determinations, or bases an award on findings of fact that are clearly erroneous. *See Zolfo*, 50 F.3d at 257.

The deference which should be afforded the Bankruptcy Court's fee determination is much greater here because it turns on the Bankruptcy Court's interpretation of its own order approving the employment of the appellant. A bankruptcy court's determination as to the meaning of its own order is entitled to "substantial deference." *In re Merry-Go-Round Enters., Inc.*, 400 F.3d 219, 227 (4th Cir. 2005); *In re Bono Dev., Inc.*, 8 F.3d 720, 721-22 (10th Cir. 1993); *In re Mount Laurel Res.*, 258 B.R. 652, 658 (S.D. W. Va. 2001).

## COUNTER STATEMENT OF THE CASE

Citing the nearing maturity date of certain debt obligations and a need for compliance with a federal law prohibiting physicians from referring certain patients to them, Coram Healthcare Corporation ("CHC") and Coram, Inc. ("CI," and together with CHC, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code") on August 8, 2000 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Appendix ("App.") at A-4, Docket Index No. ("D.I." ) 1. As of the Petition Date, Cerberus Partners, L.P. ("Cerberus"), Foothill Capital Corporation ("Foothill"), and Goldman Sachs Credit Partners L.P. ("Goldman," and together with Cerberus and Foothill, the "Noteholders") held

more than $252 million in unsecured notes issued by the Debtors.  *In re Coram Healthcare Corp.,* 271 B.R. 228, 232 (Bankr. D. Del. 2001) ("*Coram I*").

On August 22, 2000, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"), under Section 1102 of the Bankruptcy Code.  *Id.*  The Creditors' Committee had three members, two of the Noteholders (Goldman and Foothill) and Aetna U.S. Healthcare, which held a claim of $2 million.  *Id.*  The Creditors' Committee retained Chaim Fortgang, Esquire, then of Wachtell, Lipton, Rosen & Katz, as its lead counsel.[1]  App. at A-29, D.I. 253.

The Debtors filed what is termed a "pre-packaged" bankruptcy, meaning in this case that the Debtors negotiated a proposed plan of reorganization with the Noteholders prior to the Petition Date and filed that pre-negotiated plan on the Petition Date.  *Id.*  This proposed plan of reorganization (the "First Plan") provided for:  (a) the cancellation of all CHC shareholder interests, (b) the issuance of new stock representing 100% of the Debtors' equity to the Noteholders, and (c) a *pro rata* payment of $2 million to all other general unsecured creditors.  *In re Coram Healthcare Corp.,* 315 B.R. 321, 327 (Bankr. D. Del. 2004) ("*Coram II*").  The Noteholders and the Noteholder dominated Creditors' Committee supported the First Plan.  *Coram I*, 271 B.R. at 231.

In connection with valuation issues, the Debtors retained Chanin Capital Partners LLC ("Chanin") to provide certain "financial advisory services" including an enterprise valuation of the Company and court testimony with respect to the enterprise valuation.  App. at A-5, D.I. 12.  The terms of Chanin's retention, which the Bankruptcy Court approved, included (a) a monthly fee of $115,000 for Chanin's services, (b) reimbursement of Chanin's expenses,

---

[1] After Mr. Fortgang left Wachtell, Lipton, Rosen & Katz, Theordore Gewertz, Esquire replaced Mr. Fortgang as lead counsel for the Creditors' Committee.

and (c) a transaction fee of $300,000 (for work performed on, among other things, an enterprise valuation). The "transaction fee" was payable to Chanin upon confirmation of a plan of reorganization approved by the Company's board of directors. (*See* Letter of Aug. 1, 2000 from Eric Scroggins to Daniel D. Crowley, Supplemental Index ("Supp. App.") at B-103). Chanin neither sought nor received its "transaction fee," because "the Company's board of directors" did not approve the plan of reorganization ultimately confirmed by the Bankruptcy Court. (*See* Final Fee App. Of Chanin Capital Partners LLC, for Allowance of Compensation and for the Reimbursement of Expenses for Services Rendered During the Period from Sept. 19, 2000 Through Mar. 7, 2002, Supp. App. B-75-84).

Even though the Debtors had retained Chanin, the Creditors' Committee decided to hire its own financial advisor to assist it in its support of the Debtors' First Plan. Accordingly, the Creditors' Committee hired UBS Warburg LLC (now UBS Securities LLC) ("UBS") to provide a back up valuation and to assist it in preparation at cross-examination of witnesses for the Equity Committee, which opposed the Debtors' First Plan. The Committee filed an application to retain UBS on November 29, 2000. As disclosed to the Bankruptcy Court, UBS would be compensated, subject to Bankruptcy Court approval, by payment of a monthly fee and a contingent valuation fee. The monthly fee of $50,000 was "payable in advance on the 21st day of each month" beginning the fourth month after the date of UBS's retention (the "Monthly Fee"). App. at A-648. Unlike the Monthly Fee that was payable on a date certain, the $700,000 contingent fee was payable "on the effective date of the Company's plan of reorganization" (the "Valuation Fee"). *Id.*

The Bankruptcy Court held a hearing with respect to UBS's retention on December 1, 2000. At that hearing, the Bankruptcy Court confirmed that all fees charged by

