**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : |
| | : |
| | : CHAPTER 11 |
| CORAM HEALTHCARE CORP. and | : |
| CORAM, INC., | : CASE NO. 00-3299 (MFW) |
| | : (Jointly Administered) |
| Debtors. | : |
| ———————————————— | : |
| | : |
| UBS SECURITIES LLC, | : |
| | : CIVIL NO. 04-1558-SLR |
| Appellant, | : |
| v. | : |
| | : |
| CORAM HEALTHCARE CORP., et al., | : |
| | : |
| Appellee. | : |
| ———————————————— | : |

---

**SUPPLEMENTAL APPENDIX TO BRIEF OF APPELLEE, ARLIN M. ADAMS,**
**CHAPTER 11 TRUSTEE OF CORAM HEALTHCARE CORP. AND CORAM, INC.**

---

Barry E. Bressler
Richard A. Barkasy
Michael J. Barrie
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA, 19103-7286
(215) 751-2000

And

Bradford J. Sandler
ADELMAN LAVINE GOLD & LEVIN, P.C.
919 N. Market Street, Suite 710
Wilmington, DE 19801

Attorneys for Appellee,
Arlin M. Adams, Chapter 11 Trustee

## TABLE OF CONTENTS – SUPPLEMENTAL APPENDIX

Chanin Capital Partners Valuation, July 31, 2000.................................................................B-1

Deloitte & Touche Valuation, November 15, 2000..............................................................B-3

Hearing Transcript, December 1, 2000.................................................................................B-5

Chanin Capital Partners Valuation, December 4, 2000.......................................................B-13

UBS Warburg Valuation, December 11, 2000.....................................................................B-15

Deloitte & Touche Valuation, December 14, 2000..............................................................B-17

Debtors' Second Joint Plan Pursuant to Chapter 11
Of the United States Bankruptcy Code, July 31, 2001........................................................B-19

Goldin Associates, LLC Valuation, August 31, 2001..........................................................B-67

UBS Warburg Valuation, November 5, 2001.......................................................................B-69

Hearing Transcript, November 6, 2001................................................................................B-71

Final Fee Application of Chanin Capital Partners LLC, for
Allowance of Compensation and for the Reimbursement of
Expenses for Services Rendered During the Period From
September 19, 2000 through March 7, 2002.........................................................................B-75

First and Final Fee Application of UBS Securities LLC,
As Financial Advisor to the Official Unsecured Creditors'
Committee, for Final Allowance of Compensation for
Professional Services Rendered and Reimbursement of
Actual and Necessary Expenses Incurred for the Period
November 21, 2000 through October 27, 2003.....................................................................B-113

Objection of the Chapter 11 Trustee to [Docket No. 3249]
The First and Final Fee Application of UBS Securities LLC,
As Financial Advisor To The Official Unsecured Creditors'
Committee, For Final Allowance Of Compensation For
Professional Services Rendered and Reimbursement Of
Actual And Necessary Expenses Incurred For The Period
November 21, 2000 Through October 27, 2003....................................................................B-195

Hearing Transcript, October 18, 2004 ............................................................... B-203

*Hanley v. Sevilla Rest. & Bar*, 1997 U.S. Dist. LEXIS 652 (S.D.N.Y. 1997) .................... B-206

*Scheiderer v. Delcol*, 584 N.Y.S.2d 424 (N.Y. App. 1992)................................................ B-210

*Deutsch v. Kensington Publishing Corp.,* 1982 U.S. Dist. LEXIS 15448
    (S.D.N.Y. Oct. 5, 1982) ............................................................................ B-214

EXHIBIT

D-8

Presentation to the
Board of Directors of:

# Coram Healthcare Corporation



# C O R A M

July 31, 2000



CHANIN CAPITAL PARTNERS

12 East 49th Street • Suite 1400
New York, New York 10017
tel. 212/758-2629

1100 Santa Monica Boulevard • Suite 830
Los Angeles, California 90025
tel. 310/445-4010

CONFIDENTIAL
EMB 001797

CHANIN CAPITAL PARTNERS

*Los Angeles • New York*

## VALUATION SUMMARY

### *Valuation Summary*

- The EV for Coram is approximately $207.0 million.

  ᴧ The EV is approximately 6.2x FY 2000 projected EBITDA and 4.7x FY 2001 projected EBITDA.

  ᴧ The EV is approximately 8.5x FY 2000 projected EBITDA less capital expenditures and 6.2x FY 2001 projected EBITDA less capital expenditures.

  ᴧ The EV is in line with the mid-point value obtained in the discounted cash flows analysis of approximately $200.0 million.

- The EV for Coram is based upon the weighted average of three valuation methodologies:

  ᴧ Discounted cash flow analysis

  ᴧ Public company comparable multiples analysis

     ⇒ EV / revenues

     ⇒ EV / EBITDA

     ⇒ EV / EBITDA – capital expenditures

  ᴧ Comparable transaction analysis

     ⇒ EV / revenues

     ⇒ EV / EBITDA

- 68 -

CONFIDENTIAL
EMB 001864

B-2



EXHIBIT

EC-58

# Coram Healthcare Corporation

## Valuation Analysis

*Prepared on Behalf of*

Committee of Equity Holders

*In Connection with*

Chapter 11 Bankruptcy Proceedings

*As of November 15, 2000*

*This is a preliminary analysis based on limited scope procedures. Financial and operational data utilized in this analysis represent items made available prior to November 30, 2000. Since we understand further documentation and testimony may be forthcoming, the calculations of value presented herein are necessarily tentative in nature and, as such, they are subject to revision upon the performance of additional procedures and consideration of additional information.*

CONFIDENTIAL
EMB 001885

B-3

# Summary of Results

- Based on the alternative calculations described herein, we have developed the following indications of value for the Coram, Inc. business enterprise:

  *Market Approach – Guideline Public Company*     $ 306  to $ 342   mil.

