Cash necessary for Reorganized Coram to make payments under the Plan will be obtained from Reorganized Coram's cash balances and operations and/or the Exit Financing Facility.

11.11    Funding of the Unsecured Claims Reserve and the CHC Equity Reserve.  On or before the Effective Date, Coram shall transfer the CHC Noteholder Consideration and the CHC Equity Interest Consideration to the Plan Administrator to fund the Unsecured Claims Reserve and/or the CHC Equity Interest Reserve as set forth in, and required by, Article IV of the Plan.

11.12    The Plan Administrator.  On the Effective Date, the officers and board of directors of CHC shall be deemed removed from office pursuant to the Confirmation Order, CHC shall be dissolved in accordance with section 11.3 of the Plan and the operation of the Unsecured Claims Reserve and the CHC Equity Interest Reserve and liquidation of CHC shall become the general responsibility of the Plan Administrator pursuant to and in accordance with the provision of the Plan and the Plan Administration Agreement.

1.  *Responsibilities*.  The responsibilities of the Plan Administrator shall include maintaining the Unsecured Claims Reserve and the CHC Equity Interest Reserve; liquidating remaining assets; prosecuting objections to and estimations of Claims against CHC; calculating and implementing all distributions from the Unsecured Claims Reserve and the CHC Equity Interest Reserve in accordance with the Plan; filing all required tax returns and paying taxes and all other obligations on behalf of the Unsecured Claims Reserve and the CHC Equity Interest Reserve from funds therein; and such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

2.  *Powers*.  The Powers of the Plan Administrator shall include, without Bankruptcy Court approval in each of the following cases, the power to invest funds in, and withdraw, make distributions and pay taxes and other obligation owed by the Unsecured Claims Reserve and the Equity Interest Reserve, from funds therein in accordance with the Plan; the powers to engage employees and professional persons to assist the Plan Administrator with respect to its responsibilities; the power to dispose of, and deliver title to others of, remaining assets on behalf of or against CHC; and such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or the Plan Administration Agreement.

3.  *Certain Tax Obligations relating to the Unsecured Claim Reserve*.  Absent definitive guidance from the Service or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator requests one, or the receipt of an adverse determination by the Service upon audit if not contested by the Plan Administrator), and except as otherwise provided in the Plan, the Plan Administrator shall, as to amounts retained in the Unsecured Claims Reserve in respect of Disputed Claims.:

33

(i)    treat the escrowed funds as a discreet trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Tax Code (sections 641 *et seq*.), and

(ii)    to the extent permitted by applicable law, report consistently for state and local income tax purposes.

All parties (including holders of Allowed CHC General Unsecured Claims and holders of CHC General Unsecured Claims which are Disputed Claims) are required to report consistent with such treatment.

4. *Certain Tax Obligations relating to the CHC Equity Reserve.* Absent definitive guidance from the Service or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator requests one, or the receipt of an adverse determination by the Service upon audit if not contested by the Plan Administrator), and except as otherwise provided in the Plan, the Plan Administrator shall, as to amounts retained in the CHC Equity Reserve:

(i)    treat the escrowed funds as a discreet trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each CHC Equity Interest, in accordance with the trust provisions of the Tax Code (sections 641 *et seq*.), and

(ii)    to the extent permitted by applicable law, report consistently for state and local income tax purposes.

All parties (including holders of Allowed CHC General Unsecured Claims, holders of CHC General Unsecured Claims which are Disputed Claims, and holders of Equity Interests) are required to report consistent with such treatment.

5. *Compensation.* In addition to reimbursement for the actual out-of-pocket expenses incurred, the Plan Administrator shall be entitled to reasonable compensation for services rendered on behalf of the Unsecured Claims Reserve and the CHC Equity Interest Reserve in an amount and on such terms as may be agreed to by the Debtors and as reflected in the Plan Administration Agreement. Any dispute with respect to such compensation shall be resolved by agreement among the parties or, if the parties are unable to agree, determined by the Bankruptcy Court.

34

## ARTICLE XII
## EFFECTIVENESS OF THE PLAN

12.1    Conditions Precedent to Confirmation.  The Plan shall not be confirmed unless and until the following conditions shall have been satisfied or waived by the Debtors and the Noteholder Group:

(1)    The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Noteholder Group.

