## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>CORAM HEALTHCARE CORP. and CORAM, INC.<br><br>Debtors | BK No. 00-3299 through 00-3300 |
| UBS SECURITIES, LLC,<br><br>Appellant<br><br>v.<br><br>CORAM HEALTHCARE, et al.<br><br>Appellee | Civ. No. 04-1558-SLR |

REPLY BRIEF OF APPELLANT, UBS SECURITIES, LLC

**Counsel for Appellant**

Susan Power Johnston
Charles H. Jeanfreau
Martin E. Beeler
COVINGTON & BURLING
1330 Avenue of the Americas
New York, NY 10019

Neal Levitsky
L. Jason Cornell
FOX ROTHSCHILD, LLP
919 North Market Street, Suite 1300
Wilmington, DE 19899

*Attorneys for Appellant UBS Securities, LLC*

**Counsel for Appellee**

Barry E. Bressler
Richard A. Barkasy
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Kenneth E. Aaron
WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
Wilmington, DE 19899

*Attorneys for Appellee Arlin M. Adams, as Chapter 11 Trustee for Coram Healthcare Corporation, et al.*

Table of Contents

Introduction .......................................................................................................................... 1

ARGUMENT ........................................................................................................................ 1

I.      The Opening Brief Properly States the Scope and Standard of Review ............................ 1

        A.      The Bankruptcy Court's Decision Is Not Due "Substantial Deference" ............... 1

                1.      The Bankruptcy Court Interpreted the Engagement Agreement................. 2

                2.      The Retention Order Did Not Alter or Vary the Terms of the
                        Engagement Agreement ..................................................................... 3

        B.      The "Abuse of Discretion" Standard Is Inapplicable ............................................. 4

II.     The Trustee's Contract Law Arguments Are Erroneous....................................................... 5

        A.      The Language of the Engagement Agreement Did Not Create  an Express
                Condition Precedent to Payment of the Valuation Fee. .......................................... 5

        B.      UBS Has Not Conceded the Existence of a Condition Precedent to
                Payment of the Valuation Fee ................................................................................. 8

        C.      Extrinsic Evidence is Admissible to Establish the Meaning of the
                Engagement Agreement ........................................................................................... 9

        D.      The Rule of Construction Against the Drafter is Inapplicable.............................. 11

III.    The Trustee Misrepresents the Nature and Scope of UBS's Retention by the
        Committee ....................................................................................................................... 13

IV.     The Terms of Chanin's Retention Do Not Undermine UBS's Position Regarding
        the Impropriety of a Contingent Valuation Fee ................................................................. 14

        A.      The Scope and Terms of Chanin's Retention Were Not  Comparable to the
                Scope and Terms of UBS's Retention.................................................................... 15

        B.      Chanin's Failure to Seek Payment of its Transaction Fee Is Irrelevant ............... 17

V.      Remand to the Bankruptcy Court for a "Reasonableness" Determination Is
        Inappropriate. ................................................................................................................... 17

Conclusion............................................................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Albany Sav. Bank v. Halpin*, 117 F.3d 669 (2d Cir. 1997)........................................... 9, 11,

*In re Cedar Chemical Corp.*, 294 B.R. 224 (Bankr. S.D.N.Y. 2003) .............................. 10

*In re Circle K Corp.*, 165 B.R. 653 (Bankr. D. Ariz. 1994) ........................................... 19

*In re Northwestern Corp.*, 324 B.R. 538 (Bankr. D. Del. 2005).................................... 18

*Deutsch v. Kennsington Public Corp.*, 1982 U.S. Dist. LEXIS 15448 (S.D.N.Y.
    Oct. 5, 1982)........................................................................................................ 6, 7,

*Eagle Leasing Corp. v. Hartford Fire Insurance Co.*, 540 F.2d 1257 (5th Cir.
    1976) ................................................................................................................... 12

*In re Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir. 1989)........................................ 4

*In re Federal Mogul-Global, Inc.*, 348 F.3d 390 (3d Cir. 2003), and *In re High
    Voltage Eng'g Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004)............................ 3, 4, 17

*In re Grand Union Co.*, 200 B.R. 101 (D. Del. 1996) ..................................................... 4

*In re High Voltage Engineering Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004)................. 4

*Morgan Stanley Group Inc. v. New England Insurance Co.*, 225 F.3d 270 (2d Cir.
    2000) .................................................................................................................. 11

*In re National Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997) .............................................. 18

*In re Northwestern Corp.*, 332 B.R. 534 (D. Del. 2005) ................................................. 18

*Schering Corp. v. Home Insurance Co.*, 712 F.2d 4 (2d Cir. 1983) ......................... 11, 12,

*Utica Alloys, Inc. v. Alcoa, Inc.*, 303 F. Supp. 2d 247 (N.D.N.Y. 2004)........................ 10

*In re Zenith Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ................................................... 16

*Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253 (3d Cir. 1995) ........................ 4

## STATE CASES

*Balanoff v. 83 Maiden LLC*, No. 98 Civ. 6442 RPP, 2000 WL. 16947 (S.D.N.Y. January 10, 2000) ................................................. 11, 12

*Preferred Mortgage Brokers, Inc. v. Byfield*, 282 A.D.2d 589 (N.Y. App. Div. 2001) ..................................................................................... 7