UBS would be subject to a review for "reasonableness" under Section 330 of the Bankruptcy Code. Supp. App. at B-9. On December 12, 2000, the Bankruptcy Court entered an Order approving the retention of UBS (the "Retention Order"). App. at A-681-82. In the Retention Order, the Bankruptcy Court quoted from the Retention Agreement verbatim with respect to the Monthly Fee, ordering that the "Monthly Fee shall be payable in advance on the 21st day of each month, for which a Monthly Fee is payable." App. at A-682. With respect to the contingent Valuation Fee, the language of the Order differed from the engagement letter stating that: "the Valuation Fee $700,000 is to be paid to UBSW at the time of the effective date of the Debtors' plan of reorganization." *Id.*

In the year 2000, Chanin performed two enterprise valuations in support of the First Plan, concluding that the Debtors' value was $207 million as of July 31, 2000 and $189 million as of December 4, 2000. Supp. App. at B-2 & B-4. UBS provided a third enterprise valuation in support of the Debtors' First Plan that backed up Chanin's two previous valuations and concluding that the Debtors' valuation was between $170 million to $215 million. Supp. App. at B-16.

The Bankruptcy Court denied confirmation of the First Plan, finding that incomplete disclosure of the relationship between the Debtors' Chief Executive Officer, Daniel D. Crowley, and one of the Noteholders (Cerberus), precluded it from finding that the First Plan was proposed in good faith, a statutory requirement for plan confirmation. *Coram I*, 271 B.R. at 232.

Thereafter, the Debtors created a special committee of independent directors (the "Special Committee") to review the Debtors' affairs and propose a new plan of reorganization. *Coram II*, 315 B.R. at 327. The Bankruptcy Court approved the Special Committee's retention

of Goldin Associates, L.L.C. ("Goldin") to perform an impartial investigation.  On July 31, 2001,

after Goldin completed its investigation and made a report, the Debtors filed their Second Joint

Plan of Reorganization with the Bankruptcy Court (the "Second Plan").  The Second Plan,

similar to the terms of the First Plan, incorporated Goldin's recommendations and included

provisions for:  (a) payment of up to $3 million (instead of $2 million) to holders of general

unsecured claims, (b) payment of up to $10 million to holders of CHC equity interests, if certain

conditions were met (i.e., the CHC shareholders, as a class, voted to accept the Second Plan and

no creditors objected based on the absolute priority rule), (c) the cancellation of all CHC

shareholder interests, and (d) the issuance of 100% of the Debtors' equity to the Noteholders.

Supp. App. at B-21-66.

        At the confirmation hearing of the Second Plan, which occurred over seven days,

Chanin testified as to a third enterprise valuation concluding that the Debtors' value was $224

million as of October 1, 2001.  Supp. App. at B-73.  UBS performed a second valuation to back

up Chanin's third valuation, opining that as of November 5, 2001, the Debtors' value was

between $150 million to $190 million.  Supp. App. at B-70.  Goldin Associates, L.L.C. also

performed a valuation that supported the Second Plan and concluded that the Debtors' value was

$246 million as of August 31, 2001.  Supp. App. at B-68.   On December 21, 2001, the

Bankruptcy Court denied confirmation of the Second Plan for the reasons set forth in *Coram I*,

which were not related to valuation.  *Coram II*, 315 B.R. at 327.

        Following the denial of the Second Plan, the Bankruptcy Court granted the

motion for appointment of a chapter 11 trustee to oversee the Debtors' operations and to

facilitate the reorganization process.  *Id.* at 328.  On March 7, 2002, the Court approved the

United States Trustee's selection of Arlin M. Adams, Esquire as the Chapter 11 Trustee in the

Debtors' bankruptcy cases (the "Trustee"). *Id.*

On May 2, 2003, the Trustee filed the Chapter 11 Trustee's Joint Plan of

Reorganization, which was subsequently amended and modified (the "Trustee's Plan"). *Id.* The

Equity Committee filed a competing plan of reorganization on December 19, 2002 (the "Equity

Committee's Plan"). *Id.* After a protracted confirmation hearing to consider the competing

plans was held over a span of twelve days between September 30, 2003 and April 20, 2004, the

Bankruptcy Court entered an Order as of October 31, 2004, granting confirmation of the

Trustee's Plan and denying confirmation of the Equity Committee's Plan. The Trustee's Plan

became effective on December 1, 2004. App. at A-552, D.I. 4015.

Unlike the two plans proposed by the Debtors, which plans UBS was hired to

support, the Trustee's Plan provided, among other things, the following: (a) cash payment to the

general unsecured creditors of 100% of their allowed pre-petition claims plus the possibility of

payment of post-petition interest, (b) an estimated pro-rata distribution of $40 million[2] to CHC's

common shareholders in exchange for the cancellation of their equity in CHC, (c) a settlement

with the Noteholders whereby the Noteholders released their preferred stock and their remaining

notes and made a $56 million contribution to the Debtors' estates, (d) retention by the

reorganized entity of $10 million in working capital, (e) the dissolution of CHC, and (f) issuance

of all the common and preferred stock in the reorganized entity to the Noteholders. *Coram II*,

315 B.R. at 328.

On or around October 31, 2003, UBS filed the First and Final Fee Application of

UBS Securities LLC, as Financial Advisors to the Official Unsecured Creditors' Committee, for

---

[2] Provided the administrative claim of the former CEO for in excess of $16 million in bonus
compensation is denied.

Final Allowance of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses for the Period November 21, 2000 Through October 27, 2003 (the "Fee Application").  Supp. App. at B-113.  In the Fee Application, UBS requested final allowance of professionals fees and reimbursement of expenses as follows: (i) $700,000 for the Valuation Fee, which had been contingent upon the confirmation of the Debtors' plan of reorganization; (ii) $47,085.85 for expenses incurred (the "Expense Reimbursement"); and (iii) $450,000.00 for Monthly Fees of $50,000.00 per month for a nine month period beginning from March 21, 2001 continuing through December 20, 2001.  Supp. App. at B-120.