  *Market Approach – Guideline Transaction*        $ 255  to $ 317   mil.

  *Income Approach – Discounted Net Cash Flow*     $ 279   mil.

- Considering the quality and quantity of available data and weighing these indications of value based on our assessment of their relative reliability we calculate a point estimate of value for the Coram business enterprise of approximately $ 292 mil.

*This is a preliminary analysis based on limited scope procedures. Financial and operational data utilized in this analysis represent items made available prior to November 30, 2000. Since we understand further documentation and testimony may be forthcoming, the calculations of value presented herein are necessarily tentative in nature and, as such, they are subject to revision upon the performance of additional procedures and consideration of additional information.*

CONFIDENTIAL
EMB 001904

B-4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                          )
                                )
CORAM HEALTHCARE CORP. and      )
CORAM, INC.,                    ) Case Nos. 00-3299
                                ) through 00-3300 (MFW)
        Debtors.                )


United States Bankruptcy Court
824 Market Street - Sixth Floor
Wilmington, Delaware


December 1, 2000
9:00 a.m.


BEFORE:  HONORABLE MARY F. WALRATH,
         United States Bankruptcy Judge



TRANSCRIPT OF PROCEEDINGS


WILCOX & FETZER
1330 King Street - Wilmington Delaware  19801
(302) 655-0477

DEC 05 2000



**WILCOX & FETZER LTD.**
Registered Professional Reporters


Pachulsk, Stang, Ziehl,
Young & Jones



B-5

1   given to Mr. Pump within Deloitte & Touche's internal

2   databases that --

3               THE COURT:  But wouldn't that be covered

4   by the confidentiality agreement at any rate?

5               MR. SCHEPACARTER: It should be.  I'm not

6   sure that the witness was the one that had the

7   information.  I don't think --

8               THE COURT:  Then it's not even relevant

9   then, would it be?

10              MR. SCHEPACARTER: Okay.  Other than that

11  and with respect to the Crowley representation, it

12  seemed that it's fairly distinct.  I think it would be

13  a problem if they were doing work for Mr. Crowley and

14  Mr. Crowley had the ability to either give them more

15  work or there was something that --

16              THE COURT:  I dare say $10,000 a year

17  isn't going to influence Deloitte & Touche's

18  representation here.

19              MR. SCHEPACARTER: Right.  That's what I am

20  saying.  It just doesn't seem like it was something, a

21  relationship such as that that Mr. Crowley could

22  confer some type of economic benefit on the debtor.

23              But other than that, those are the only

24  two issues I have seen so far.

23

```
1                THE COURT:  I am prepared to enter the

2    order approving the application.

3                MR. SCHWARTZ:  Thank you, Your Honor.

4                THE COURT:  With respect to the creditors'

5    committee's application, perhaps I should do the same

6    thing, see if there are any objections, Mr. Gewertz.

7                MR. LEVY:  The equity committee does not

8    object.

9                THE COURT:  Does the debtor?

10               MR. FRIEDMAN:  No.

11               MR. GEWERTZ:  Your Honor, we have

12   submitted an application on behalf of --

13               THE COURT:  Does the U.S. Trustee?

14               MR. SCHEPACARTER: I'm sorry.  I didn't

15   want to interrupt.

16               MR. GEWERTZ:  I'm sorry.  I was looking

17   the wrong way.

18               MR. SCHEPACARTER:  That's fine.  The

19   objections here, Your Honor -- could I just address

20   the Court from standing here?

21               THE COURT:  Yes.

22               MR. SCHEPACARTER: The objections here are

23   slightly different.  I don't think there is that

24   conflict connection issue, at least I didn't read it
```

1   in the affidavit that I read at 11:00 o'clock last

2   night.

3           There are a couple of things that were a

4   little bit cause for concern.  It appeared that there

5   was to be paid a transaction fee, I'll call it a

6   transaction fee, a valuation fee of about $700,000 and

7   then ongoing if I guess the case kept going $50,000 a

8   month.  I think in this case there's an administrative

9   order and I would just object to getting paid outside

10  of the administrative order or outside of filing some

11  type of fee application.

12          I understand that under 328 that certain

13  compensation schemes can be approved, but the problem

14  there is that sort of once they're approved, unless

15  there's something that was really wrong that had taken

16  place earlier, they're not really subject to review.

17  And I kind of think that that valuation fee should be

18  subject to some type of review down the line once this

19  case actually gets confirmed.

20          THE COURT:  Are you suggesting you want it

21  subject to the reasonableness of the fee standard

22  rather than whether it was improvidently granted

23  standard?

24          MR. SCHEPACARTER: Somewhat.

1      THE COURT:  Any objection to that for

2  Warburg?

3      MR. GEWERTZ:    I can't speak for Warburg.

4  On behalf of the committee, we don't have any

5  objection.  I think I had made it clear to a Warburg

6  representative that that is the standard that this

7  Court prefers.  And I believe Your Honor so indicated

8  that yesterday in a hearing I heard or the day before.