(2)    Coram shall have received a binding commitment for the Exit Financing Facility.

(3)    All exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors and the Noteholder Group.

12.2    Conditions Precedent to Effectiveness.  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived in writing by the Debtors and the Noteholder Group:

(1)    The Bankruptcy Court shall have entered the Confirmation Order and no stay or injunctions against the consummation of the Plan shall have been issued by a court of competent jurisdiction.

(2)    Reorganized Coram shall have, or immediately upon the effectiveness of the Plan shall have, sufficient Cash to make all Cash payments required to be made on the Effective Date pursuant to the terms of the Plan;

(3)    All conditions necessary to effectuate Reorganized Coram's Exit Financing Facility shall have been satisfied or waived.

(4)    Any statutory fees owing the U.S. Trustee shall have been provided for or paid in full.

(5)    All other actions and documents necessary to implement the provisions of the Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

(6)    The Plan Administrator shall have executed the Plan Administration Agreement evidencing the Plan Administrator's agreement to serve in that capacity.

(7)    The Unsecured Claims Reserve and the CHC Equity Interest Reserve shall have been fully funded in accordance with the Plan and any applicable orders of the Bankruptcy Court with respect thereto.

(8)    Any Person who is to receive a distribution of New Coram Stock pursuant to the Plan shall have executed the Shareholder Agreement contained in the Plan Supplement.

(9)    The Effective Date shall have occurred on or before November 30, 2001.

## ARTICLE XII
## EFFECTS OF CONFIRMATION OF THE PLAN

13.1    <u>Vesting of Assets</u>.  Consistent with sections 1123(a)(5)(A) and 1141 of the Bankruptcy Code, on the Effective Date, except as otherwise provided in the Plan, title to all assets and property of the Estates, including without limitation all shares of and equity interests in Coram and Coram International Holdings Ltd. that are property of the Estate of CHC, shall pass to and vest in Reorganized Coram, free and clear of all Claims, Equity Interests, liens, charges and other rights of creditors or equity holders arising prior to the Effective Date.  On and after the Effective Date, Reorganized Coram may operate its business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in the Plan or in the Confirmation Order.  Without limiting the foregoing, Reorganized Coram may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, and expenses without application to the Bankruptcy Court.

13.2    <u>Discharge</u>.  Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and treatment of Claims and Equity Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Equity Interests arising on or before the Effective Date, including any interest accrued thereon from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Equity Interests:  (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Equity Interests and other rights of equity security holders in the Debtors.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Equity Interests and the issuance of the New Coram Stock, of a discharge of all Claims and other debts and liabilities against the Debtors

36

and a termination of all Equity Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharge of the Claim or terminated Equity Interest.

     13.3    <u>Injunctions</u>.

     13.3.1  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged claims, debts or liabilities or terminated Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, Reorganized Coram, or their respective property other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, Reorganized Coram, or their respective property, other than as permitted as pursuant to (a) above; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Reorganized Coram or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or Reorganized Coram; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

     13.3.2  As of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such release claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner or other proceedings; (b) enforcing, attaching, collecting or recovering in any manner, any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with this section 13.3 or is inconsistent with the provisions of the Plan.

     13.3.3  By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Equity Interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this section 13.3.

     13.4    <u>Releases by the Estate and its Representatives</u>.  In consideration of the promises and obligations of the Debtors, Reorganized Coram hereunder, and Mr. Crowley as embodied in the Executive Compensation Waiver, as of and on the Effective Date, the Debtors, the Estates, the Creditors' Committee, the Equity Committee, the Noteholder Group, and any and all Persons claiming

37

through any of the foregoing entities whether directly or indirectly, and any of their successors, assigns or representatives shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors, their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns of the foregoing, whether directly or indirectly, except as otherwise provided in the Plan, the Bankruptcy Code, or the Confirmation Order.