*Prince George's Country Club, Inc. v. Carr*, 202 A.2d 354 (Md. 1964) ................... 5, 6, 7

*Wilmington Firefighters Association Local 1590 v. City of Wilmington, No. Civ.A. 19035*, 2002 WL. 418032 (Del. Ch. March 12, 2002) ........................................ 12, 16,

## FEDERAL STATUTES

11 U.S.C. § 328(a) ............................................................................... 17

## OTHER AUTHORITIES

5 CORBIN ON CONTRACTS § 24.27, at 297-300 ......................................... 12

James W. Giddens, *Compensation of Investment Bankers in Bankruptcy Proceedings: Just or Unjust Enrichment?*, 23 Ann. Rev. Banking & Fin. L. 485, 494 (2004) .......................................................................... 16

iii

<u>Introduction</u>[1]

UBS Securities, LLC ("UBS") submits this reply brief in further support of its appeal from the denial by the Bankruptcy Court for the District of Delaware of UBS's application for compensation for valuation services it rendered to the Committee during the Chapter 11 cases of the Debtors.  The brief of Appellee, Arlin M. Adams, Chapter 11 Trustee (the "Trustee") of Coram Healthcare Corp. and Coram Inc., dated November 10, 2005 (the "Trustee's Brief") is replete with erroneous legal arguments and misleading factual statements regarding: (1) the proper scope and standard of review applicable to this Court's review of the Fee Application Order; (2) the proper application of New York contract law to the interpretation of the Engagement Agreement; (3) the scope and nature of UBS's retention by the Committee; (4) the relevance of the terms and conditions applicable to the retention of other financial advisors in this case to the determination whether the Valuation Fee payable to UBS was "contingent"; and (5) the propriety of remanding this case to the Bankruptcy Court for review of UBS's fees pursuant to a "reasonableness" standard.  For the reasons set forth below and in the Opening Brief, the Court should reverse the Bankruptcy Court's denial of the Valuation Fee.

<u>ARGUMENT</u>

I.     <u>The Opening Brief Properly States the Scope and Standard of Review</u>

     A.     <u>The Bankruptcy Court's Decision Is Not Due "Substantial Deference"</u>

The Trustee argues that the Fee Application Order is due "substantial deference" because it was allegedly based on the Bankruptcy Court's interpretation of the Retention Order, rather than an interpretation of the Engagement Agreement.  Trustee's Brief at 2, 10-11.  The Trustee is

---

[1] Capitalized terms not otherwise defined have the meaning given to them in UBS's initial Brief on Appeal, dated October 11, 2005 (the "Opening Brief").

mistaken.  The Bankruptcy Court's decision was based on an interpretation of the Engagement Agreement, which was not altered or varied by the Retention Order.

>        1.        The Bankruptcy Court Interpreted the Engagement Agreement

The Retention Order explicitly provided that the terms of UBS's engagement were approved "in accordance with, and upon the terms and conditions contained in" the Engagement Agreement, App. at A-682, and a copy of the Engagement Agreement was attached to the Retention Order.  Moreover, the Retention Order explicitly stated that the Valuation Fee was payable "in accordance with the [Engagement Agreement]."  *Id.*  The Retention Order itself thus established that the Engagement Agreement controls the terms of the Committee's engagement of UBS and that any consideration of UBS's fees would require an interpretation of the Engagement Agreement.

Second, the Fee Application Order demonstrates that Chief Judge Walrath interpreted the terms of the Engagement Agreement, not the Retention Order.  The Fee Application Order states that "witness testimony concerning the intent of the parties to the UBS fee agreement was not warranted since the agreement was unambiguous."  Supplemental Appendix to Reply Brief of UBS at C-2.  This language, including the underlined language, which Chief Judge Walrath added by hand to the Fee Application Order, proves that that the Bankruptcy Court's decision regarding the Valuation Fee was based on her interpretation of the Engagement Agreement.

Finally, the transcript of the Fee Application hearing demonstrates that Chief Judge Walrath based her decision on an interpretation of the Engagement Agreement.  She cited the Engagement Agreement in her consideration of and ruling on the Fee Application several times and never cited the Retention Order.  *See* App. at A-690, A-693, A-696.

2.     The Retention Order Did Not Alter or Vary
the Terms of the Engagement Agreement

The Trustee's contention that the Retention Order, not the Engagement Agreement, controls the terms of UBS's engagement by the Committee is erroneous.  This is not a case in which the "bankruptcy court . . . impose[d] terms and conditions of a professional's employment that vary from those sought in the employment application."  *See* Trustee's Brief at 10.  As discussed above, the Retention Order explicitly adopted the terms of the Engagement Agreement.  Furthermore, the Retention Order did not alter or vary the terms of that agreement. Consequently, the Engagement Agreement, rather than the court's retention order, controls the terms of UBS's employment.

The Retention Order quoted the Engagement Agreement verbatim with respect to the Monthly Fees.  It included language governing the Valuation Fee that differed from that in the Engagement Agreement only in that the phrase "on the effective date of the Company's plan of reorganization" was replaced by the phrase "at the time of the Effective Date of the Debtor's plan of reorganization."  App. at A-682.  Nothing in the Retention Order or elsewhere in the record of this case suggests that the Bankruptcy Court intended to vary the fundamental terms of UBS's engagement by including this slightly different language.