As disclosed in the Fee Application, UBS worked a total of 1,349 hours from November 21, 2000 trough October 27, 2003 and sought fees of $1,150,000 ($700,000 Valuation Fee and $450,000 in Monthly Fees).  Supp. App. at B-114.   If awarded both the Valuation Fee and Monthly Fee, UBS would have realized a blended hourly rate of more than $850 per hour. With an award of $450,000, UBS has realized a blended hourly rate of approximately $334 per hour.

The Trustee timely objected to the Final Fee Application on several grounds. First, the Trustee objected to the allowance of the $700,000 contingent Valuation Fee because, as the Retention Order and the Engagement Agreement made clear, payment of such fee was contingent upon confirmation of the Debtors' plan of reorganization.  Supp. App. at B-196-97. Second, the Trustee objected to the allowance of reimbursements of $30,545.70 for monies paid by UBS to Convington & Burling, UBS's counsel, because the retention and scope of such services were not approved in advance by the Bankruptcy Court as required by the Engagement Agreement.  *Id.* at B-197-98.  Finally, the Trustee believed that the Monthly Fees were

unreasonable for six of the nine months because UBS performed no services during those months.  Supp. App. at B-198.

A hearing on the Fee Application and the Trustee's objection thereto was held before the Bankruptcy Court on October 18, 2004.  App. at A-683.  At the hearing, Chief Judge Mary F. Walrath held that UBS was not entitled to the contingent Valuation Fee.  Interpreting the meaning of its own Retention Order, the Bankruptcy Court ruled:

> With respect to the valuation fee, I think that I'll disallow the $700,000 valuation fee since there was a condition precedent and that was the effective date of the debtor's plan of reorganization.  I don't think despite the way the language is written, although a fee arose, [it] is not payable unless the effective date occurs and the effective dates [sic] has not occurred and presumably won't occur.

App. at A-695.

With respect to the fee reimbursements, the Bankruptcy Court ruled that attorneys' fees could not be paid under the clear terms of the engagement letter since no separate application was filed.  *Id.*  However, with respect to the Monthly Fees, the Bankruptcy Court found they were due and payable and therefore awarded $450,000 to UBS denying the Trustee's objection in part.  *Id.*

On November 24, 2004, UBS filed its Notice of Appeal from the November 15, 2005 Order.  On January 5, 2005, Kevin Gross, Esquire was appointed as mediator.  On August 19, 2005, Mr. Gross filed a Mediator's Report stating the parties had engaged in good faith settlement negotiations but had reached an impasse and desired to proceed with the appeal.

For the reasons set forth below, Appellee Arlin M. Adams, Esquire, the Chapter 11 Trustee of the Bankruptcy Estates of CHC and CI, respectfully requests that the Court enter an Order Affirming the Bankruptcy Court's Order of November 15, 2005.

## ARGUMENT

I.    **THE BANKRUPTCY COURT'S INTERPRETATION OF ITS OWN RETENTION ORDER SHOULD NOT BE DISTURBED ON APPEAL.**

UBS contends that the Bankruptcy Court's order should be reversed because Chief Judge Walrath's "reading of the Engagement Agreement was clearly erroneous." UBS's argument misses the mark completely because in ruling on UBS's fees, the Bankruptcy Court correctly interpreted its own Retention Order.

The Creditors' Committee employed UBS under Section 1103 of the Bankruptcy Code. Accordingly, the Retention Order (and not the Engagement Agreement) governed the terms and conditions of UBS's employment.[3] The Retention Order provided that "the valuation fee of $700,000 is to be paid to UBSW at the time of the effective date [of] the Debtors' plan of reorganization." App. at A-682. Chief Judge Walrath correctly interpreted her own Retention Order when she determined that the effective date of the Debtors' plan of reorganization was a condition precedent of paying the Valuation Fee to UBS. Contrary to UBS's belief, the Bankruptcy Court did not interpret the terms of a private contract between an investment banker and its client. *Id.*

A bankruptcy court is well suited to provide the best interpretation of its own order. *In re Zinchiak*, 406 F.3d 214, 224 (3d Cir. 2005). Consequently, a bankruptcy court's determination as to the meaning of its own order must be afforded "substantial deference." *In re Merry-Go-Round Enters., Inc.*, 400 F.3d at 227; *In re Bono Dev., Inc.*, 8 F.3d at 721-22; *In re Mount. Laurel Res.*, 258 B.R. at 658; *see also Deep v. Copyright Creditors*, 122 Fed. Appx. 530,

---

[3] In a retention order, the bankruptcy court may impose terms and conditions of a professional's employment that vary from those sought in the employment application. *See e.g. In re Fed. Mogul-Global, Inc.*, 348 F.3d 390 (3d Cir. 2003); *In re High Voltage Eng'g. Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004).

PHDATA 1325318_1

531 (2d Cir. 2004) (the bankruptcy court's interpretation of its order "warrants customary appellate deference" and should not be disturbed "absent a clear abuse of discretion"); *Casse v. Key Bank Nat'l Ass'n*, 198 F.3d 327, 333 (2d Cir. 1999) (the appellate court should defer to a bankruptcy court's interpretation of an ambiguous provision of its own order); *In the Matter of Weber*, 25 F.3d 413, 416 (7th Cir. 1994) ("a bankruptcy court's interpretation of a confirmed plan is subject only to deferential review").