9      And I believe the engagement letter itself

10  contemplates a final application which would be

11  subject to that standard.

12      THE COURT:  All right.

13      MR. SCHEPACARTER: Okay.

14      THE COURT:  And that was the only concern?

15      MR. SCHEPACARTER: The other part was the

16  $50,000 per month they would have to file, if it gets

17  that far, I think they would have to file fee

18  applications to get paid whatever they need to get

19  paid.

20      THE COURT:  They would follow the normal

21  professional compensation procedures that are

22  applicable in this case.

23      MR. GEWERTZ: .Right.  That doesn't kick in

24  until after four months from November 21, Your Honor.

1    Hopefully we won't get that far.

2           THE COURT:  That may be a different issue

3    then.

4           MR. SCHEPACARTER: Yeah.  From what I have

5    heard so far, it might be a Chapter 7 by then.

6           MR. GEWERTZ:  Yes.

7           THE COURT:  If that's the only objection

8    you have --

9           MR. GEWERTZ:  Yes.  We would proffer the

10    affidavit.  Mr. Dishner is here if anyone wants to

11    cross-examine him on the substance of his affidavit.

12           THE COURT:  Does anybody desire testimony?

13           MR. SCHEPACARTER: No.

14           THE COURT:  All right.  I will accept the

15    affidavit in support of it and approve the

16    application, subject to the filing of fee applications

17    and approval.

18           MR. GEWERTZ:  Your Honor, I have an order.

19    May I approach the bench with that?

20           THE COURT:  Is it changed from the order

21    attached to the application?

22           MR. GEWERTZ:  Deidre, is the order changed

23    from the order attached to the application?  I believe

24    it is.

1    MS. RICHARDS: No, it's not.

2    MR. GEWERTZ: No, it's not.

3    THE COURT: Then I will enter the order

4    attached to the application.

5    MR. GEWERTZ: Thank you, Your Honor.

6    THE COURT: I think we're ready to proceed

7    with confirmation.

8    MR. FRIEDMAN: Excellent. Your Honor, I

9    think we have until 2:00 o'clock today, so if I could

10    I would just like maybe to suggest as to how we might

11    proceed. First of all, Your Honor, there were a

12    number of objections to confirmation filed. With

13    respect to all but one, those objections have been

14    resolved.

15    At some point before this hearing closes,

16    we will put on the record all the resolutions that we

17    have reached with all of the parties, other than the

18    equity committee.

19    THE COURT: Okay.

20    MR. FRIEDMAN: Given the amount of time we

21    have today, I would rather just sort of cut to the

22    chase on the important issues.

23    THE COURT: Do you want to proceed to

24    testimony, because you may have witnesses here, to

1    assure we get through them?

2              MR. FRIEDMAN:  Yes.  We're not going to

3    get through today.

4              THE COURT:  Or as many as possible.

5              MR. FRIEDMAN:  Well, what has happened is

6    we have with the equity committee agreed that we would

7    put on today the direct testimony of Daniel Crowley.

8    They have not yet had the opportunity to depose him,

9    so they would like to take his deposition before

10   cross-examination, which we have agreed to.

11             I don't think that the direct testimony of

12   Mr. Crowley will be finished much earlier than 2:00

13   o'clock.  So I think that for better or worse, that's

14   what we're going to be listening to most of the day.

15             What I would like to do though would be to

16   maybe spend in total maybe half an hour just with

17   various opening statements.  I think in this case it

18   would be helpful because --

19             THE COURT:  Well, it might generate

20   responding opening statements.

21             MR. FRIEDMAN:  No.  We would expect that

22   there would be.  What I was going to suggest is maybe

23   perhaps maybe ten minutes from the debtor, ten minutes

24   from the equity committee and I think there may be ten

*Presentation Update*

# CORAM HEALTHCARE CORPORATION



# C O R A M

*December 4, 2000*



CHANIN CAPITAL PARTNERS

11100 Santa Monica Boulevard • Suite 830
Los Angeles, California 90025
tel. 310/445-4010

EXHIBIT
D - 10
Abbott

12 East 49th Street • Suite 1400
New York, New York 10017
tel. 212/758-2629

CONFIDENTIAL
EMB 001932

B-13

CHANIN CAPITAL PARTNE.                                              *Los Angeles • New York*

## VALUATION SUMMARY

### *Valuation Summary*

- The Updated EV for Coram is approximately $189 million.

- The Updated EV for Coram is based upon the weighted average of three valuation methodologies:

  - ➢ Discounted cash flow analysis
  - ➢ Public company comparable multiples analysis
    - ⇒ EV / revenues
    - ⇒ EV / EBITDA
    - ⇒ EV / EBITDA – capital expenditures
  - ➢ Comparable transaction analysis
    - ⇒ EV / revenues
    - ⇒ EV / EBITDA

- 10 -

CONFIDENTIAL
EMB 001941

B-14

STRICTLY PRIVATE AND CONFIDENTIAL

'S Warburg

# Plan of Reorganization: Valuation Analysis

Presentation to the Official Committee of Unsecured Creditors
of Coram Healthcare Corp. and Coram, Inc.