   13.5   Exculpation.   The Debtors, their Estates, Reorganized Coram, the Creditors' Committee, the Noteholder Group, and their respective members, officers, directors, employees, representatives, attorneys and agents, shall, to the fullest and broadest extent permitted by law, be deemed released by each of them against the other and by the holders of Claims or Interests and all persons claiming through any of the foregoing entities, directly or indirectly or derivatively, of or from any and all claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Debtors' chapter 11 Cases, including without limiting the generality of the foregoing, the commencement of the Cases, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the DIP Facility, the Exit Financing Facility, the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or otherwise in connection with the Cases, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

   13.6   Third-Party Releases    In consideration of the promises, obligations, and waivers of rights to receive funds by Mr. Crowley and the members of the Noteholder Group, as embodied in the Plan and the Executive Compensation Waiver, as of and on the Effective Date, any party that votes in favor of the Plan and any and all Persons claiming through any such party, whether directly or indirectly, and any such party's successors, assigns or representatives (collectively, "Releasors") shall, to the fullest and broadest extent permitted by law, be deemed to have waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, whether known or unknown, which they possessed or may possess prior to the Effective Date against the Debtors and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, and against the members of the Noteholder Group and all of their present and former directors, officers, employees, agents, representatives and attorneys and any successors or assigns, whether directly or indirectly, except as otherwise explicitly provided in the Plan, the Bankruptcy Code, or the Confirmation Order. The release described in the preceding sentence shall be enforceable as a matter of contract against any Releasor pursuant to the Plan and/or the Confirmation Order.

   13.7   Rights of Action.  Any rights or causes of action accruing to the Debtors or Reorganized Coram, including without limitation those arising under or pursuant to the Bankruptcy Code, shall remain assets of, or vest in, Reorganized Coram.  Reorganized Coram may pursue, abandon, settle or release all reserved rights of action, as appropriate, in accordance with what is in the

best interests, and for the benefit of, Reorganized Coram. Any distributions provided for in the Plan and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of Reorganized Coram to pursue and prosecute any reserved rights of action including, without limitation, those arising under or pursuant to the Bankruptcy Code.

## ARTICLE XIV
## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain and shall have exclusive jurisdiction over the Case and any and all proceedings therein including, without limitation, in respect of the following:

14.1    Claims. To determine any and all objections to the allowance of Claims.

14.2    Estimation. To determine any and all motions to estimate Claims and to estimate such Claims.

14.3    Assumption/Rejection. To determine any and all pending applications for the rejection or assumption and/or assignment of executory contracts or unexpired leases to which a Debtor or Reorganized Coram is a party or with respect to which a Debtor or Reorganized Coram may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom.

14.4    Adversary Proceedings and Contested Matters. To determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on or commenced after the Effective Date.

14.5    Modifications. To consider and approve any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in, or to clarify the Plan or any order of the Bankruptcy Court.

14.6    Dispute Resolution. To determine all controversies, suits and disputes that may arise in connection with the interpretation or consummation of the Plan or the obligations under the Plan or the Plan Administration Agreement of the Debtors, the Plan Administrator or Reorganized Coram.

14.7    Plan. To hear and determine other issues presented or arising under the Plan, to issue any appropriate injunctions and orders and take all other actions in aid of execution, implementation or enforcement of the Plan and to enforce the Confirmation Order and/or the discharge, or the effect of such discharge.

14.8    Compensation. To determine any and all applications for allowance of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan.

14.9    <u>Distributions</u>.  To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided herein.

14.10    <u>Assets</u>.  To recover assets of the Debtors and property of their Estates, wherever located.

14.11    <u>Taxes</u>.  To hear and to determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

14.12    <u>Final Decree</u>.  To enter final decrees closing the Cases.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

15.1    <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in cash on or before the Effective Date.

15.2    <u>Plan Binding on All Persons</u>.  Upon Confirmation, and subject to the occurrence of the Effective Date, where applicable, the Plan shall be binding upon and inure to the benefit of the Debtors and their successors and assigns, and the holders of Claims and Equity Interests and their respective successors and assigns whether or not such holders voted to accept the Plan.  The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever as provided in this Plan.