The cases on which the Trustee relies for the proposition that the Retention Order, rather than the Engagement Agreement controls the terms of UBS's engagement, *In re Fed. Mogul-Global, Inc.*, 348 F.3d 390 (3d Cir. 2003), and *In re High Voltage Eng'g Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004), are inapposite.  In *Federal Mogul*, the bankruptcy court approved the retention of a financial advisor by an equity holders' committee, subject to a monthly fee cap that was imposed by the court but was not included in the retention application.  *In re Federal Mogul-Global, Inc.*, 348 F.3d 390, 395 (3d Cir. 2003).  The Delaware District Court and the

3

Court of Appeals for the Third Circuit affirmed, but remanded the case for further consideration of the reasonableness of the cap. *Id.* at 408. Unlike this case, where the Bankruptcy Court approved the retention of UBS in accordance with the Engagement Agreement without varying its terms, the court in *Federal Mogul* explicitly and sua sponte imposed an additional term on the financial advisor's retention.

Similarly, in *In re High Voltage Eng'g Corp.*, 311 B.R. 320 (Bankr. D. Mass. 2004), the bankruptcy court did not vary or alter the terms applicable to the debtor's retention of a professional. Instead, the court held that the debtor had failed to satisfy its burden of proving that the terms of the retention were "reasonable" under Section 330 of the Bankruptcy Code. *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 335 (Bankr. D. Mass. 2004).

B.    The "Abuse of Discretion" Standard Is Inapplicable

The "abuse of discretion" standard is inapplicable in this case. As explained in the Opening Brief, the "abuse of discretion" standard applies to a fee award when the bankruptcy court reviews the reasonableness of the fee or the necessity to the estate of the services provided, and makes factual findings in support of its decision, which are precisely the types of issues under review in the cases on which the Trustee relies. *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253 (3d Cir. 1995) (reviewing reasonableness of accounting firm's fees under section 330 of the Code); *In re Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir. 1989) (remanding fee application for further consideration because, *inter alia*, lower court failed to provide factual support for their determinations regarding reasonableness of awards); *In re Grand Union Co.*, 200 B.R. 101 (D. Del. 1996) (holding that appeal of fee awards was frivolous when it appeared that bankruptcy court properly applied factors under section 330 of the Code and objecting party failed to offer legal support for any of its challenges to fee award).

4

In contrast, the Bankruptcy Court's decision in this case turned solely on a question of contract interpretation.  Indeed, the Trustee concedes that the Bankruptcy Court's ruling on the Valuation Fee was based exclusively on its determination that a condition precedent to payment of the Valuation Fee had not occurred.  Trustee's Brief at 25.  This Court should therefore apply the *de novo* standard of review applicable to questions of contract interpretation.

II.     The Trustee's Contract Law Arguments Are Erroneous

     A.     The Language of the Engagement Agreement Did Not Create
          an Express Condition Precedent to Payment of the Valuation Fee.

The Trustee does not cite any relevant legal authority supporting the proposition that the language of the Engagement Agreement created an express condition precedent to payment of the Valuation Fee.  The cases on which the Trustee relies for this contention actually demonstrate that the language of the Engagement Agreement merely sets forth the timing of payment of the fee.

The Trustee claims that *Prince George's Country Club, Inc. v. Carr*, 202 A.2d 354, 361 (Md. 1964), supports the proposition that "it is well-settled that 'a promise can be made conditional by using language fixing the time of performance.'"  Trustee's Brief at 13.  On the contrary, that case squarely holds that an express condition precedent may be found if the contract clearly identifies a term as a condition.  The contract at issue there was a purchase agreement that contemplated the sale of substantially all of the assets of a corporation, including real property.  202 A.2d at 355-56.  The contract provided, among other things, that a brokerage commission was to be paid "at the time of the settlement of this contract … from the sale proceeds."  *Id.*  The broker who procured the sale sued to collect his commission after the corporation failed to consummate the sale.  The court held that the language quoted above created a condition precedent to payment of the commission because: (1) the provision appeared

5

in a section of the contract along with numerous other provisions preceded by the phrase: "This sale is made upon . . . the *following conditions*" (emphasis in original); and (2) the agreement provided "not only that the commission was to be paid at the time of settlement but that it was to be paid from the $700,000 part of the purchase price, and the necessary inference, we find, is that if there was no such purchase price there was to be no commission." *Id.* at 361.  The court also stated that "[t]he essence of a brokerage commission is that it is dependent upon success." *Id.* at 360 (citation omitted).  Finally, the court noted that provisions stating that a commission was to be paid "at the time of settlement" are often interpreted to designate the time of payment, rather than a condition to payment. *Id.* at 361.

Unlike the contract in the Prince George's Country Club case, the Engagement Agreement did not identify the Valuation Fee provision as a condition precedent.  Moreover, unlike the linkage between the commission and receipt of the sale proceeds in that case, payment of the Valuation Fee was not tied to any "success" component -- e.g., confirmation of a plan of reorganization.  Indeed, a valuation fee, which constitutes a payment for services which are not contingent upon the achievement of a particular outcome, is a completely different type of compensation from an incentive-based fee like a brokerage commission.[2]

The other principal cases relied on by the Trustee are similarly inapposite.  In *Deutsch v. Kennsington Pub. Corp.*, 1982 U.S. Dist. LEXIS 15448 (S.D.N.Y. Oct. 5, 1982), the party seeking to avoid the operation of a condition precedent, a freelance editor, had undertaken to obtain republication rights from various authors for a publishing firm.  The editor received an

---

[2] Similarly, under the reasoning of *Prince George's Country Club*, the example from the Restatement (Second) of Contracts that the Trustee cites as support for its argument, *see* Trustee's Brief at 21, is distinguishable because it involves a real-estate brokerage arrangement.