Chief Judge Walrath was in the best position to interpret her own Retention Order. *See In re Mount. Laurel Res. Co.*, 258 B.R. at 658 ("Because the bankruptcy court was directly engaged in the earlier proceedings, it had a better vantage point to make a determination on its earlier order."). Chief Judge Walrath was uniquely aware of the terms and conditions upon which she approved of UBS's employment as a financial advisor to the Creditors' Committee. As a result, her determination in this regard should not be disturbed on appeal.

## II.    EVEN IF THE BANKRUPTCY COURT WAS NOT INTERPRETING ITS OWN RETENTION ORDER, BUT WAS INSTEAD INTERPRETING THE TERMS OF THE ENGAGEMENT AGREEMENT, ITS DECISION SHOULD NOT BE OVERTURNED.

### A.    UBS Is Not Entitled To The Valuation Fee Because, As The Bankruptcy Court Ruled, The Effective Date Of The Debtors' Plan Of Reorganization Was A Condition Precedent To Payment Of Such Fee.

UBS seeks reversal of the Bankruptcy Court's ruling that the effective date of the Debtors' plan of reorganization constituted a condition precedent to payment of the Valuation Fee, alleging that it constitutes an inappropriate interpretation of the Engagement Agreement. The Bankruptcy Court's decision should not be disturbed, even if the Bankruptcy Court did interpret the Engagement Agreement (and did not merely explain the meaning of its own Retention Order). The Bankruptcy Court's determination regarding the terms and conditions of

UBS's employment was consistent with well-established principles of contract construction and represents the only reasonable reading of the Engagement Agreement.

At the time that the Engagement Agreement was executed, Coram's first plan of reorganization was pending and was the only plan of reorganization that had been filed. The Committee supported Coram's proposed plan and joined forces with the Debtors at the confirmation hearing. The Committee wanted to retain UBS as its financial advisor to provide expert valuation testimony at the confirmation hearing and to help assist its counsel in preparing to cross-examine witnesses called by the Equity Committee, which objected to Coram's plan on several grounds.

Similar to the Retention Order, the Engagement Agreement provides that "the Committee, subject to the approval of the Bankruptcy Court pursuant to the Retention Order or otherwise, shall cause the Company to pay UBSW on the effective date of the Company's plan of reorganization seven hundred thousand dollars ($700,000.00). (the 'Valuation Fee')." App. at A-648. This language makes it clear that UBS was not entitled to be paid a Valuation Fee unless and until the Debtors' plan of reorganization it was retained to support was confirmed and became effective.

Despite the efforts of UBS and the Committee, the Bankruptcy Court denied confirmation of both of the Debtors' proposed plans of reorganization. After confirmation of the Debtors' second plan was denied, the Trustee was appointed and ultimately the Bankruptcy Court confirmed a substantially different plan proposed by the Trustee. As Judge Walrath determined, UBS did not earn a Valuation Fee because the condition precedent – confirmation of a plan proposed by the Debtors – did not occur.

PHDATA 1325318_1

**B.    The Language Of The Engagement Agreement Clearly Created A
Condition Precedent.**

UBS now contends that the language of the Engagement Agreement was
insufficient as a matter of law to create a condition of payment.  This argument fails because it is
well-settled that "a promise can be made conditional by using language fixing the time of
performance." *Prince George's Country Club, Inc. v. Carr*, 202 A.2d 354, 361 (Md. 1964).  As
the Court of Appeals of New York explained in the oft-cited case of *Amies v. Wesnofske*, 174
N.E. 436, 437 (N.Y. 1931), "the employment of such words as 'when,' or 'after,' or 'as soon as,'
clearly indicate that a promise is not to be performed except upon a condition."  *See also*
*O'Boyle v. DuBose-Killeen Prop., Inc.*, 430 S.W.2d 273, 277 (Tex. App. 1968) (the use of words
such as "when," "after," "as soon as," "when the sale is completed," "at the date of passing title"
or "upon consummation of deal" clearly indicate a promise is not to be performed except upon
fulfillment of the condition).  As the Bankruptcy Court correctly found, the language of the
Retention Order and the Engagement Agreement that the Valuation Fee would be paid on the
effective date of the Debtors' plan, clearly created a condition precedent to UBS's entitlement to
a Valuation Fee.

This case is similar to *Deutsch v. Kennsington Publishing Corp.*, 1982 U.S. Dist.
LEXIS 15448 (S.D.N.Y. Oct. 5, 1982) in which the plaintiff free-lance editor, publisher and
writer contracted with the defendant publishing firm to contact certain individual authors whose
material had previously been published to obtain for defendant re-publication rights to that
material.  Pursuant to the terms of the contract, plaintiff was to receive an upfront payment of
$3,000 for his efforts, plus additional sums "within thirty (30) days of receipt of a contract signed
by the author or author's agent or other such representative, which has been negotiated by
[plaintiff]."  *Id.*  at *2.  The evidence showed that plaintiff made efforts to acquire properties for

13

the defendant, but those efforts did not result in defendant's contracting with any author or author's representative for the acquisition of re-publication rights.  The plaintiff received the $3,000 upfront payment, but the defendant refused to further compensate him.