C O R A M

12/11/00

CONFIDENTIAL
EMB 001953



1    2    3

# Valuation Summary

($000s)

| | Valuation Range | |
|---|---|---|
| | Low | High |
| Summary Enterprise Value | $170,000 | $215,000 |
| Plus: Present Value of NOLs [1] | - | 6,545 |
| Summary Adjusted Enterprise Value | $170,000 | $221,545 |
| Plus: Excess Cash or other assets | | |
| Reorganization Value | $170,000 | $221,545 |

NOTES:
1  Present Value of NOLs represented here assumes a 10.0% discount rate

12/11/00

Section 1: Executive Summary

❖ UBS Warburg

CONFIDENTIAL
EMB 001959

B-16

EXHIBIT
EC-59

Deloitte
&Touche

# Coram Healthcare Corporation

## Valuation Analysis

*Prepared on Behalf of*

**Committee of Equity Holders**

*In Connection with*

**Chapter 11 Bankruptcy Proceedings**

*As of December 14, 2000*

*Financial and operational data utilized in this analysis represent items made available prior to December 14, 2000. The calculations of value are based on limited scope procedures and, as such, they are subject to revision upon the performance of additional procedures and consideration of additional information.*

CONFIDENTIAL
EMB 001993

B-17

## Summary of Results

• Based on the alternative calculations described herein, we have developed the following indications of value for the Coram, Inc. business enterprise:

| | |
|---|---|
| *Market Approach – Guideline Public Company* | *$ 287  to $ 346 million* |
| *Market Approach – Guideline Transaction* | *$ 230  to $ 310 million* |
| *Income Approach – Discounted Net Cash Flow* | *$ 277 million* |

• Considering the quality and quantity of available data and weighing these indications of value based on our assessment of their relative reliability we calculate a point estimate of value for the Coram business enterprise of approximately <u>$283 million</u>.

• Alternative calculation using Chanin's year 2000 EBITDA projection results in a similar indication of overall value of $287 million.

*Financial and operational data utilized in this analysis represent items made available prior to December 14, 2000. The calculations of value are based on limited scope procedures and, as such, they are subject to revision upon the performance of additional procedures and consideration of additional information.*

**Deloitte & Touche**

21

CONFIDENTIAL
EMB 002013

B-18

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re                                    )
                                         )
CORAM HEALTHCARE CORP. and               )            Chapter 11
CORAM, INC.,                             )
                                         )            Case Nos. 00-3299 (MFW)
                    Debtors.             )            through 00-3300 (MFW)
                                         )
                                         )            Jointly Administered


**DEBTORS' SECOND JOINT PLAN PURSUANT TO
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**


Dated as of: July 31, 2001

      KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP
      David M. Friedman
      Adam L. Shiff
      Robert M. Novick
      1633 Broadway
      New York, New York 10019
      (212) 506-1700

           – and –

      PACHULSKI, STANG, ZIEHL,
        YOUNG & JONES, P.C.
      Laura Davis Jones
      Rachel Lowy
      919 North Market Street
      Wilmington, Delaware 19899-8705
      (302) 652-4100
      *Co-counsel to the Debtors and*



*Debtors in Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CORAM HEALTHCARE CORP. and | ) | Chapter 11 |
| CORAM, INC., | ) | |
| | ) | Case Nos. 00-3299 (MFW) |
| Debtors. | ) | through 00-3300 (MFW) |
| | ) | |
| | ) | Jointly Administered |

### DEBTORS' SECOND JOINT PLAN PURSUANT TO
### CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Coram Healthcare Corp. and Coram, Inc., the above-captioned debtors and debtors in possession, propose the following second joint Plan pursuant to sections 1121(a) and 1123 of title 11 of the United States Code.

### ARTICLE I
### RULES OF CONSTRUCTION

1.1     Unless otherwise provided or separately defined in this Plan, capitalized terms shall have the meanings set forth in Article II of this Plan.

1.2     Any capitalized term used in this Plan that is not defined in Article II of this Plan shall have the meaning ascribed to such term, if any, in the Bankruptcy Code.

1.3     The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.

1.4     In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.5     The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

1.6     Whenever it appears appropriate from the context, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

1.7     All exhibits are incorporated into and made a part of the Plan as if set forth in full herein, whether or not annexed hereto.  Copies of exhibits can be obtained upon written request to Kasowitz, Benson, Torres & Friedman LLP, Attn: Craig Hueneke, Chief Bankruptcy Paralegal, 1633 Broadway, New York, NY 10019.

1.8     Captions and headings to Articles and Sections of the Plan are inserted for convenience and reference only.  Captions and headings and are not intended to be a part, or to affect the interpretation, of the Plan.

## ARTICLE II
## DEFINITIONS

All of the following definitions are intended to be, and hereby are, part of the substantive provisions of this Plan and have the same force and effect as any other provision of this Plan.

2.1     "Absolute Priority Litigation" means the litigation that may be commenced in connection with the Confirmation Hearing if Class CHC 2 votes to reject the Plan, Class CHC 4 votes to accept the Plan, and the Creditors' Committee (or any other party in interest) objects to the Debtors' proposed distribution of the CHC Equity Interest Consideration to Class CHC 4, as more fully described in section III.A.3 of the Disclosure Statement.