15.3    <u>Fees and Expenses</u>.  The reasonable and necessary operating expenses and professional fees and expenses incurred by the Debtors from and after the Effective Date in connection with the consummation and implementation of the Plan shall be paid by Reorganized Coram in the ordinary course of business without further order of the Bankruptcy Court; <u>provided</u> <u>however</u>, that any unresolved dispute as to the payment of such fees and expenses shall be submitted to (and resolved by) the Bankruptcy Court.

15.4    <u>Authorization of Action</u>.  The entry of the Confirmation Order shall constitute direction to the Debtors to take or cause to be taken any action necessary or appropriate to consummate the provisions of this Plan prior to and through the Effective Date and all such actions taken or caused to be taken shall be deemed to be authorized and approved by the Bankruptcy Court.

15.5    <u>Exemption from Registration</u>.  Pursuant to section 1145(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, shall be exempt from registration under the Securities Act of 1933, as amended, and under State securities laws.

40

15.6    Severability.  Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

15.7    Modification or Amendment.  This Plan may be altered, amended or modified by the Debtors before or after the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

15.8    Revocation or Withdrawal of the Plan.  The Debtors reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

15.9    Notices.  Any notice required or permitted to be provided under the Plan to any Person shall be in writing and served by either (a) certified mail, return receipt requested, postage pre-paid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, and except as otherwise provided in the Plan to be addressed to such Person at the address most recently given by such Person to the Debtor or recorded by the Debtor on its Schedules or if to the Debtors at:

> Coram, Inc.
> 1125 Seventeenth Street, Suite 2100
> Denver, Colorado 80202
> Attn:  Allen J. Marabito

with a copy to:

> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, New York 10019
> Attn: David M. Friedman, Esq.

15.10    Governing Law.  Unless a rule of law or procedure is supplied or specified by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or a specific agreement, document or instrument, the laws of the State of Delaware shall govern the construction and implementation of the Plan and, unless otherwise stated therein, any agreements, documents, and instruments executed in connection with the Plan.

41

15.11   Saturday, Sunday, or Legal Holiday.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment, distribution or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

15.12   Filing of Additional Documents.  On or before consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

15.13   Plan Controls.  To the extent the Plan is inconsistent with the Disclosure Statement or any other document, agreement, pleading or understanding, the provisions of the Plan shall be controlling.

15.14   Section 1146 Exemption.  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the re-vesting, transfer or sale of any real property of the Debtors pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

Dated:   July 31, 2001

CORAM HEALTHCARE CORP.

By: *Allen Marabito*
Name:   Allen J. Marabito
Its:       Executive Vice President

CORAM, INC

By: *Allen Marabito*
Name:   Allen J. Marabito
Its:       President

Counsel:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Robert M. Novick
1633 Broadway
New York, New York 10019
(212) 506-1700

– and –

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES, P.C.
Laura Davis Jones
Rachel Lowy
919 North Market Street
Wilmington, Delaware 19899-8705
(302) 652-4100

**TABLE OF CONTENTS**

i

<u>CERTIFICATE OF SERVICE</u>

I, Rachel Lowy, hereby certify that a copy of the foregoing documents was served upon the persons on the attached service list in the manner indicated on this 31st day of July, 2001:

**DEBTORS SECOND JOINT PLAN PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUTPCY CODE**

Rachel S. Lowy (DE Bar No. 3753)
PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:    (302) 652-4100
Fax:    (302) 652-4400

15570-001\DOCS_DE:27219.1
07/31/01 1:48 PM

<u>CERTIFICATE OF SERVICE</u>

I, Rachel Lowy, hereby certify that a copy of the foregoing documents was served upon the persons on the attached service list in the manner indicated on this 31st day of July, 2001:

**DEBTORS SECOND JOINT PLAN PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUTPCY CODE**

Rachel S. Lowy (DE Bar No. 3753)
PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:     (302) 652-4100
Fax:     (302) 652-4400

15570-001\DOCS_DE:27219.1
07/31/01 1:48 PM

B-66

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CORAM HEALTHCARE CORP. and CORAM, INC., | Case Nos. 00-3299 (MFW) through 00-3300 (MFW) |
| Debtors. | Jointly Administered |