6

upfront fee, as well as additional fees if he provided the firm with signed contracts from the authors. Like *Prince George's Country Club,* the compensation of the editor was explicitly linked to the success of the endeavor: a material part of the bargained-for exchange was the delivery of signed contracts. In those circumstances, the court found that language requiring payment "within thirty days of receipt of a contract signed by the author . . . which has been negotiated by [the editor]" created a condition precedent to payment.

Similarly, in *Preferred Mortgage Brokers, Inc. v. Byfield*, 282 A.D.2d 589 (N.Y. App. Div. 2001), the plaintiff-mortgage broker sought payment of a brokerage fee payable "directly upon the signed acceptance of a commitment" to provide financing to the defendants. The plaintiff did not procure a signed acceptance of a commitment. As in *Deutsch*, the party seeking payment under the contract failed to perform a material part of the exchange, and the court held that a condition to payment of the party had not been fulfilled.[3]

In conclusion, there is no evidence, either in the language of the Engagement Agreement or the surrounding circumstances, that confirmation of a particular plan of reorganization proposed by the Debtors, as opposed to any other party, was a term in the agreement between UBS and the Creditors' Committee. Rather, UBS agreed to provide objective valuation services to the Committee and had fully performed its obligations under the contract when it delivered its valuations and testified in support thereof. UBS fulfilled its contractual obligations regardless of the outcome of the confirmation hearings, or whose plan was ultimately confirmed.

---

[3] Moreover, none of the agreements in the cases discussed above contained language comparable to the language in the Engagement Agreement providing that the obligation to pay the Valuation Fee arose upon the execution of the agreement.

B.     UBS Has Not Conceded the Existence of
       <u>a Condition Precedent to Payment of the Valuation Fee</u>

The Trustee offers a number of statements by UBS on the record in this case as evidence

that UBS has "conceded the existence of a condition precedent to payment of the Valuation Fee."

Trustee's Brief at 20.  In fact, the statements in context demonstrate that UBS has consistently

argued that payment of the Valuation Fee was not subject to any condition, but that payment of

the fee was deferred to accommodate the Debtors' estates.  For example, the first statement

offered by the Trustee, is a quotation from David Haller, UBS's attorney, at hearing on the Fee

Application.  Mr. Haller stated:

> On the $700,000 fee I think Your Honor understands the issue there.  Any of the
> plans of reorganizations proposed by the various parties were going to be the
> company's plan of reorganization.  The question is who proposed it and the
> agreement certainly doesn't provide that the fee would be due and payable
> dependent on who proposed a particular plan of reorganization.

Supplemental Appendix to Trustee's Brief ("Supp. App.") at B-204-05.  *Id.*  The

immediately succeeding statement by Mr. Haller included the following: "I think there's no

question in anybody's mind that the date on which the fee would become payable was simply a

question of timing as to not requiring the company to fund the fee until the plan of reorganization

went effective."  Supp. App. at B-205.

The second statement offered by the Trustee is taken from UBS's reply to the Trustee's

objection to the Fee Application:

> Read plainly and fairly, the phrase, "the Company's plan of reorganization"
> means "a plan of reorganization for the Company [or the Debtors.]"  The use of
> the possessive form does not limit the reference to a plan proposed by the
> Debtors.  It merely indicates *any* plan which reorganizes the Debtors' assets,
> regardless of the identity of the plan proponent.

App. at A-633.  This statement is followed in the reply by the assertion that "UBS's right

to payment of the Valuation Fee is not 'contingent.'"  App. at A-664.

Thus, when these statements are read in context, it is plain that UBS has never conceded the existence of a condition to payment of the Valuation Fee.[4]

C.    Extrinsic Evidence is Admissible to Establish
      the Meaning of the Engagement Agreement

In the Opening Brief, UBS demonstrated that extrinsic evidence regarding the use of "contingent" valuation fee arrangements should have been admissible in the Fee Application Hearing because, under principles of New York contract law, (i) extrinsic evidence regarding "surrounding circumstances" may be considered by the court in its efforts to discern the intent of the parties, and (ii) extrinsic evidence is admissible to clarify the provisions of an ambiguous contract. Opening Brief at 23 - 27. Under these principles, the Bankruptcy Court should have considered (i) the Reynertson Affidavit, which stated that the payment of a valuation fee is never made contingent on the outcome of a case, App. at A-657, and (ii) evidence that the actual understanding between UBS and the Committee was that the valuation fee was not contingent on any specific outcome in the case, as set forth in the Committee's response to the Trustee's Objection and in the letter agreement between UBS and the Committee confirming that the Valuation Fee was payable in October 2001, before any plan had been confirmed. App. at A-671-76, 678.