Like UBS in this case, the plaintiff contended that he was due additional compensation on the completion of his efforts and that the contractual language merely set a schedule for payment of vested compensation.  The court in *Deutsch* disagreed with the plaintiff finding that "[t]he use of the language 'within thirty days of receipt' clearly establishes that plaintiff's right to further compensation does not vest except on the occurrence of the bargained-for- condition."  *Id.* at *4.  Likewise, UBS is not entitled to the Valuation Fee.

### C.    The Bankruptcy Court Did Not Err By Refusing To Substitute "Trustee" For "The Company" As Urged By The Committee.

UBS argues that the Bankruptcy Court should have read the "on the effective date of the Company's plan of reorganization" contained in paragraph 3(a) of the Engagement Agreement as meaning on the effective date of any plan proposed by the Trustee or any other "conceivable party." *See* Appellant's Brief on Appeal from U.S. Bank. Court's Nov. 15, 2004 Order ("UBS Brief"), at p. 12.  To the contrary, a written agreement should be enforced "according to the plain meaning of its terms."  *Greenfield v. Phillies Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. App. Div. 2002).  Here, the plain meaning of the term "the Company" does not include "Trustee."

Similar contract language was addressed in *In re County Seat Stores, Inc.*, 280 B.R. 319 (Bankr. S.D.N.Y. 2002), a case in which a bankruptcy trustee filed an action against former officers and directors of the debtor alleging, *inter alia*, that they breached their fiduciary duties to the debtor.  The debtor's directors' and officers' liability insurance policy provided that the insurer was not liable to make any payment for a loss in connection with a claim "brought by

any insured or by the company; or which is brought by any security holder of the company." *Id.* at 322. The insurance carrier asserted that it was not required to provide coverage for the trustee's claims because the "company" should be interpreted as including the trustee. The bankruptcy court disagreed, holding that "[i]f the trustee is asserting the claim, the exclusion is not triggered because he is not the company or an insured." *Id.* at 324. In explaining its ruling, the court noted that "[a] bankruptcy trustee is a legal entity separate and distinct from the debtor." *Id.* at 325.

Since the Bankruptcy Court's ruling was consistent with the plain meaning of the language of the Engagement Agreement, it should be upheld.

**D.      The Bankruptcy Court's Ruling That Confirmation Of A Plan Of Reorganization Proposed By The Debtors Was A Condition Precedent To UBS's Right To A Valuation Fee Did Not Render Any Provision Of The Engagement Agreement Meaningless.**

UBS contends that the Bankruptcy Court's interpretation of the Retention Order and the Engagement Agreement as containing a condition precedent renders meaningless the provision of the Engagement Agreement which states that the Valuation Fee would be earned upon execution of the agreement. To the contrary, these provisions are not inconsistent. The "earned upon execution" language merely clarifies that no specific quantity of services need be performed before the flat Valuation Fee would be earned. However, that the fee would still not be payable unless and until a specific event occurred. Thus, for instance, if all of the objections to the Debtors' plan of reorganization had been resolved by agreement and UBS did not have to complete its valuation analysis or testify, it would have been entitled to its full Valuation Fee, subject to the Bankruptcy Court's review of the reasonableness of UBS's compensation under 11 U.S.C. § 330.

**E.      The Retention Of A Financial Advisor On A Contingent Fee Basis Is Neither Improper Nor Unusual.**

UBS argues that the Bankruptcy Court's decision should be reversed because a contingent fee is inconsistent with its ability to perform an objective valuation of the company and that a contingent fee arrangement was "unheard of" in the investment banking industry. These arguments relating to the contingent nature of the Valuation Fee fail for several reasons.

First and foremost, UBS's position that a contingent fee is somehow inappropriate is undermined by its own position as to the proper reading of the Engagement Agreement. UBS contends that the "of the Company's Plan" language of the Engagement Agreement should not be read as making the Valuation Fee contingent upon confirmation of a plan proposed by Coram, but instead contingent upon "any plan proposed by any other conceivable party." *See* UBS Brief at 12. Under UBS's suggested interpretation, the Valuation Fee would still be contingent upon the confirmation of a Chapter 11 plan of reorganization in the Coram case and would not be payable if there was another outcome of the bankruptcy proceedings, such as conversion to Chapter 7 or dismissal of the case.

Contrary to UBS's argument, there is nothing untoward or unusual about the use of a contingent fee. Section 328(a) of the Bankruptcy Code specifically authorizes the employment of professional persons on a contingent fee basis. Moreover, "[m]any retention agreements with investment bankers, financial advisors (and even counsel) contain contingent fee arrangements." *In re Zenith Elecs. Corp.*, 241 B.R. 92, 102 (Bankr.D. Del. 1999); s*ee also In re Farmland Indus., Inc.*, 397 F. 3d 647 (8th Cir. 2005) (portion of fees of unsecured creditor's committee's and unsecured bondholder's committee's financial advisors contingent upon amounts ultimately recovered by the employing committee).

In fact, in this case, the Debtors retained Chanin as its financial advisors to provide certain "financial advisory services" including an enterprise valuation of the Company. Supp. App. at B-81. The terms of Chanin's retention, which the Bankruptcy Court approved, included a transaction fee of $300,000 (for work performed on, among other things, an enterprise valuation) payable to Chanin upon confirmation of a plan of reorganization approved by the Company's board of directors. (*See* Letter of Aug. 1, 2000 from Eric Scroggins to Daniel D. Crowley, Supp. App. B-103). Chanin neither sought nor received its "transaction fee," because the "Company's board of directors" did not approve the plan of reorganization ultimately confirmed by the Bankruptcy Court. (*See* Final Fee App. Of Chanin Capital Partners LLC, for Allowance of Compensation and for the Reimbursement of Expenses for Services Rendered During the Period from Sept. 19, 2000 Through Mar. 7, 2002, Supp. App. B-75-79).