2.2     "Administrative Claim" means any Claim constituting a cost or expense of administration of the Debtors' Chapter 11 cases incurred on or after the Petition Date and allowed by Final Order under section 503(b) of the Bankruptcy Code, including, without limitation: (a) any and all DIP Claims, (b) any actual and necessary costs and expenses incurred after the petition date of preserving the Estates of the Debtors and operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses or for the acquisition or lease of property or for the procurement of services, any costs and expenses of the Debtors and/or Reorganized Coram for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of claims by or Claims against the Debtors and for distributions under the Plan, (c) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under section 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, (d) all fees and charges assessed against the Debtors' Estates under section 1930, Chapter 123 of title 28 of the United States Code.

2.3    "<u>Allowed Administrative Claim</u>" means an Administrative Claim that is or becomes an Allowed Claim.

2.4    "<u>Allowed CHC Equity Interest</u>" means an Allowed Equity Interest in CHC.

2.5    "<u>Allowed CHC General Unsecured Claim</u>" means a CHC General Unsecured Claim to the extent it is or has become an Allowed Claim.

2.6    "<u>Allowed CHC Notes Claims</u>" means the CHC Notes Claims.

2.7    "<u>Allowed CHC Priority Non-Tax Claim</u>" means a Priority Non-Tax Claim that is or becomes an Allowed Claim against CHC.

2.8    "<u>Allowed CHC Secured Claims</u>" means a CHC Secured Claim to the extent it is or has become an Allowed Claim.

2.9    "<u>Allowed Claim</u>" means a Claim to the extent such Claim: (a)(i) is either:  (A) scheduled by a Debtor pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated or disputed; or (B) proof of which has been timely filed, or deemed timely filed, with the Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable orders of the Court, or late filed with leave of Court; and (ii) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Court; or (b) has otherwise been allowed by a Final Order or pursuant to this Plan.  An Allowed Claim: (A) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed; and (B) shall be net of any setoff amount of any claim that may be asserted by the Debtors against the holder of such claim, which shall be deemed to have been setoff in accordance with the provisions of this Plan. Without limiting the foregoing, no Claim shall be considered an Allowed Claim before the time that an objection has been or may be filed with regard to such Claim if: (x) the amount or classification of the Claim specified in the relevant proof of claim exceeds the amounts of or has a classification different from any corresponding Claim scheduled by a Debtor in its Schedules of Assets and Liabilities; (y) any corresponding Claim scheduled by a Debtor has been scheduled as disputed, contingent or unliquidated; or (z) no corresponding Claim has been scheduled by the Debtor in its Schedules of Assets and Liabilities.

2.10    "<u>Allowed Coram Equity Interest</u>" means an Allowed Equity Interest in Coram other than a Coram Preferred Stock Interest.

2.11    "<u>Allowed Coram General Unsecured Claim</u>" means a Coram General Unsecured Claim, to the extent it is or has become an Allowed Claim.

3

2.12    "Allowed Coram Notes/Preferred Stock Claims" means the Coram Notes/Preferred Stock Claims.

2.13    "Allowed Coram Notes Claims" means the Coram Notes/Preferred Stock Claims to the extent such Claims are based upon or evidenced by the Notes

2.14    "Allowed Coram Preferred Stock Interests" means the Coram Notes/Preferred Stock Claims to the extent such Claims are based upon or evidenced by the Coram Preferred Stock Interests.

2.15    "Allowed Coram Priority Non-Tax Claim" means a Priority Non-Tax Claim that is or becomes an Allowed Claim against Coram.

2.16    "Allowed Coram Secured Claim"  means a Coram Secured Claim to the extent it is or has become an Allowed Claim.

2.17    "Allowed Equity Interest" means an Equity Interest as of the Record Date.

2.18    "Allowed General Unsecured Claim" means a General Unsecured Claim that is or becomes an Allowed Claim.

2.19    "Allowed Priority Tax Claim" means a Priority Tax Claim that is or becomes an Allowed Claim.

2.20    "Allowed Secured Claim" means a Secured Claim that is or becomes an Allowed Claim.

2.21    "Amended and Restated Certificate of Incorporation of Reorganized Coram" means the certificate of incorporation of Reorganized Coram, as amended, which certificate shall be in substantially the form included in the Plan Supplement.

2.22    "Amended By-laws of Reorganized Coram" means the amended by-laws of Reorganized Coram, which amended by-laws shall be in substantially the form included in the Plan Supplement.

2.23    "Avoidance Actions" means all of the Debtors' preference and other avoidance power claims pursuant to sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other applicable law.

2.24    "Ballot" means the form or forms distributed to each holder of an impaired claim on which the holder is to indicate acceptance or rejection of the Plan.

4

2.25   "Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §§ 101 et seq.) as in effect on the Petition Date and as amended after the Petition Date to the extent applicable to the Debtor's Chapter 11 Cases.

2.26   "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the District of Delaware, including the United States Bankruptcy Judge presiding over the Debtors' Chapter 11 cases, and to the extent it is necessary and appropriate for jurisdiction to be exercised by the United States District Court for the District of Delaware, including the United States District Judges, or any other court with jurisdiction over the Debtors' Chapter 11 cases, this definition shall include same.

2.27   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure (Fed. R. Bankr. Proc. 1001 et seq.) as in effect on the Petition Date and as amended after the Petition Date to the extent applicable to the Debtor's Chapter 11 Cases.