## UPDATED REPORT OF INDEPENDENT RESTRUCTURING ADVISOR GOLDIN ASSOCIATES, L.L.C.

GOLDIN ASSOCIATES, L.L.C.
400 Madison Avenue
New York, New York 10017
(212) 593-2255

OF COUNSEL:
KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY 10022
(212) 715-9100

KL2:2108873.7

CONFIDENTIAL
EMB 002248

B-67

## Summary of Goldin's Valuation of Coram
### ($000s)

| Method | Basis | July 31, 2000 EV | Weight | December 14, 2000 EV | Weight | June 15, 2001 EV | Weight | August 31, 2001 EV | Weight |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Market | EV/Revenue | 227,116 | 5% | 255,604 | 5% | 396,312 | 5% | 375,242 | 5% |
| | EV/EBITDA | 251,444 | 10% | 257,940 | 10% | 255,555 | 10% | 248,225 | 10% |
| Comparable Transactions | EV/Revenue | 455,690 | 5% | 409,141 | 5% | 485,210 | 5% | 485,210 | 5% |
| | EV/EBITDA | 278,703 | 20% | 239,687 | 20% | 159,542 | 20% | 157,817 | 20% |
| DCF | | 182,502 | 60% | 182,899 | 60% | 238,171 | 60% | 245,747 | 60% |
| Enterprise Value | | 224,527 | | 216,708 | | 244,443 | | 246,857 | |

### B.    The Integrity and Accuracy of Coram's Financial Records

The valuations performed by the Financial Advisors and Goldin utilized the financial information reported by Coram and/or provided by Coram's management; hence, Goldin needed to satisfy itself as to the integrity and accuracy of this information. Given the issues raised in Coram's bankruptcy, Goldin's examination focused on whether:

- the valuation analysis by Chanin as of July 2000 utilized sound and reliable financial information;

- Coram's accounting and financial management systems had been manipulated in a way calculated to produce false or misleading information and to lead the Financial Advisors and Goldin to a particular (and potentially erroneous) conclusion, i.e., that the enterprise value of Coram was, on the Valuation Dates, significantly below the amount of the debt claims; and

- Mr. Crowley and/or Cerberus (Mr. Feinberg) used their positions deliberately to mismanage the company and benefit themselves or itself in dereliction of their respective duties to Coram.

Especially in light of the substantial shortfalls in enterprise value Goldin found from the amount of the debt claims on the Valuation Dates, Goldin focused closely on issues and areas in which a finding of impropriety and/or inaccuracy could have a potentially material financial impact, i.e., could result in a different outcome. Goldin undertook an inquiry in that

KL3:2108573.7

-79-

CONFIDENTIAL
EMB 002331

B-68

STRICTLY PRIVATE AND CONFIDENTIAL



C O R A M

**UBS Warburg**

# Plan of Reorganization
## Updated Valuation Analysis

Presentation to the Official Committee of Unsecured Creditors
of Coram Healthcare Corp. and Coram, Inc.
as of November 5, 2001



NOVEMBER 2001

CONFIDENTIAL
EMB 002176

1101935N.DOC

# Valuation Summary

| (US$mm) | Valuation Range | | Implied 2002 EBITDA Multiple Range (x) |
|---|---|---|---|
| | Low | High | |
| **Comparable Company Analysis** | 140 | 180 | 5.2 – 6.7 |
| **Discounted Cash Flow Analysis** | 150 | 185 | 5.6 – 6.9 |
| **Precedent Transactions Analysis** | 140 | 200 | 5.2 – 7.4 |
| **Valuation Range** | 150 | 190 | 5.6 – 7.1 |

Section 1: Executive Summary

4

✤ UBS Warburg

CONFIDENTIAL
EMB 002183

B-70

224

VOLUME 2

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

In Re:                          )
                                )
CORAM HEALTHCARE CORP. and      )
CORAM, INC.,                    ) Case No. 00-3299
                                ) through 00-3300(MFW)
        Debtors.                )

        United States Bankruptcy Court
        824 Market Street - Sixth Floor
        Courtroom No. 1
        Wilmington, Delaware

        November 6, 2001
        1:40 p.m.