---

[4] The Trustee alleges that UBS has failed to explain why it would be an "acceptable" forfeiture of the Valuation Fee if the case were converted to Chapter 7 or dismissed, rather than resulting in a confirmed plan. Trustee's Brief at 21. The Trustee misstates UBS's argument. UBS has consistently argued that, correctly interpreted, the Engagement Agreement merely fixed the timing of the payment of the Valuation Fee. If no plan had been confirmed because of, e.g., dismissal of the case, payment of the Valuation Fee would be made according to an "alternative measure" -- such as within a reasonable time of the dismissal. Opening Brief at 17. Further, as a practical matter, the likely consequence of conversion to Chapter 7 would be administrative insolvency. In such a circumstance, specific provisions regarding the payment of UBS's fees would be of limited usefulness. This is a concession to the practicalities of a chapter 7 liquidation, and does not support the view that the Valuation Fee was contingent on the confirmation of a plan proposed by the Debtors as opposed to any other party.

9

The Trustee did not respond to the authorities cited by UBS discussing the importance of considering "surrounding circumstances" in contract interpretation.[5]  The Trustee instead argues that the Engagement Agreement is unambiguous and that UBS has merely proffered an interpretation that constitutes an "alternative in litigation" to contradict the Trustee's and the Bankruptcy Court's interpretation of the Engagement Agreement.  Trustee's Brief at 23 - 24.  The Trustee's position is contrary to applicable New York law, as demonstrated in the Opening Brief and in the cases the Trustee cites.

In *In re Cedar Chem. Corp.*, 294 B.R. 224, 230 (Bankr. S.D.N.Y. 2003), the bankruptcy court stated that, under New York law, an agreement is ambiguous, and parol evidence is therefore admissible, "only if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business."  *Id.*  Under this standard, the terms of the Engagement Agreement relating to payment of the Valuation Fee are ambiguous and extrinsic evidence should be admitted in considering the meaning of those terms.  *See also* Opening Brief at 24 - 25.

Moreover, unlike this case, in the Trustee's cases the courts found that a reasonable question regarding contract meaning was not raised.  In *Cedar Chemical*, the court held that the interpretation proffered by the party claiming that the contract was ambiguous was unreasonable because it was circular, made no sense of the contract language, and, if accepted, would render certain terms of the contract superfluous.  *Cedar Chemical*, 294 B.R. at 230-31.  In *Utica Alloys*,

---

[5] The Trustee argues that evidence of the intent of UBS and the Committee regarding the timing of payment of the Valuation Fee is irrelevant because the "subjective views of the contracting parties" may not be considered by the court.  Trustee's Brief at 17 - 18.  The "objective manifestation" rule cited by the Trustee is applicable only if the contract language is unambiguous, *see Albany Savings Bank v. Halpin*, 117 F.3d 669, 672 (2d Cir. 1997), which, as UBS has argued in the Opening Brief, is not the case here.

*Inc. v. Alcoa, Inc.*, 303 F. Supp.2d. 247 (N.D.N.Y. 2004), a significant factor in the court's

determination that a reasonable interpretation had not been offered was that the objecting party's

proffered testimony was not based on industry experience in dealing with similar contracts, but

rather from reading only the contract in question from a biased perspective.  *Utica Alloys*, 303 F.

Supp.2d at 253-254.

In contrast, UBS's reading of the Engagement Agreement involves no circularity, makes

complete grammatical and semantic sense of the contract language, and is grounded in and

consistent with the customs, practices, usages and terminology of the relevant industry.  *See*

Opening Brief at 11- 15, 23 - 24.

D.    The Rule of Construction Against the Drafter is Inapplicable

The Trustee also argues that the terms of the Engagement Agreement, assuming such

terms are deemed ambiguous, should be construed against UBS as the drafter of the contract.

Trustee's Brief at 24.  Construction against the drafter -- or *contra proferentem* -- is inapplicable

in this case.  First, the Trustee is not a party to the Engagement Agreement.  The purpose of this

rule of construction is to aid the court in discerning the *intent of the parties* when the parties to a

contract dispute the meaning of contract language.  *See Morgan Stanley Group Inc. v. New*

*England Insurance Co.*, 225 F.3d 270, 276 (2d Cir. 2000).  Here the parties to the Engagement

Agreement -- UBS and the Committee -- agree on the meaning of the provision governing

payment of the Valuation Fee.

Second, even if the rule were applicable, it would not exclude the admission of parol

evidence regarding the meaning of the Engagement Agreement.  *Albany Sav. Bank v. Halpin*,

117 F.3d 669, 674 (2d Cir. 1997) (holding that lower court erred in excluding intrinsic evidence

and stating "we have held specifically that the rule does not preclude the admission of parol

evidence") (citations omitted).