Finally, the independence of UBS's valuation analysis (like Chanin's) was not undermined because a portion of its fee was contingent upon confirmation of the Debtors' proposed plan. Valuation testimony is not rendered unreliable merely because the financial advisor who performed the valuation is entitled to an outcome determinative fee. *In re Zenith Electronics Corp.,* 241 B.R. at 103 (testimony of financial advisor entitled to success fee upon confirmation of plan as to valuation of debtor was "relevant and reliable").

**F.     UBS And The Committee's Subjective, Unexpressed Intent Is Irrelevant.**

UBS avers that the Bankruptcy Court's decision should be reversed because both it and the Creditors' Committee agree that confirmation of a plan of reorganization proposed by the Debtors was not a condition precedent to payment of the Valuation Fee. This argument is without merit because the subjective views of the contracting parties are irrelevant.

"The best evidence of what parties to a written agreement intended is what they say in their writing." *Slamow v. Delcol*, 594 N.E.2d 918, 919-20 (N.Y. App. Div. 1992). "In determining the intention of the parties, it is the objective manifestations of their intent to one another that count, not their unexpressed subjective views." *Hanley v. Sevilla Restaurant & Bar*, 1997 U.S. Dist Lexis 652, at * 8 (S.D.N.Y. 1997). As Judge Learned Hand explained:

> A contract has, strictly speaking, nothing to do with the personal,
> or individual intent of the parties. A contract is an obligation
> attached by the mere force of law to certain acts of the parties,
> usually words, which ordinarily accompany and represent a known
> intent.

*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911), *aff'd* 201 F. 664 (2d Cir. 1912), *aff'd sub nom. Nat'l City Bank v. Hotchkiss*, 231 U.S. 50 (1913). These principles are particularly important in the context of a professional employment agreement in a Chapter 11 proceeding because, unlike in a private setting, such an agreement impacts creditors, shareholders and other parties in interest beyond the contracting parties.

As Chief Judge Walrath determined, the Retention Order and the Engagement Agreement clearly provide that confirmation of a plan of reorganization proposed by the Debtors was a condition precedent to payment of a Valuation Fee. UBS and the Committee are sophisticated parties with experienced and competent counsel. If they had a different intention, they were required to have set it forth in the Engagement Agreement submitted to the Bankruptcy Court. *See Scheiderer v. Producers Credit Corp.*, 2005 Bankr. Lexis 861, at *7 (6th Cir. BAP May 19, 2005) ("the debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan") (unpublished).

III.   **THE BANKRUPTCY COURT ENFORCED THE UNMISTAKABLE
LANGUAGE IN THE RETENTION AGREEMENT AND UBS DID NOT
SUFFER A DISPROPORTIONATE FORFEITURE.**

The Bankruptcy Court's order should be affirmed because it enforced the clear

and concise terms of the Engagement Agreement and, in any event, UBS did not suffer any

disproportionate forfeiture.  UBS contends the Bankruptcy Court committed error by

"interpreting" the Engagement Agreement to affect forfeiture against UBS.  According to UBS,

the Bankruptcy Court should have (a) employed an interpretative preference against finding a

condition in the "ambiguous or doubtful contract language" of the Engagement Agreement, and

(b) excused the express condition because it caused UBS to suffer a disproportionate forfeiture.[4]

A condition precedent is "an act or event, other than a lapse of time, which, unless

the condition is excused, must occur before a duty to perform a promise in the agreement arises."

*Oppenheimer & Co., Inc. v. Oppensheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y.

1995).  Express conditions are agreed to and imposed by the parties themselves and must be

literally performed.  *Id.*  "Though the court may regret the harshness of such a condition, as it

may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the

parties unless to do so would violate public policy.  *Id.*  Interpretation as a means of reducing the

risk of forfeiture cannot be employed if the occurrence of the event as a condition is expressed in

unmistakable language.  *Id.*  "The policy favoring freedom of contract requires that, within broad

limits, the agreement of the parties should be honored even though forfeiture results."  *Id.* (citing

Restatement (Second) of Contracts § 227, comment b).

---

[4] The Trustee believes UBS's argument lacks merit because the Bankruptcy Court interpreted
what it meant by its own Retention Order, a ruling which is entitled to great deference.

First, assuming *arguendo* that this Court finds the Bankruptcy Court would have interpreted the Engagement Agreement (and not the Retention Order as the Trustee contends), UBS's argument still fails because there was no ambiguous or doubtful language. To the contrary, UBS and the Bankruptcy Court expressed the condition precedent in unmistakable language. In fact, on many occasions UBS conceded the existence of a condition precedent to payment of the Valuation Fee. For example:

- MR. HALLER: On the $700,000 fee I think Your Honor understands the issue there. Any of the plans of reorganizations proposed by the various parties were going to be the company's plan of reorganization. The question is who proposed it and the agreement certainly doesn't provide that the fee would be due and payable dependent on who proposed a particular plan of reorganization. Supp. App. at B-204-05.

- Read plainly and fairly, the phrase, "the Company's plan of reorganization" means "a plan of reorganization for the Company [or the Debtors.]" The use of the possessive form does not limit the reference to a plan proposed by the Debtors. It merely indicates *any* plan which reorganizes the Debtors' assets, regardless of the identity of the plan proponent. App. at A-663.