2.28   "Business Day" means any day other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

2.29   "Cases" means the cases under Chapter 11 of the Bankruptcy Code which were commenced on the Petition Date with respect to the Debtors.

2.30   "Cash" means legal tender of the United States of America and equivalents thereof, including but not limited to bank deposits, checks and similar items.

2.31   "Certificate of Incorporation" means the certificate of incorporation of Coram, as amended or restated prior to the Confirmation Date.

2.32   "Chapter 11" means Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 et seq.), as in effect on the Petition Date, and as amended after the Petition Date and effective during the Debtors' Chapter 11 cases, to the extent applicable to the Debtors' cases.

2.33   "CHC" means Coram Healthcare Corporation, a Delaware corporation.

2.34   "CHC Equity Interest" means an Equity Interest in CHC.

2.35   "CHC Equity Interest Consideration" means Cash in the amount of $10 million.

2.36   "CHC Equity Reserve" means a reserve established in the event Class CHC 4 votes to accept this Plan by the applicable requisite majorities, to hold in one or more segregated accounts to be established by the Debtors or the Plan Administrator, the CHC Equity Interest Consideration, subject to the Absolute Priority Litigation, if any, and which will be maintained in trust for holders of Allowed Equity Interests in Class CHC 4.

5

2.37    "CHC General Unsecured Claim" means a General Unsecured Claim against CHC.

2.38    "CHC General Unsecured Consideration" means cash in the amount of $2 million.

2.39    "CHC Noteholder Consideration" means cash in the amount of $1 million.

2.40    "CHC Notes Claims, means, collectively, any Claim against CHC based upon or evidenced by the Notes, which as of the Petition Date, aggregated approximately $252,007,000.

2.41    "CHC Secured Claim" means a Secured Claim against CHC.

2.42    "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

2.43    "Claimant" means the holder of a Claim or an Allowed Equity Interest on the Confirmation Date.

2.44    "Class" means a category of holders of Claims or Equity Interests as established pursuant to Articles III and IV of the Plan.

2.45    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order.

2.46    "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

2.47    "Confirmation Hearing" means the hearing before the Bankruptcy Court respecting the Confirmation of the Plan.

2.48    "Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan in accordance with the provisions of the Bankruptcy Code.

2.49    "Coram" means Coram, Inc., a Delaware corporation.

2.50    "Coram General Unsecured Claim" means a General Unsecured Claim against Coram.

2.51    "Coram Notes/Preferred Stock Claims" means, collectively, any claim against Coram based upon or evidenced by (i) the Notes, which as of the Petition Date, aggregated approximately $252,007,000, and (ii) the Coram Preferred Stock Interests.

2.52    "Coram Preferred Stock Interests" means, collectively, any interest in and claim against Coram based upon or evidenced by the Preferred Stock, including, without limitation, any accrued dividends.

6

2.53    "Coram Secured Claim" means a Secured Claim against Coram.

2.54    "Creditors' Committee" means the Official Committee of Unsecured Creditors designated by the United States Trustee on August 22, 2000.

2.55    "Cure Claim" means a Claim against the Debtors, or any of them, arising from an obligation to cure defaults within the meaning of section 365(b) of the Bankruptcy Code.

2.56    "Debtors" means CHC, the Debtor and Debtor in Possession in Chapter 11 Case No. 00-3299 (MFW) pending before the Bankruptcy Court, and Coram, the Debtor and Debtor in Possession in Chapter 11 Case No. 00-3300 (MFW) pending before the Bankruptcy Court.

2.57    "Debtors-in-Possession" means the Debtors as debtors in possession in the Cases.

2.58    "DIP Claims" means all Claims of DIP Lenders arising under the DIP Facilities.

2.59    "DIP Facilities" means the debtor-in-possession credit agreement and any related agreements between the Debtors and the DIP Lenders.

2.60    "DIP Lenders" means Madeleine LLC and any other lenders participating in the DIP Facilities.

2.61    "DIP Order" means all Final Orders authorizing, approving or amending the DIP Facilities.

2.62    "Disbursing Agent" means the bank, trust company, corporation, other organization or Person (including the Plan Administrator), if any, selected by the Debtors or Reorganized Coram to make distributions under and in accordance with the Plan.

2.63    "Disclosure Statement" means the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, either in its present form or as it may be altered, amended, supplemented or modified from time.

2.64    "Disputed Claim" means (a) any Claim listed in any of the Schedules as contingent, unliquidated or disputed; (b) any Claim against any of the Debtors, proof of which is filed designating such Claim in any respect as contingent, unliquidated or disputed; (c) any Claim which, in whole or in part, is the subject of a timely objection interposed by the Debtors or any other party in interest; or (d) any Claim which is the subject of litigation as to amount or liability by any of the Debtors; provided, however, that the amount of a Disputed Claim shall mean the lesser of (x) the amount listed in the Schedules, (y) the amount stated in a proof of Claim as filed with the Bankruptcy Court or (z) the amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code; and

provided, further, however, that, in the event the Bankruptcy Court shall estimate the amount of a Disputed Claim for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code, such estimation shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim.

2.65   "Distribution" means any consideration to be provided under this Plan to the holder of an Allowed Claim on account of such Claim or to the holder of an Allowed Equity Interest on account of such Equity Interest.