        -- -- -- --
        TRANSCRIPT OF PROCEEDINGS
        -- -- -- --

BEFORE:    THE HONORABLE MARY F. WALRATH, JUDGE.

        -- -- -- --

- - - - - - - - - - - - - - - - - - - - - - - - - -
        WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware   19801
            (302) 655-0477



1370

01/15/02

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

B-71

1    a significant benefit.

2       Q.   Your testimony about the cost of equity for

3    Coram relative to the comparable companies, you have

4    taken into account the fact that you used turnaround

5    premium in your calculation.  Is that fair?

6       A.   That's correct.

7       Q.   Even with the turnaround premium, your view is

8    that the cost of equity would be higher?

9       A.   That is my view, correct.  We have not changed

10   our determinants in terms of turnaround premium from

11   our July valuation.  Given the actual results to date,

12   given what we have in terms of update, given what's

13   taken place in place of operations, there is

14   significant cause for a higher turnaround premium.

15      Q.   By the way, is a turnaround premium, to your

16   knowledge, an appropriate valuation methodology?  Is

17   that something you have support for?

18      A.   Yes.

19      Q.   Is there another term for a turnaround premium?

20      A.   Specific risk is a term that's used in many

21   valuation texts.

22      Q.   And I guess I asked you this.  Your

23   calculations of value, are they all summarized in

24   Exhibit 6?



Scroggins - Direct                                              347

1    A.    Yes, they are.

2    Q.    And just to be clear, did you do anything

3    different methodologically from the valuation you

4    performed last year, which you testified to last year?

5    A.    No.    Our methodology has been and is consistent

6    with what we provided in terms of the inputs and

7    methodologies from our July 2000 presentation.

8    Q.    And what conclusions have you reached with

9    respect to Coram's enterprise value as of October

10   2001?

11   A.    Our October 2001 enterprise value is

12   approximately $224 million.

13   Q.    And have Coram's operations improved or

14   worsened since July of this year?

15   A.    They've declined.    They've worsened.

16   Q.    And you are valuing Coram $20 million higher

17   now than you were in July.    Is that correct?

18   A.    We are valuing Coram higher giving the benefit

19   to Coram in terms of its initiatives and enhancements,

20   but that valuation, as a reminder, is predicated

21   largely on the stock price increases of the comparable

22   companies as well.

23   Q.    So Coram's enhanced value is entirely due to

24   the higher stock prices of the comparables?

1      A.    That's correct.  Shown forth in the multiples

2   of the comparable companies.

3      Q.    Sitting here today, what is your best opinion

4   about what Coram is worth today?

5      A.    From an enterprise value standpoint, we've

6   given the value of $224 million.

7      Q.    Anybody attempt to influence any of your

8   conclusions with respect to your October valuation?

9      A.    No one.

10     Q.    Now, tell me, if you will, how do you compute

11  equity value from an enterprise value?

12     A.    You would take your enterprise value.  You'd

13  add cash to that.  And from that number you would

14  subtract out your interest-bearing debt and accrued

15  interest, any noncore, nonordinary course liabilities,

16  and, as an example, preferred stock and accrued

17  dividends.

18             MR. LOW:  This is not covered in his

19  report.  I'm not sure where this goes.

20             MR. FRIEDMAN:  Your Honor, he testified to

21  these things.

22             THE COURT:  Overruled.

23  BY MR. FRIEDMAN:

24     Q.    Mr. Scroggins, can you look at Debtors' Exhibit

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case No. 00-3299 (MFW) through |
| CORAM, INC. | : | 00-3300 (MFW) |
| | : | |
| Debtor(s). | : | Jointly Administered |

**Hearing Date: March 24, 2005 @ 9:30 AM**

**Objection Deadline: March 17, 2005**

**FINAL FEE APPLICATION OF CHANIN CAPITAL PARTNERS LLC,
FOR ALLOWANCE OF COMPENSATION AND FOR THE REIMBURSEMENT
OF EXPENSES FOR SERVICES RENDERED DURING THE PERIOD
FROM SEPTEMBER 19, 2000 THROUGH MARCH 7, 2002**