Third, the rule is employed by New York courts as an interpretive device only as a "last resort," and will be applied only if the terms of an agreement cannot be construed by application of the other rules of contract construction and interpretation. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) (holding that trial court erroneously invoked the rule and stating that it is "clearly the law in New York" that the doctrine should be used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument); *Balanoff v. 83 Maiden LLC*, No. 98 Civ. 6442 RPP, 2000 WL 16947 (S.D.N.Y. January 10, 2000) (noting that doctrine is applied as a last resort and has a "low priority" in New York law and refusing to apply in case where other rules of interpretation and extrinsic evidence supported drafting party's interpretation); *see* 5 CORBIN ON CONTRACTS § 24.27, at 297-300 (Joseph M. Perillo ed., Rev'd ed. 1998) ("The "contra proferentem" rule has been described as being applicable only as a last resort, when other techniques of interpretation and construction have not resolved the question of which two or more possible reasonable meanings the court should choose."). As set forth in the Opening Brief, the Court may resort to other rules of contract interpretation and construction to resolve the meaning of the Engagement Agreement, which renders application of the rule inappropriate.[6]

Finally, the rule does not apply in a case, such as this one, involving a bargained-for contract negotiated by sophisticated parties. *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540

---

[6] The Trustee argues that one of the rules of construction cited by UBS -- that a court should avoid an interpretation that renders a provision meaningless -- is inapplicable here. Trustee's Brief at 15. The Trustee states that the Bankruptcy Court's interpretation of the Engagement Agreement does not render meaningless the provision stating that the Valuation Fee was "earned upon execution" of the agreement, because that language merely meant that no "specific quantity of services" had to be performed for UBS to earn the Valuation Fee. The Trustee's argument is without merit and is based on misunderstanding of the Engagement Agreement. UBS did not need to perform a specific quantity of services to earn the Valuation Fee because the fee is a flat fee -- not because of the "earned upon execution" language.

F.2d 1257, 1261 (5th Cir. 1976); *Schering Corp.*, 712 F.2d at 10 n.2; *Balanoff*, 2000 WL 16947at 8 n.4. The underlying rationale for the rule, which is meant to address imbalances in bargaining power, is absent when the parties have equal bargaining power. *Schering Corp.*, 712 F.2d at 10 n.2; *Wilmington Firefighters Ass'n Local 1590 v. City of Wilmington*, No. Civ.A. 19035, 2002 WL 418032, (Del. Ch. March 12, 2002) (holding doctrine of contra proferentem inapplicable when parties had equal bargaining power). The Trustee admits that the Engagement Agreement was negotiated and drafted by sophisticated parties. Trustee's Brief at 18.

III.    The Trustee Misrepresents the Nature and Scope of UBS's Retention by the Committee

The Trustee repeatedly misrepresents the scope and nature of UBS's retention by the Committee. The Trustee attempts retroactively to narrow the scope of UBS's retention by alleging that UBS "was hired to support" the two plans proposed by the Debtors. Trustee's Brief at 7. Variations on this theme appear throughout the Trustee's Brief. *See, e.g.*, Trustee's Brief at 4 ("the Committee decided to hire its own financial advisor to assist in its support of the Debtors' First Plan") and 22 (stating that UBS's valuation work was duplicative of Chanin's work and the plans that it testified in support of were not confirmed). These statements are not supported by the record in this case. The Trustee has offered no support for its narrow reading of the scope of UBS's retention. More important, the evidence that is properly before this Court contradicts the Trustee's view.

The Engagement Agreement provides that UBS was retained broadly to serve as the Committee's financial advisor "in connection with" the Debtors' cases and that UBS would provide valuation services and expert testimony generally for use in the cases. App. at A-648. There is no evidence in the Engagement Agreement -- or elsewhere in the record -- that scope of UBS's retention was limited to providing a valuation "supporting" the Debtors' plans. The Committee retained UBS to provide an objective, analytic service -- a valuation of the Debtors --

13

and this is what the Committee received.  It is true that the Committee supported the Debtors'

plans, but this fact does not change the objective nature of the services provided by UBS; the

Committee's support of such plans could have been withdrawn, for example, if UBS's analysis

indicated that the plans were not feasible or if the value of the estates was significantly higher

than the Debtors estimated.

The evidence that the Trustee cites regarding the estimates of value prepared by Chanin

and UBS proves that UBS was not retained merely to provide support for Debtors' proposed

plans and, as the Trustee argues, "duplicate" the services provided by Chanin.  As the Trustee

acknowledges, UBS provided an enterprise valuation on two occasions that differed from

Chanin's estimates.  Trustee's Brief at 5, 6.

Finally, the Trustee argues that UBS has received $450,000 in Monthly Fees and that this

is fair compensation to UBS in these cases.  As support for this allegation the Trustee states that

the valuation services provided by UBS were allegedly "duplicative" of Chanin's services, and

that the plans UBS was allegedly retained to support failed.  Trustee's Brief at 22 - 23.  As

discussed above, the record contains no predicate for these allegations and indeed refutes them.

Moreover, contrary to the Trustee's assertion, UBS has received no payment for its services to

the Committee.  The Trustee has refused to pay the Monthly Fees to UBS pending the outcome

of this appeal, notwithstanding the Bankruptcy Court's order to pay the Monthly Fees and the

Trustee's failure to cross-appeal the award of such fees.