- [T]he intent of the parties to the Letter Agreement [was or is] that UBS would earn its Valuation Fee upon rendering its valuation and related testimony but would receive its Valuation Fee in full upon confirmation of any plan of reorganization with respect to the Company." App. at A-673.

- Rather, the Creditors' Committee intended that UBS would receive its Valuation fee regardless of whether the plan then proposed by the Debtors or another plan was confirmed. App. at A-672.

- The reading adopted by the Bankruptcy Court makes the Debtors' obligation to pay the Valuation Fee contingent upon the approval of a specific plan of reorganization – one proposed by the Debtors – rather than any plan proposed by any other conceivable party (including, in addition to the Chapter 11 Trustee and the Equity Committee, UBS' own clients on the Committee). *See* UBS Brief at 13.

- The Bankruptcy Court's conclusion that this language meant that the Valuation Fee would only be paid upon the effective date of a

PHDATA 1325318_1

plan of reorganization proposed by the Debtors (and not upon the effective date of a plan proposed by any other party) failed to construe the contract as a whole, resulted in an unfair and anomalous consequence, and thus violated the basic rules of contact interpretation which requires that a court endeavor to give contracts a fair and reasonable construction which avoids unfair and anomalous consequences. *See* UBS Brief at 3.

Actually, the only issue argued by UBS is concrete: the meaning of the word "Company" in the Engagement Agreement and "Debtors" in the Retention Order (assuming for argument sake that the Retention Order is even subject to this level of review). Those terms were unmistakably defined in both places: UBS and the Creditors' Committee defined "Company" in the Retention Letter to mean "Coram Healthcare, Inc. and its affiliates," (App. at A-648), and the Bankruptcy Court defined "Debtors" in the Retention Order to mean Coram Healthcare Corp. and Coram, Inc. App. at A-682.

UBS's argument is further flawed because even if one interprets "Company" or "Debtors" to mean any plan proponent, as UBS urges this Court to do, a "forfeiture" could nevertheless occur. UBS fails to explain why, on the one hand, it would constitute an acceptable forfeiture if a case were converted to a case under Chapter 7 of the Bankruptcy Code or dismissed after UBS performed its work (and therefore no plan would become effective), but, on the other hand, an unacceptable forfeiture where the Court enforces the unmistakable language of the Engagement Agreement.

The Restatement (Second) of Contracts further supports the Bankruptcy Court's determinations. As an illustration, the Restatement offers the following:

A contracts to sell and B to buy land for $100,000. At the same time, A contracts to pay C, a real estate broker, as his commission, $5,000 "on the closing of title." B refuses to consummate the sale. Absent a showing of a contrary intention, a court may conclude that C assumed this risk, and that A's duty is conditional on the sale being consummated. A is then under no duty to pay C.

Restatement (Second) Contracts § 277, Ill. 5.  Just like the payment to C was payable "*on* the closing of title" (emphasis added) (and A was therefore not liable to C when B refused to consummate the sale), the Valuation Fee here was payable to UBS "*on* the effective date of the Company's plan of reorganization."  App. at A-648.

A similar result occurred in *Preferred Mortgage Brokers, Inc. v. Hevin Byfield, et al.*, 723 N.Y.S.2d 230 (N.Y. App. Div. 2001).  In that case, defendants retained plaintiff, a mortgage broker, to assist them in securing financing to purchase a house.  *Id.*  The plaintiff required defendants to pay plaintiff a fee directly "upon the signed acceptance of a commitment."  *Id* at 230-31.  Plaintiff, however, earned its fee by obtaining a mortgage loan commitment on defendants' behalf.  *Id.*  Defendant never signed any documents accepting the commitment, and did not close on the proposed loan.  *Id.*   When defendants failed to pay plaintiff the fee, plaintiff commenced an action for breach of contract.  Summary judgment was entered in favor of plaintiff and the appellate division reversed, finding that defendants' signed acceptance of a commitment was a condition precedent to defendants' obligation to pay.  *Id.*  Just like the court in *Preferred Mortgage Brokers, Inc.* found a condition precedent existed where contract language stated "upon [the] signed acceptance of a commitment," so to does a condition precedent exist here "on the effective date of the Company's plan of reorganization."  Accordingly, the Debtors' estates are not liable for the Valuation Fee.

Finally, there is no "disproportionate forfeiture."  UBS received Monthly Fees totaling of $450,000.  Without the Valuation Fee, UBS will receive a blended rate of $334 per hour, fair compensation for the services performed, especially since: (1) 38% of the work was done by associates and analysts who had been out of college three years or less; (2) its valuation

work was duplicative of that done by Chanin, and (3) the plans which it testified in support of were not confirmed.  Accordingly, there is no disproportionate forfeiture.

## IV.    THE BANKRUPTCY COURT CORRECTLY DECLINED TO HEAR PAROL EVIDENCE BECAUSE THE TERMS OF THE RETENTION ORDER AND THE ENGAGEMENT AGREEMENT WERE UNAMBIGUOUS.

The Engagement Agreement is not ambiguous and UBS's argument that additional evidence was required in order to understand terms of the agreement is wrong.