2.66   "Effective Date" means the first Business Day on which all conditions to effectiveness of the Plan, as set forth in Section 12.2 hereof, have been satisfied or waived and on which no stay of the Confirmation Order is in effect.

2.67   "Equity Committee" means the Official Committee of Equity Security Holders designated by the United States Trustee on October 18, 2000.

2.68   "Equity Interest" means the Preferred Stock and any equity interest in a Debtor represented by duly authorized, validly issued, unissued or outstanding shares of stock, or any interest or right to convert into such an equity interest or acquire any equity interest, or any Claims arising or deriving therefrom, that was in existence immediately prior to the Petition Date, including, without limitation, any warrants, options, employee stock options or contract rights to acquire or purchase such interests at any time.

2.69   "Estates" means the estates, created in the Debtors' Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

2.70   "Executive Employment Agreement" shall mean the agreement respecting the employment of the Debtors' Chief Executive Officer, Daniel D. Crowley, effective immediately prior to the Petition Date.

2.71   "Executive Compensation Waiver" shall mean the voluntary agreement of Daniel D. Crowley to waive his rights to receive bonus compensation in the amount of $7.5 million that Mr. Crowley has earned pursuant to Executive Employment Agreement effective upon, and only upon, the occurrence of the Effective Date of this Plan.

2.72   "Exit Financing Facility" means the financing facility in the approximate aggregate principal amount of $40 million between Reorganized Coram and one or more lenders, substantially in the form included in the Plan Supplement, pursuant to which such lender(s) shall have agreed to provide financing to Reorganized Coram on terms and conditions satisfactory to Coram.

2.73    "Face Amount" means: (a) when used with reference to a Disputed Unsecured Claim, either (i) the full stated amount claimed by the holder of such Claim in any group of Claims filed by the Bar Date, or otherwise deemed timely filed under applicable law, if the proof of claim specifies only a liquidated amount; (ii) if no proof of Claim is filed by the Bar Date or otherwise deemed timely filed under applicable law, the full amount of the Claim listed on the Debtors' Schedules provided, that such amount is not listed as disputed, contingent or unliquidated; or (iii) the applicable deductible under the relevant insurance policy, minus any reimbursement obligations of the applicable Debtor to the insurance carrier for sums expended by the insurance carrier on account of such Claim (including defense costs) if such amount is less than the amount specified in (i) or (ii) above or the proof of Claims specifies an unliquidated amount (and) (b) when used with reference to a Disputed Uninsured Claim, either (i) the full stated amount claimed by the holder of such Claim and any proof of Claim filed by the Bar Date or otherwise deemed timely filed under applicable law, if the proof of claim specifies only a liquidated amount; or (ii) the amount of the Claim acknowledged by the applicable Debtor or Reorganized Debtor in any objection filed such Claim or in the Schedules as an undisputed, non-contingent and liquidated Claim, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, proposed by the Debtors or established by Reorganized Coram following the Effective Date, if no proof of Claim has been filed by the Bar Date or has otherwise been deemed timely filed under applicable law or if the proof of Claim specifies an unliquidated amount.

2.74    "Final Order" means an order or judgment of a court as to which (a) any appeal that has been taken has been determined finally or dismissed and such order has not been reversed, stayed, modified or amended, (b) the time to appeal, petition for certiorari or request reargument or rehearing has expired and as to which no appeal, petition for certiorari, or request for reargument or rehearing is pending or as to which any right to appeal, petition for certiorari, or request reargument or rehearing has been waived or if an appeal, certiorari, reargument or rehearing thereof has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, or (c) the time to take any appeal or to seek certiorari or further reargument or rehearing has expired.

2.75    "General Unsecured Claim" means any Claim other than an Administrative Claim, a Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Allowed Coram Notes/Preferred Stock Claim or an Allowed CHC Notes Claim.  The term "General Unsecured Claim" shall consist of, except as set forth above in this definition, all impaired unsecured claims not otherwise classified that are not cured, paid, released or waived pursuant to the Plan, assumed by a Debtor pursuant to the Plan or agreements incorporated into the Plan, or classified in any other class, including, without limitation, claims (a) for goods sold and/or services rendered, (b) for moneys lent, (c) based upon guarantees of performance or payment of the obligations or duties of any Person, (d) for tort liability, (e) for environmental remediation, (f) of governmental unites under any applicable unclaimed property or escheat laws, (g) of governmental units for taxes, assessments, penalties or charges which are not Priority Tax Claims, (h) for contribution, reimbursement or indemnity, (i) for fines, penalties or other assessments, (j) for the portion of any Claim supported directly or indirectly by a letter of credit issued

9

for the account of a Debtor in excess of the amount available under such letter of credit, and (k) representing the undersecured portion of any claim that is otherwise a Secured Claim.

2.76    "KERP Order" means that certain Order Pursuant to Section 363(b) of the Bankruptcy Code Authorizing and Approving Debtors' Adoption of Key Employee Retention Program, dated August 31, 2000.

2.77    "Most Recent Address" means as of any date, with respect to any holder of a Claim or its designee, its address set forth in the proof of claim or other writing most recently filed with the Bankruptcy Court or received by the Debtor and if no such proof of claim or writing has been filed or received, then the address set forth on the Debtors' Schedules.

2.78    "New Coram Stock" means ten million (10,000,000) shares of common stock, $0.01 par value, authorized by Reorganized Coram pursuant to this Plan, representing one hundred percent (100%) of the issued and outstanding voting common stock of Reorganized Coram on the Effective Date.