Chanin Capital Partners LLC ("Chanin" or "Applicant"), financial advisor to

Coram Healthcare Corp. and Coram, Inc. ("Debtors") (the Debtors and their

subsidiaries, the "Company"), for its final application pursuant to 11 U.S.C. §§ 330 and

331 for an allowance of compensation for services rendered and for reimbursement of

expenses incurred in connection therewith (the "Application"), respectfully represents:

**INTRODUCTION**

1. By this Application, Chanin seeks:

(i) Final allowance of fees and expenses in the aggregate amount of

$165,228.75 for the period of September 19, 2000 through October

31, 2000 (the "First Fee Application"), which compensation was

awarded to Chanin pursuant to an order of this Court dated August

14, 2001;

(ii)     Final allowance of fees and expenses in the aggregate amount of $115,749.68 for the period of November 1, 2000 through November 30, 2000 (the "Second Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated August 14, 2001;

(iii)    Final allowance of fees and expenses in the aggregate amount of $118,961.38 for the period of December 1, 2000 through December 31, 2000 (the "Third Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated August 14, 2001;

(iv)     Final allowance of fees and expenses in the aggregate amount of $117,013.51 for the period of January 1, 2001 through January 31, 2001 (the "Fourth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated August 14, 2001;

(v)      Final allowance of fees and expenses in the aggregate amount of $118,959.98 for the period of February 1, 2001 through February 28, 2001 (the "Fifth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(vi)     Final allowance of fees and expenses in the aggregate amount of $116,666.52 for the period of March 1, 2001 through March 31, 2001 (the "Sixth Fee Application"), which compensation was

230367-1

awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(vii)    Final allowance of fees and expenses in the aggregate amount of $116,603.50 for the period of April 1, 2001 through April 30, 2001 (the "Seventh Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(viii)   Final allowance of fees and expenses in the aggregate amount of $115,597.63 for the period of May 1, 2001 through May 31, 2001 (the "Eighth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(ix)     Final allowance of fees and expenses in the aggregate amount of $115,424.86 for the period of June 1, 2001 through June 30, 2001 (the "Ninth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(x)      Final allowance of fees and expenses in the aggregate amount of $115,649.17 for the period of July 1, 2001 through July 31, 2001 (the "Tenth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(xi)     Final allowance of fees and expenses in the aggregate amount of $116,754.44 for the period of August 1, 2002 through August 31, 2001 (the "Eleventh Fee Application"), which compensation was

230367-1

awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(xii)    Final allowance of fees and expenses in the aggregate amount of $115,718.65 for the period of September 1, 2001 through September 30, 2001 (the "Twelfth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(xiii)    Final allowance of fees and expenses in the aggregate amount of $118,207.40 for the period of October 1, 2001 through October 31, 2001 (the "Thirteenth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(xiv)    Final allowance of fees and expenses in the aggregate amount of $131,320.91 for the period of November 1, 2001 through November 30, 2001 (the "Fourteenth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

(xv)    Final allowance of fees and expenses in the aggregate amount of $118,317.06 for the period of December 1, 2001 through December 31, 2001 (the "Fifteenth Fee Application"), which compensation was awarded to Chanin pursuant to an order of this Court dated December 31, 2002;

230367-1

(xvi)     Final allowance of fees and expenses in the aggregate amount of $116,532.89 for the period of January 1, 2002 through January 31, 2002 (the "Sixteenth Fee Application"), for which an order has not yet been entered by this Court;

(xvii)    Final allowance of fees and expenses in the aggregate amount of $116,308.11 for the period of February 1, 2002 through February 28, 2002 (the "Seventeenth Fee Application"), for which an order has not yet been entered by this Court; and

(xviii)   Final allowance of fees and expenses in the aggregate amount of $27,181.61 for the period of March 1, 2002 through March 7, 2002 (the "Eighteenth Fee Application"), for which an order has not yet been entered by this Court.

## JURISDICTION

2.   Venue of this proceeding and this application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are 11 U.S.C. §§ 330 and 331 and Federal Rules of Bankruptcy Procedure 2002(a) and 2016.