IV.    The Terms of Chanin's Retention Do Not Undermine UBS's
       Position Regarding the Impropriety of a Contingent Valuation Fee

The Trustee argues that the terms of the retention of Chanin Capital Partners LLC

("Chanin") by the Debtors in this case undermine UBS's assertion that a contingent valuation fee

arrangement is not usual and that, therefore, the parties to the Engagement Agreement would not

14

have agreed to such an arrangement.  Trustee's Brief at 16 - 17.  Evidence regarding Chanin's

retention does not support the Trustee's argument.  First, and most importantly, the documents

regarding Chanin's retention are not part of the record on appeal and are thus not properly before

this Court.  *See* UBS Securities, LLC's Statement of Issues and Designation of Record on

Appeal, dated November 24, 2004, Docket No. 2.[7]  There is no evidence in the record on appeal

rebutting the statements in the Reynertson Affidavit indicating that "contingent" valuation fees

are unusual and improper.  Moreover, unlike the Engagement Agreement, the terms of Chanin's

retention made its fee explicitly subject to a condition relating to the outcome of the case.

    A.    The Scope and Terms of Chanin's Retention Were Not
             Comparable to the Scope and Terms of UBS's Retention

The scope of Chanin's retention was much broader than UBS's retention.  Chanin was

retained by the Debtors to provide the full spectrum of investment banking services to the

Debtors:

> including, but not limited to such services as prepare an enterprise valuation of the
> Company, analyze the pro forma debt capacity of the Company, assist the Company in
> sourcing and negotiating DIP financing, assist the Company in the development and the
> preparation of a Plan of Reorganization and Disclosure Statement, provide such
> testimony as may be required in connection with DIP financing and/or confirmation of
> the Plan of Reorganization, advise the Company's Board of Directors (the "Board") on
> issues related to the Restructuring Transaction, advise the Special Committee of the
> Board, and advise the Board with respect to employee retention issues.  A restructuring
> transaction shall include but not be limited to a restructuring of existing obligations, an
> exchange transaction, or a plan of reorganization consummated either out-of-court or
> in-court ("Restructuring Transaction").

Letter of August 1, 2000 from Eric Scroggins to Daniel D. Crowley, Supp. App. at B-103.  The

Debtors expected Chanin to do work for which an investment bank would typically be

compensated with a success fee, the size of which is largely determined by the size of the

---

[7] The Trustee did not file a counterstatement of issues or a counter-designation of the record on appeal.

transaction. In contrast, UBS was retained by the Creditors' Committee solely to perform

valuation services, *see* App. at A-648, for which compensation is never conditioned on the

outcome.

> The Chanin retention agreement further provides
>
> the Company shall pay Chanin a restructuring transaction fee (the "Transaction Fee")
> equal to $300,000 in connection with the advisory services described herein . . . . The
> Transaction Fee shall be payable in cash upon (1) closing of an out-of-court
> restructuring through an exchange or tender offer or other mechanism, (2) obtaining the
> requisite consents from the requisite constituencies to a "pre-packaged" in-court
> restructuring plan of reorganization, and the confirmation thereof or (3) the
> confirmation of a plan of reorganization (other than a "pre-packaged" plan, which is
> described in (2) above) in an in-court restructuring (in each case approved by the
> Company's Board of Directors).[8]

*Id.* This kind of "success fee" payable upon the achievement of specified outcomes is often

approved. *See, e.g., In re Northwestern Corp.*, 332 B.R. 534, (D. Del. 2005). In contrast, UBS's

compensation pursuant to the Engagement Agreement contemplated a monthly retainer fee and a

flat fee payable with respect to the valuation services provided by UBS, wholly without regard to

outcome of the case. As stated in the Reynertson Affidavit, the payment of an unconditional flat

fee for valuation services is customary in the investment banking industry. App. at A-657-58;

*see* James W. Giddens, *Compensation of Investment Bankers in Bankruptcy Proceedings: Just or

Unjust Enrichment?*, 23 Ann. Rev. Banking & Fin. L. 485, 494 (2004) ("For advisory services

such as a valuation opinion, a banker is paid an agreed-upon fee.").[9]

---

[8] Notably, the Chanin retention agreement, unlike the Engagement Agreement, includes no language
stating that the Company's obligation to pay the Transaction Fee "arose upon execution" of the
agreement.

[9] Similarly, *In re Zenith Elec. Corp.*, 241 B.R. 92, 103 (Bankr. D. Del. 1999) does not support the
Trustee's argument. In *Zenith*, an equity committee objected to valuation testimony offered by the
debtor's financial advisor in connection with confirmation of the debtor's plan on the ground that the
advisor's prepetition engagement agreement included a success fee contingent on confirmation of the
plan. *Zenith*, 241 B.R. at 102. The court held that the valuation testimony was not "tainted" by the
(continued…)

16

B.     <u>Chanin's Failure to Seek Payment of its Transaction Fee Is Irrelevant</u>

The Trustee also implies that the nonoccurrence of the condition to payment of Chanin's "Transaction Fee" supports the Trustee's argument that the condition to payment of the Valuation Fee has not occurred.  The Trustee states that "Chanin neither sought nor received its 'transaction fee,' because the 'Company's board of directors' did not approve the plan of reorganization ultimately confirmed by the Bankruptcy Court."  Trustee's Brief at 17.  Chanin's final fee application does not explain why it did not seek the transaction fee.  Nevertheless, even if the Trustee's theory is correct, it is irrelevant.  Chanin's retention agreement, unlike the Engagement Agreement, provided a success fee contingent upon certain outcomes, rather than a flat fee for valuation services.  Moreover, unlike the Valuation Fee, payment of Chanin's transaction fee was subject to a condition -- confirmation of a plan of reorganization "approved by the Company's board of directors" -- that has not occurred.