UBS argues that the Bankruptcy Court impermissibly prohibited the introduction of parol evidence that would have established an ambiguity in the Engagement Agreement.  *See* UBS Brief at 24.  UBS argues that if the Bankruptcy Court had heard Mr. Reynerston's testimony that "contingent" valuation fee arrangements were unheard of in this business the Court could then have proceeded to resolve this ambiguity.  *See* UBS Brief at 26.  But, "a party cannot create an ambiguity simply by offering an alternative interpretation of the contract."  *In re Cedar Chem. Corp.*, 294 B.R. 224, 230 (Bankr. S.D.N.Y. 2003).  "[J]ust as extrinsic evidence may not be used to create an ambiguity in a contract, 'unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation.'"  *Utica Alloys, Inc. v. Alcoa Inc.,* 303 F. Supp. 2d 247, 253 (N.D.N.Y. 2004).  Thus, UBS's proffered testimony of Mr. Reynerston that the contract terms were likely intended to defer payment is just the type of testimony that New York courts have found unhelpful and inadmissible in construing contract terms.

In any event, the Engagement Agreement is not ambiguous.  Much like the Retention Order, the Engagement Agreement provided that the "Committee" shall cause Coram to pay to UBS "on the effective date of the Company's plan of reorganization . . . $700,000."  App. at A-648.  There are no terms in this clause that, when viewed objectively by a reasonably

23

intelligent person, are capable of more than one meaning.  *See In re Cedar Chem. Corp.*, 294

B.R. at 230.  "The primary objective in interpreting a contract is to give effect to the parties'

intent as revealed in the language that they used."  *Id.* at 229.  The language here is clear and

easily understandable and no further evidence was required to understand the parties' intent.

UBS cannot simply avoid the clear language of the agreement by belatedly proffering an

alternative in litigation in order to attempt to introduce extrinsic and irrelevant evidence.

       Further, even assuming that the Engagement Agreement is deemed ambiguous,

New York law is clear that ambiguities in a written contract are to be construed against the

drafter.  *See Prosperity Partners, Inc. v. Bonilla*, 374 F. Supp.2d 290 (E.D.N.Y. 2005); *Bernstein

v. Sosnowitz*, 603 N.Y.S.2d 493, 493 (N.Y. App. Div. 1993) ("Moreover, it is well settled that

any ambiguity which might exist must be construed against the defendant as drafter of the

agreement.").  Since UBS drafted the Engagement Agreement, even if it was ambiguous (which

it is not) it would be construed against UBS and not the Debtors' bankruptcy estates.  Thus, no

extrinsic evidence would be required and the Engagement Agreement would be read as including

the condition precedent found by the Bankruptcy Court.

## V.    IF THE COURT DETERMINES THAT THE BANKRUPTCY COURT ERRED, THE COURT SHOULD REMAND THIS MATTER TO THE BANKRUPTCY COURT FOR FURTHER PROCEEDINGS.

       In the event the Court determines that the Bankruptcy Court erred in its

determination that there was an unqualified condition precedent to payment of a Valuation Fee,

the Court should remand the matter to the Bankruptcy Court to determine whether an additional

$700,000 fee is reasonable, and if not, the reasonable amount that should be awarded, if

anything.  In the affidavit filed in support of its application to be appointed, UBS represented that

its Valuation Fee and other fees would be subject to subsequent allowance by the Bankruptcy

Court upon application under § 330 of the Bankruptcy Code. Supp. App. at B-158. Moreover, at the UBS retention hearing held on December 1, 2000, the Bankruptcy Court confirmed that both the Valuation Fee and the Monthly Fees were subject to evaluation under the reasonableness standard of 11 U.S.C. § 330. Supp. App. at B-8-9. Accordingly, the Bankruptcy Court will need to make a determination, after notice to all parties-in-interest and a hearing, of whether the fees charged by UBS were reasonable. *See In re Commercial Fin. Servs., Inc.*, 298 B.R. 733, 751 (10th Cir. B.A.P. 2003) (bankruptcy court properly reviewed financial advisor's fee application under § 330 standards where the bankruptcy court indicated that it would evaluate the reasonable fee in its bench ruling approving the retention). The Bankruptcy Court was not required to make this determination at the hearing where it denied the Valuation Fee because a condition precedent to UBS receiving the Valuation Fee had not occurred.

Likewise, if the Court finds that the Bankruptcy Court erroneously found the Engagement Agreement was unambiguous, and the Court further finds that the ambiguous terms should not be construed against UBS as the drafter, the matter should be remanded to the Bankruptcy Court for further proceedings.

PHDATA 1325318_1

## CONCLUSION

Chief Judge Walrath was in the best position to interpret her own Retention Order.  Her finding that the confirmation of a plan of reorganization proposed by the Debtors was a condition precedent to payment of a Valuation Fee was consistent with the plain meaning of the unambiguous terms of the Retention Order.  The Bankruptcy Court's award of $450,000 to UBS was fair compensation for the services that it rendered for the Committee in this case.  For these and all of the other reasons set forth herein, the Bankruptcy Court's Order should be affirmed.

Respectfully submitted,

Dated:  November 10, 2005                    ADELMAN LAVINE GOLD & LEVIN


By   /s/ Bradford J. Sandler
         Bradford J. Sandler (#4142)
         Suite 710
         919 North Market Street
         Wilmington, Delaware 19801-1292
         (302) 654-8200 (telephone)
         (302) 654-8217 (facsimile)

         -and-

         SCHNADER HARRISON SEGAL & LEWIS LLP
         Barry E. Bressler
         Richard A. Barkasy
         Michael J. Barrie
         1600 Market Street, Suite 3600
         Philadelphia, Pennsylvania  19103-7286
         (215) 751-2000 (telephone)
         (215) 751-2205 (facsimile)

         Co-Counsel to Arlin M. Adams,
             Chapter 11 Trustee

26