2.79    "New Secured Notes" means the new secured, interest-bearing promissory notes in the aggregate principal amount of $180 million to be issued to holders of Allowed Coram Notes Claims pursuant to sections 7.8 and 9.4 of the Plan, which notes shall be guaranteed and secured by a pledge of all stock and liens on all assets owned by each direct or indirect operating subsidiary of Coram, which shall be senior in priority to all other obligations of the Reorganized Coram except the Exit Financing Facility, which shall require payments of interest only during the first four years after their issuance, and which shall be in the form included in the Plan Supplement.

2.80    "Noteholder Group" means Cerberus Partners, L.P., Goldman Sachs Credit Partners L.P., and Foothill Capital Corporation.

2.81    "Notes" means the Series A Notes and the Series B Notes.

2.82    "Old Coram Board of Directors" means the board of directors of Coram that existed as of the Confirmation Date.

2.83    "Person" means a person as defined in section 101(41) of the Bankruptcy Code or an entity as defined in section 101(15) of the Bankruptcy Code.

2.84    "Petition Date" means August 8, 2000.

2.85    "Plan" means this Second Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code (including all exhibits and schedules annexed hereto or included in the Plan

Supplement) either in its present form or as it may be altered, amended or modified from time to time by the Debtors.

2.86   "Plan Administrator" means the fiduciary responsible for, among other things, holding and distributing the Unsecured Claim Reserve and the CHC Equity Reserve pursuant to the Plan, the Plan Administration Agreement, the Confirmation Order, or such other order as may be entered by the Bankruptcy Court, the completion of the process of prosecution or settlement of disputed claims against CHC, and the completion of all other obligations pursuant to the Plan Administration Agreement.

2.87   "Plan Administration Agreement" means the agreement describing the powers, duties, and rights of the Plan Administrator in administering the Plan, in substantially the form included in the Plan Supplement.

2.88   "Plan Supplement" means a separate volume, to be filed with the Clerk of the Bankruptcy Court, containing, among other things, forms of the Amended By-Laws of Reorganized Coram, the Amended and Restated Certificate of Incorporation of Reorganized Coram, form of New Secured Notes, and a schedule of the names and information as to the business and professional backgrounds of all senior officers and directors of Reorganized Coram.

2.89   "Preferred Stock" means the preferred stock issued by Coram during the Cases pursuant to, inter alia, the Order Authorizing and Approving Issuance of Preferred Stock in Exchange for Debt of the Bankruptcy Court dated December 28, 2000, and having a liquidation preference when issued of $109,000,000 and bearing a cumulative compounding dividend at the rate of 15% per annum of the liquidation preference amount.

2.90   "Priority Non-Tax Claim" means that portion of any Claim entitled to priority in right of payment under sections 507(a)(2), (3), (4), or (6), of the Bankruptcy Code.

2.91   "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code, but excludes that portion of a Claim to the extent it is a Secured Claim.

2.92   "Pro Rata" means: (i) in the case of a Class, the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class and, (ii) in the case of a particular type of Claim or Equity Interest, the proportion the amount of an Allowed Claim or Allowed Equity Interest of a particular type bears to the aggregate amount of all Allowed Claims, or Allowed Equity Interests, as the case may be, of such type.

2.93   "Record Date" means the date the clerk of the Bankruptcy Court enters upon the docket an order approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

2.94    "Reinstated or Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim in accordance with section 1124 of the Bankruptcy Code, or (b) if applicable under section 1124 of the Bankruptcy Code: (i) curing all prepetition and postpetition defaults other than defaults relating to the insolvency or financial condition of a Debtor or its status as a debtor under the Bankruptcy Code; (ii) reinstating the maturity date of the Claim; (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a provision allowing acceleration; and (iv) not otherwise altering the legal, equitable and contractual rights to which the Claim entitles the holder thereof.

2.95    "Rejection List" means a list, if any, filed by the Debtors not less than ten (10) business days prior to the Confirmation Hearing setting forth the leases and contracts the Debtors are rejecting under this Plan pursuant to section 365 of the Bankruptcy Code, which Rejection List shall be served upon the non-Debtor party to each lease or contract described therein

2.96    "Reorganized Coram" means Coram, Inc., a Delaware corporation, as reorganized and as successor to Coram, pursuant to the Plan and Confirmation Order.

2.97    "Reorganized Coram Board of Directors" means the board of directors of Reorganized Coram on and after the Effective Date.

2.98    "Schedules" means the schedules of assets and liabilities and the statement of affairs filed by the Debtors with the Bankruptcy Court as amended from time to time.

2.99    "Secured Claim" means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estate, to the extent of the value of the holder's interest in such property as of the relevant determination date, and includes any Claim that is: (i) subject to an offset right under applicable law; and (ii) a secured claim against a Debtor pursuant to section 506(a) and 553 of the Bankruptcy Code.

2.100    "Securities Exchange Agreement" means the Securities Exchange Agreement dated as of May 6, 1998 between Coram and CHC, and Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P., and Foothill Capital Corporation, as subsequently amended.

2.101    "Series A Notes" means the Series A Senior Subordinated Notes issued by Coram and guaranteed by CHC pursuant to, among other documents, the Securities Exchange Agreement in the aggregate original principal amount of $150,000,000 and originally due May 2001.