## BACKGROUND

3.   On August 8, 2000 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.   In April 2000, the Debtors retained Chanin to provide financial advice concerning an enterprise valuation, debt capacity analysis, negotiating DIP

230367-1

financing and assisting the Debtor related to any Plan of Reorganization issues, among other things.

5. By order authorized by the Court dated October 20, 2000 (the "Retention Order") and annexed hereto as Exhibit "A", Chanin was granted approval of its retention as financial advisor to the Debtors, effective September 19, 2000. In connection with its representation of the Debtors, Chanin entered into an amended engagement letter with the Debtors on August 1, 2000, which engagement letter provides for the Debtors to pay the fees and expenses of Chanin as set forth therein ("Engagement Letter" – Exhibit "B").

6. This Application is submitted pursuant to the terms of the Administrative Order Pursuant to Sections 105(a) and 331 Establishing a Procedure for Monthly and Interim Compensation and Reimbursement of Expenses of Professionals dated August 9, 2000 (the "Administrative Fee Order").

7. Pursuant to Chanin's Retention Authorization, Chanin is to be compensated for its services in accordance with the terms and conditions contained in the Engagement Letter. Pursuant to the Engagement Letter, Chanin's financial advisory fee is $115,000.00 in cash per month (the "Monthly Advisory Fee"). Additionally, the Debtors shall reimburse Chanin monthly, upon request, for all reasonable out-of-pocket expenses incurred in connection with its engagement by the Debtors, including, without limitation, coach class travel and lodging expenses, data processing, reproduction and communication charges, courier services and other actual and necessary out-of-pocket business expenses.

230367-1

8.  On March 7, 2002, the Court appointed a trustee to assume control over the Debtors' property and affairs pursuant to section 1104 of the Bankruptcy Code.

9.  On November 1, 2004, the Court entered an order confirming the Chapter 11 Trustee's Second Amended Joint Plan of Reorganization (the "Plan"). On December 1, 2004, the Plan became effective.

10. Chanin seeks approval of $2,026,967.74 in advisory fees and $49,227.95 as reimbursement of expenses for the period from September 19, 2000 through March 7, 2002 (the "Compensation Period"). Chanin has received payments of $2,076,195.69 for advisory fees and $45,173.08 for expenses.

11. Other than that mentioned herein, the Applicant has received no payment and no promises for payment from any source for services rendered in connection with these cases. There is no agreement or understanding between the Applicant and any other person for the sharing of compensation to be received for the services rendered in these cases.

12. The Engagement Letter outlines the specific services that were to be provided by Chanin. Such services included, but were not limited to preparation of an enterprise valuation of the Company, analysis of the pro forma debt capacity of the Company, assisting the Company in sourcing and negotiating DIP financing, assisting the Company in the development and the preparation of a Plan of Reorganization and Disclosure Statement, providing such testimony as may be required in connection with DIP financing and/or confirmation of the Plan of Reorganization, advising the Company's Board of Directors (the "Board") on issues related to the Restructuring Transaction, advising the Special Committee of the

230367-1

Board, advising the Board with respect to any committee appointed throughout a chapter 11 reorganization and advising the Company with respect to employee retention issues.

## ADVISORY ACTIVITY

13. The professionals of Chanin (the "Professionals") who have primarily rendered professional services on behalf of the Committee include Eric A. Scroggins, Robert J. Stobo, and Juan Aguilar.

> A. Eric A. Scroggins was a Managing Director of Chanin. Prior to joining Chanin, Mr. Scroggins worked at Houlihan Lokey Howard and Zukin.

> B. Robert J. Stobo was a Vice President of Chanin. Prior to joining Chanin, Mr. Stobo worked as Chief Financial Officer of Crescent Health Services.

> C. Juan Aguilar was an Analyst of Chanin. Prior to joining Chanin, Mr. Aguilar worked at the CIT Group in the Commercial Finance Department.

## SUMMARY OF SERVICES RENDERED

14. From September 2000 through March 7, 2002, Chanin rendered professional services to the Debtors as requested and as necessary and appropriate in furtherance of the interests of the Debtors' estate.

15. Chanin does not maintain, in the normal course of providing financial advisory services to its clients, detailed written records in the form prescribed by this Court. However, in this case, Chanin maintained written records of the time

230367-1