V.     Remand to the Bankruptcy Court for a
        <u>"Reasonableness" Determination Is Inappropriate</u>.

Remand to the Bankruptcy Court for review of the Monthly Fees and/or the Valuation Fee under the "reasonableness" standard of section 330 of the Code is not warranted.  Pursuant to the Retention Order, the Bankruptcy Court has fixed the terms and conditions of UBS's employment.  Therefore, the Bankruptcy Court may allow compensation different from the compensation provided in the Retention Order after the conclusion of UBS's employment only "if such terms and conditions prove to have been improvident in light of developments not

---

success fee, because "[t]he 'success fee' was not offered for its testimony at the confirmation of the hearing."  *Id.*  The *Zenith* court thus implicitly acknowledged a distinction between services for which a contingent fee might be appropriate and those for which a contingent fee might raise questions regarding the reliability or objectivity of the services provided.

WM1A 69334v1 12/09/05

capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a); *see In re Fed. Mogul-Global Inc.*, 348 F.3d 390, 397 (3d Cir. 2003) ("[W]hen a Bankruptcy Court has 'fixed . . . terms and conditions' of employment for an application to employ that was approved, the Court may allow compensation on different terms or conditions only if the court's initial approval 'prove[s] to have been improvident in light of developments not capable of being anticipated at the time' of approval."); *In re Northwestern Corp.*, 332 B.R. 534 (D. Del. 2005) (holding that bankruptcy court abused its discretion when it reduced monthly fee of financial advisor by application of reasonableness analysis under section 330(a) when terms of financial advisor's retention had been preapproved under section 328(a)).

        Application of the "improvident" standard under section 328(a) is proper in this case. The Engagement Agreement, which is incorporated into the Retention Order explicitly provides that approval of the terms and conditions thereof, is subject to approval pursuant to section 328(a) of the Bankruptcy Code. App. at A-648. In addition, UBS sought preapproval of its compensation arrangement, which insulates its fees from later evaluations of their reasonableness. *See In re Nat'l Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997) (holding that "improvident" standard applied to fee application when bankruptcy court entered an order of employment upon the terms and conditions of engagement letter but did not cite section 328 in order and purported to reserve power to review fees for reasonableness under terms of order). Notwithstanding any statements made by Judge Walrath and Committee Counsel at the hearing on UBS's retention, the Bankruptcy Court did not explicitly reserve the power in the Retention Order to review all or any part of UBS's fees pursuant to the "reasonableness" standard of section 330. *Compare In re Northwestern Corp.*, 324 B.R. 538, 540-41 (Bankr. D. Del. 2005) (reviewing financial advisor's "Restructuring Fee" under section 330 when retention order was

18

modified by court to expressly make the fee subject to reasonableness review). Similarly, the statement in the affidavit supporting the Fee Application that UBS's fees and expenses would be subject to allowance upon a proper application by UBS "in accordance with sections 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and local rules of the Court," Supp. App. at B-158, merely acknowledged that any payment would be subject to the fee application process required by the Code. *See In re Circle K Corp.*, 165 B.R. 653, 656 (Bankr. D. Ariz. 1994) ("Section 330(a) provides the framework for fee and cost review, expressly subject to the limitations of § 328(a)").

Remand of the Fee Application to the Bankruptcy Court for review under the reasonableness standard of Section 330 is thus inappropriate. Should this Court choose to remand to the Bankruptcy Court, however, the Monthly Fees should in no case be subject to further review. UBS has appealed the Fee Application Order only with respect to the Bankruptcy Court's decision regarding the Valuation Fee and the Trustee did not cross-appeal the award of Monthly Fees. The Fee Application Order is final with respect to the Monthly Fees, and it is too late for the Trustee to contend that they were not reasonable.

WM1A 69334v1 12/09/05

Conclusion

For the reasons set forth above and in the Opening Brief, the Court should reverse the Fee

Application Order and should direct the Trustee to make immediate payment to UBS of the full

amount of its fees totaling $1,150,000.

Dated: December 9, 2005


                                        /s/ L. Jason Cornell,  Esquire
                                        FOX ROTHSCHILD LLP
                                        Neal J. Levitsky (DE Bar No. 2092)
                                        L. Jason Cornell (DE Bar No. 3821)
                                        919 N. Market Street
                                        P.O. Box 2323
                                        Wilmington, DE  19899-2323
                                        Phone:  (302) 654-7444
                                        Fax:  (302) 656-8920

                                            -and-

                                        Susan Power Johnston
                                        Charles H. Jeanfreau
                                        Martin E. Beeler
                                        1330 Avenue of the Americas
                                        New York, New York 10019
                                        212-841-1000

                                        Attorneys for UBS Securities LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that one (1) copy of the attached was served this 9th day

of December, 2005 upon the following individuals in the manner specified:

Barry E. Bressler, Esquire
Richard A. Barkasy
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
**Via First Class Mail, postage prepaid**

Kenneth E. Aaron, Esquire
WEIR & PARTNERS LLP
824 Market Street Mall, Suite 1001
Wilmington, Delaware 19899
**Via Hand Delivery**

<u>/s/ Neal J. Levitsky, Esquire</u>
Neal J. Levitsky, Esquire (No. 2092)

21