UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>CORAM HEALTHCARE CORP. and CORAM, INC.<br><br>Debtors | BK No. 00-3299 through 00-3300 |
| UBS SECURITIES, LLC,<br><br>Appellant<br><br>v.<br><br>CORAM HEALTHCARE, et al.<br><br>Appellee | Civ. No. 04-1558-SLR |

**SUPPLEMENTAL APPENDIX TO REPLY BRIEF OF APPELLANT, UBS SECURITIES, LLC**

# TABLE OF CONTENTS TO SUPPLEMENTAL APPENDIX TO REPLY BRIEF OF UBS SECURITIES, LLC

**DOCUMENT**                                                                                                              **PAGE**

ORDER GRANTING IN PART AND DENYING IN PART THE APPLICATION OF UBS SECURITIES, LLC AS FINANCIAL ADVISOR TO THE OFFICIAL UNSECURED CREDITORS' COMMITTEE FOR FINAL ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FOR THE PERIOD NOVEMBER 21, 2000 THROUGH OCTOBER 27, 2003 .................................. C-1

*WILMINGTON FIREFIGHTERS ASSOCIATION LOCAL 1590 V. CITY OF WILMINGTON, NO. CIV.A. 19035*, 2002 WL. 418032 (DEL. CH. MARCH 12, 2002) ........................................................................... C-3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------- x   Chapter 11
In re                              :
                                   :
CORAM HEALTHCARE CORP. and         :   Case No. 00-3299 through
CORAM INC. et al.,                 :   00-3300 (MFW)
                                   :
        Debtors.                   :   Jointly Administered
                                   :   Hearing Date: 11/11/04
---------------------------------- x   Re: Docket No. 3249
```

**ORDER GRANTING IN PART AND DENYING IN PART THE APPLICATION OF UBS SECURITIES LLC AS FINANCIAL ADVISOR TO THE OFFICIAL UNSECURED CREDITORS' COMMITTEE FOR FINAL ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FOR THE PERIOD NOVEMBER 21, 2000 THROUGH OCTOBER 27, 2003**

UBS SECURITIES LLC ("UBS"), as financial advisors to the official committee of unsecured creditors in the above captioned chapter 11 cases (the "Creditors' Committee"), having filed an application for allowance of compensation and reimbursement of expenses for the period of November 21, 2000 through October 27, 2003 (the "Fee Application"); and objections to the Fee Application having been filed by (i) the Hon. Arlin M. Adams, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Coram Healthcare Corp. and Coram, Inc. and (ii) the Official Committee of Equity Security Holders of Coram Healthcare Corp. (collectively, the "Objections"); and the Court having reviewed the Fee Application, the Objections, the responses to the Objections filed by UBS and the Creditors' Committee (collectively, the "Responses"); and the Court determining that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) notice of the Fee Application was adequate under the circumstances; (c) all persons with standing were afforded the opportunity to

C-1

NY: 414304-1

be heard on the Fee Application and (d) witness testimony concerning the intent of the parties to the UBS fee agreement was not warranted since the agreement was unambiguous;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Fee Application is GRANTED with respect to the $450,000.00 of Monthly Advisory Fees requested by UBS;

2. The Fee Application is GRANTED with respect to expenses in the amount of $16,540.15;

3. The Fee Application is DENIED with respect to the $700,000.00 Valuation Fee requested by UBS; and

4. The Fee Application is DENIED with respect to that portion of UBS' expense request comprising $30,545.70 of legal fees paid to UBS' counsel.

5. The Debtors shall distribute the sum of $450,000.00 as compensation and $16,540.15 as reimbursement of expenses to UBS as compensation for services rendered and disbursements incurred by UBS for the period November 21, 2000 through October 27, 2003.

Dated:

_Nov. 15_, 2004

_____
United States Bankruptcy Judge



Not Reported in A.2d                                                                                                                    Page 3
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

p
c
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**WILMINGTON FIREFIGHTERS**
ASSOCIATION, Local 1590, Appellant
v.
CITY OF WILMINGTON, Appellee.
**No. CIV.A. 19035.**

Submitted: Feb. 15, 2002.
Decided: March 12, 2002.

Firefighters' union filed unfair labor practice charge against city, alleging that city had refused to honor parity provision of collective bargaining agreement. Executive director of the Public Employee Relations Board (PERB) concluded that city had not committed an unfair labor practice, and the full PERB affirmed. Union appealed. The Court of Chancery, Strine, Vice Chancellor, held that parity provision was a broad and unqualified protection requiring city to accord firefighters access to any greater wages given to another union, not just across-the-board salary increases.

Reversed.

West Headnotes

**[1] Labor and Employment** 1878
231Hk1878 Most Cited Cases
(Formerly 232Ak677.1 Labor Relations)
Whether parity provision in collective bargaining agreement between firefighters' union and city was ambiguous or clear on its face was a question of law subject to review on a de novo basis.

**[2] Labor and Employment** 1880
231Hk1880 Most Cited Cases
(Formerly 232Ak680 Labor Relations)
To the extent that parity provision in collective bargaining agreement between firefighters' union and city was ambiguous and subject to more than one reasonable interpretation, reviewing court had to respect Public Employee Relations Board's (PERB's) choice of one of those interpretations so long as its decision was supported by substantial evidence.

**[3] Labor and Employment** 1279
231Hk1279 Most Cited Cases
(Formerly 232Ak257.1 Labor Relations)
Term "wages" in parity provision of collective bargaining agreement between firefighters' union and city was not ambiguous, and thus extrinsic evidence could not be used to aid in interpretation, since both union and city agreed that it referred generally to the salary or cash compensation provided to union members during the normal scope of their employment.

**[4] Labor and Employment** 1279
231Hk1279 Most Cited Cases
(Formerly 232Ak257.1 Labor Relations)
Parity provision of collective bargaining agreement between firefighters' union and city was a broad and unqualified protection requiring city to accord firefighters access to any greater wages given to another union, and did not limit that right to general, across-the-board salary increases.

**[5] Labor and Employment** 1279
231Hk1279 Most Cited Cases
(Formerly 232Ak257.1 Labor Relations)
Doctrine of **contra proferentem** should not have been applied so as to construe purported ambiguity in parity provision of collective bargaining agreement between firefighters' union and city against drafter of that phrase; since parties to collective bargaining process had equal bargaining power and had engaged in significant negotiation, applying this rule of strict construction against drafter would not help to ascertain their intent.

**[6] Labor and Employment** 1883(1)
231Hk1883(1) Most Cited Cases
(Formerly 232Ak680 Labor Relations)
Public Employee Relations Board's (PERB's) conclusion that unqualified term "greater wages" in parity provision of collective bargaining agreement between firefighters' union and city should be read narrowly to encompass only a general, across-the-board salary increase given to another union was not supported by substantial evidence, even though city personnel director had testified that she subjectively believed the parity provision was so limited, since city had never enunciated its narrow view of the term "wages" to union and prior course of dealing between union and city would not have given the union a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.                                                                  C-3

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 6 of 17

Not Reported in A.2d                                                                                                              Page 4
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

reason to know of such an interpretation.
Ronald L. Stoner, Esquire, of Ronald Stoner, P.A., Wilmington, Delaware, Attorney for Appellant.

Wendy K. Voss, Esquire, of Potter Anderson & Corroon, Wilmington, Delaware, Attorney for Appellee.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

*1 It is not unusual for a city to have multiple units of employees with which it must negotiate collective bargaining agreements. That reality may be problematic for both the city and its unions. The city wishes to close out contract negotiations with units once unit-specific concerns are addressed. But the individual units--faced with arguments from the city about its limited capacity to grant wage and benefit increases--fear that if they sign first, another union might hold out and exert leverage to get a higher increase then they extracted. One solution to this dilemma for a city and a union is for the parties to craft a "parity provision" to give the union a right to receive higher wages and benefits paid to any other bargaining unit signing a later collective bargaining agreement. This enables the city employer to settle contracts, while protecting early-settling unions from looking foolish.

This matter involves a parity provision secured by the Wilmington Firefighters Association Local 1590 ("WFFA") in its collective bargaining negotiations with the City of Wilmington ("City") over its most recently enacted three-year contract. The parity provision was crafted by WFFA President Michael P. McNulty, Sr. during the negotiation process, but was not included in the text of the final collective bargaining agreement ("CBA"). Rather, the parity provision was memorialized as part of a letter dated June 24, 1999 and signed by McNulty and two City officials (the "June 24th Letter"). The provision states that "[I]f any other Union receives wages or benefits greater than what [ ] Local 1590 bargained for[,] Local 1590 will receive those gr[e]ater wages, and benefits." [FN1]

> FN1. June 24 Ltr., App. to City Ans. Br. (hereinafter "City App.") at A294.

The CBA provided the firefighters with a three percent salary increase in each year of their contract, but contained no parity language. In hearings before the state Public Employee Relations Board ("PERB"), the WFFA asserted that the parity provision contained in the June 24th Letter had been incorporated into the CBA as a so-called "side-letter" agreement.

The parity provision lay dormant until May 25, 2000, when the City negotiated a new collective bargaining agreement with the Fraternal Order of Police Lodge No. 1 (the "FOP"). Like the firefighters' CBA, that agreement (the "FOP Agreement") provided for a "general increase" of three percent. [FN2] But it also provided that in light of redeployments, restructuring, and "developments within local law enforcement agencies," the City would make additional upward adjustments to the FOP's "Salary Matrix." [FN3] Critically, the minimum annual pay raise received by a police officer as a result of the FOP Agreement was 4.1 percent--or a full 1.1 percent higher than was received by the members of the WFFA. [FN4] The average annual increase granted to police officers was even higher.

> FN2. FOP Agreement § 16.1, City App. at A330.
>
> FN3. FOP Agreement, § 16.1, City App. at A329.
>
> FN4. See Voss Arg. in Tr. of Full PERB Hearing, 6/20/01, at 15-16, City App. at A478-79.

Believing that the FOP Agreement provided wages and benefit increases exceeding their own and that the parity provision was triggered, the WFFA asked the City to return to the bargaining table. The City refused, denying that any agreement about parity existed. The WFFA then filed an unfair labor practice ("ULP") charge with the PERB.

*2 On May 7, 2001, the PERB's executive director concluded that the June 24th Letter was a binding contract as to parity, limited to the term "wages and benefits." [FN5] He further held that the term "wages" was ambiguous and, construing the phrase against the drafter (i.e., the WFFA), found that "wages" under the parity provision are limited to "general across-the-board salary increase[s]." [FN6]

> FN5. Dec. of PERB Exec. Dir. at 7, City App. at A451.
>
> FN6. Id.

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 7 of 17

Not Reported in A.2d                                                                                                   Page 5
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

The executive director also stated that the additional monies received by the FOP beyond those provided to the WFFA were "economic adjustments ... unique to the FOP," and were thus not subject to the parity provision. [FN7] He therefore concluded that the City had not committed a ULP under 19 Del. C. § 1607(a)(5) when it refused to reopen negotiations. On appeal, the full PERB affirmed the decision of the executive director.

FN7. *Id.*

The WFFA has appealed the PERB decision to this court under 19 Del. C. § 1609. In this opinion, I conclude that the PERB erred when it found that the term "wages" in the parity provision is ambiguous, and more important, that the PERB's interpretation of the contract is commercially unreasonable.

By its plain terms, the parity provision guaranteed that the WFFA would be provided the benefits of any greater wages offered by the City to other bargaining units, such as the FOP. The parity provision is a broad and unqualified protection. By finding that the parity provision contains an implicit carve-out for any wage increases that the City accorded to other bargaining units so that long as those increases were denominated as something other than a "general across-the-board increase," the PERB rendered the parity provision meaningless. Simply by labeling wage increases for other units as something other than what they typically would be called, the City (the PERB held) could avoid its obligations under the parity provision.

That interpretation makes the parity provision toothless. Moreover, the PERB's interpretation finds no support in the unqualified language of the provision itself, or in the negotiating history between the parties. It grants the City exceptions from the parity provision that it did not negotiate at the table, and deprives the WFFA of its legitimate contractual expectations.

I. *Statement of Facts* [FN8]

FN8. The facts are drawn largely from the record before the PERB. They are almost entirely undisputed.

A. *The WFFA and the City Begin Negotiations for a New CBA*

The WFFA is the exclusive collective bargaining representative for the City's firefighters. In September of 1998, the WFFA commenced negotiations with the City for a new agreement. The previous agreement had expired. In prior years, the WFFA had generally been the last City union to enter collective bargaining negotiations; thus, no prior contract between the City and the WFFA had included a parity provision.

But when Lieutenant Vince Carroccia, chief negotiator for the WFFA, and Mary Dees, the City's principal negotiator, began discussions for a new contract, the firefighters were not the only union without an agreement. As of that time, the City's police union, the FOP, had not yet forged a new collective bargaining agreement.

*3 By the summer of 1999, the WFFA and the City had made substantial progress in their contract talks. It was during this late stage of the negotiation process that the parity provision was crafted.

B. *The June 24th Letter Is Signed By the City and WFFA*

On June 24, 1999, the WFFA sent the June 24th Letter. That Letter, reprinted *verbatim* and including spelling and grammatical errors, reads as follows:

Dear Mary,

This letter will act as conformation for a tentative agreement between the City of Wilmington and Local 1590 Wilmington Firefighters Association. It is understood that the changes to the current contract are those that we have worked on at the bargaining table. All other Articles in the contract will remain as is current contract language.

*If any other Union receives wages or benefits greater than what, Local 1590 bargained for Local 1590 will receive those grater wages, and benefits. (Parity with other locals)*

Upon the singing of the contract the City and the Union will share an equal coast of the printing of the contract. As in the past we will print 200 contracts Union will keep 175 and give the remainder to the City for future employees. [FN9]

FN9. June 24 Ltr., City App. at A294 (emphasis added).

The Letter was signed by McNulty. Dees signed it and forwarded the letter to John Morgan, the legal representative for the City negotiating team. The City added a signature line for Morgan, who affixed his signature and returned the letter to McNulty.

In the PERB proceedings, the WFFA contended that as per instructions from Dees, the parity provision was incorporated into the final CBA as a "side letter"--a practice, the union claimed, that was not

Not Reported in A.2d                                                                                                          Page 6
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

unusual in such agreements. By contrast, the City asserted that Dees did *not* agree to any side-letter provisions, and that it understood the letter to reflect merely "a preliminary and tentative agreement on parity, obligating it only to discuss or further negotiate the issue." [FN10] Once the June 24th Letter left Morgan's office, "[a]pparently through inadvertence, the parity issue simply never was discussed or considered again" in discussions between the City and the WFFA. [FN11]

> FN10. City Post-Hearing Br. in ULP Charge Before PERB Exec. Dir. at 7, City App. at A395.

> FN11. *Id.* at 10, City App. at A398.

### C. *The Firefighters' CBA, Which Includes a Three-Percent Pay Raise, Is Ratified and Executed*

On July 6, 1999, the City forwarded to the WFFA a first draft of a "Summary of Tentative Agreement," designed to serve as a preliminary working draft of the new CBA. The document underwent several changes in the roughly two-week period after submission to the WFFA, but at no time did it contain parity language. On July 20, 1999--ostensibly with the belief that they were voting on the proposed CBA *as well as* the June 24th Letter (and the parity provision contained therein)--the WFFA membership ratified the CBA. By resolution, the Wilmington City Council approved the CBA on August 5, 1999. On August 9, 1999, the Mayor of the City of Wilmington and WFFA representatives formally executed the CBA.

The CBA was a three-year agreement covering the time period from July 1, 1998 to June 30, 2001. [FN12] With respect to wages, Section 14.1 of the CBA states that "[t]hese salaries *reflect a 3% increase* in each year of the contract" across each of the five pay classifications: firefighter, senior firefighter, lieutenant, captain, and battalion chief. [FN13]

> FN12. Thus, the CBA applied retroactively.

> FN13. CBA § 14.1, City App. at A269 (italics added).

### D. *The FOP Forges a New Agreement, Which Includes a Three-Percent Raise and Adjustments to Its "Salary Matrix"*

*4 The parity provision remained in the background until May 25, 2000, when the City and the police union executed the FOP Agreement. With respect to wages, Section 16.1 of that Agreement notes that it "reflect[s] a general increase of 3.0%." [FN14]

> FN14. FOP Agreement § 16.1, City App. at A329.

That clause does not tell the whole story on salary, however. In addition to the "general increase" of three percent, the FOP Agreement also included a significant overhaul of the steps in the FOP's pay scale--its so-called "Salary Matrix." Section 16.1 further states that

> In light of changing responsibilities resulting from the redeployment of the Wilmington Police Department, specifically relating to the adoption of community policing and the continuing implementation of advanced technologies in the day-to-day responsibilities of Police Officers, as well as developments within other law enforcement agencies, the City will implement ... changes to the Police salary matrix[.]

In addition to the "baseline" three-percent salary increase provided by § 16.1--*which were also reflected in the Salary Matrix*--the adjustments to the Salary Matrix resulted in *additional* pay raises of varying magnitude to members of the FOP. Those additional raises, according to the WFFA, ranged from one to three percent, [FN15] depending on the officers' classifications within the Matrix. Like the firefighters, the police bargaining unit's pay scale is organized by rank, ranging from patrol officer to lieutenant. *In no instance, however, did any officer receive less than an overall salary increase of 4.1 percent.* [FN16] *The average increase for police officers is some percentage materially higher than 4.1 percent, but is unspecified in the record.*

> FN15. WFFA Op. Br. at 4.

> FN16. *See, e.g.,* Voss Arg. in Tr. of Full PERB Hearing, 6/20/01, at 15-16, City App. at A478-79.

The record is also less than clear on why the FOP Agreement was crafted as it was. At oral argument, counsel for the City indicated that the agreement's salary terms were apparently unprecedented, insofar as they purported to separate the wage increases into two categories (*i.e.,* the three percent general increases contained in the Salary Matrix on the one hand, and the other increases to the Matrix on the other), even though both categories manifested themselves in the same Salary Matrix. [FN17]

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 9 of 17

Not Reported in A.2d                                                                                                      Page 7
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

> FN17. Hearing Tr. at 48.

Because a minimum increase of 4.1 percent increase went to each member of the FOP, and the average increase was even higher, obviously the possibility emerges that the FOP Agreement was crafted as it was precisely so as to give the City some way of arguing that the greater FOP increases did not trigger the WFFA parity provision. [FN18] But that possibility forms no part of my ruling.

> FN18. The City might well have perceived some danger that its primary position--that the parity provision was not a contractually binding commitment--would be rejected.

The record reveals a few stated reasons that supposedly motivated the City to give higher raises to the FOP. These included the concern that police forces in neighboring jurisdictions were earning more than the City FOP; an increased emphasis on community policing; and greater use of computers by the City police. [FN19] All of these factors are general ones that supposedly justify granting a higher raise to all City police officers than to all WFFA members.

> FN19. Of course, the stated reasons given in the FOP Agreement for why higher increases are given might not fully reflect bargaining reality. Instead, they may be the label placed after-the-fact on an outcome secured by virtue of FOP negotiating strength. Put bluntly, the desire of city officials for business and political reasons to close out a protracted and high-profile bargaining battle with its police union, *see* DEL. R. EVID. 201(b), probably was a heavy factor, but not one likely to be stated forthrightly in contractual language.

*5 Only one factor is arguably of so much greater precision as to be distinct in kind, rather than degree. Police lieutenants received the highest raises of any rank on the Salary Matrix. This was arguably justified because the responsibilities for that specific position were supposedly changed in a fundamental manner, such that the position had far greater responsibilities than it had previously entailed. [FN20] In this respect, it was contended by the City in oral argument that the position was in essence now a different job altogether, and that the adjustments were more like those associated with a job reclassification than a wage increase for an existing position. [FN21]

> FN20. *See, e.g.,* Hearing Before Full PERB at 12-13, City App. at A475-76 (City asserts that based in part on its "community policing" initiative, lieutenants effectively took on supervisory responsibilities that, under the old police supervisory scheme, had belonged to officers of a higher rank).

> FN21. *See* Voss Arg. in Hearing Tr. at 34.

*E. The WFFA Asserts That the FOP Agreement Implicates the Parity Provision*

Upon learning of the salary terms contained in the FOP Agreement, the WFFA sought to bring the City back to the bargaining table. The City refused, claiming that no parity agreement existed. On July 28, 2000, in an attempt to compel the City to commence negotiations regarding the "wage and benefit" increases in the FOP Agreement, the WFFA filed a petition for declaratory statement and a ULP charge with the PERB.

*F. The PERB Executive Director Finds That a Valid Parity Provision Exists, But That the FOP Agreement Does Not Implicate It*

In his written decision on May 7, 2001, the PERB's executive director found that the June 24th Letter was a binding parity agreement. He further held that the term "wages and benefits" was ambiguous because it was not defined and was subject to varying interpretations.

The executive director then construed the phrase against the WFFA, its drafter. In doing so, and after finding that prior parity agreements between unions and the City had traditionally been limited to "general salary increases and/or cash bonuses," he held that "consistent with prior parity agreements negotiated by the City, the June 24th parity agreement insofar as it applied to wages is limited to a *general across-the-board salary increase*." [FN22]

> FN22. Dec. of PERB Exec. Dir. at 7, City App. at A451 (italics added).

He then held that because the FOP Agreement's adjustments to the police Salary Matrix were putatively not across-the-board salary increases, they did not implicate the parity provision.

> Employers and the exclusive representatives of their organized employees must be free to address issues unique to a specific group of employees and

Case 1:04-cv-01558-SLR   Document 16-2   Filed 12/09/2005   Page 10 of 17

Not Reported in A.2d                                                                                        Page 8
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

to agree upon economic adjustments where appropriate. In addition to the 3% general across-the-board increase negotiated by the City with both the WFFA and FOP [,] additional monies applied to the FOP salary matrix were to address circumstances unique to the FOP. The additional funds were not uniformly applied. To the contrary, their distribution throughout the salary matrix varied both in amount and percent.... [Thus, t]he City did not violate 19 Del. C. § 1607(a)(5), when it refused to reopen negotiations with the WFFA concerning wages and benefits. [FN23]

> FN23. *Id.* at 8, City App. at A452 (italics added).

On July 20, 2001, the full PERB, relying heavily on the executive director's reasoning, affirmed the decision. The WFFA then filed this appeal under 19 Del. C. § 1609.

## II. *Legal Analysis*
### A. *Standard of Review*

*6 The question of whether the parity provision contained in the June 24th Letter constitutes a valid contract has not been challenged by either party. Thus, I accept as true the PERB's finding that the provision is valid and binding. As a result, the questions before me solely relate to the meaning and scope of that provision.

[1] Whether the parity provision is ambiguous or clear on its face is a question of law subject to review on a *de novo* basis. [FN24] In applying that standard, the court is nonetheless sensitive to the PERB's substantial expertise and experience in adjudicating disputes within its subject area. [FN25]

> FN24. *Bd. of Educ. of Colonial Sch. Dist. v. Colonial Educ. Ass'n*, 1996 WL 104231, at *4 (Del.Ch.), *aff'd*, 685 A.2d 361 (Del.1996).

> FN25. 29 Del. C. § 10142(d); *see also Seaford Bd. of Educ. v. Seaford Educ. Ass'n*, Del. Ch., C.A. No. 9491, mem. op. at 2, Allen, C. (Feb. 5, 1988).

[2] To the extent that the parity provision is ambiguous and subject to more than one reasonable interpretation, this court must respect the PERB's choice of one of those interpretations so long as its decision is supported by substantial evidence. [FN26] Substantial evidence is defined as "[s]uch relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [FN27]

> FN26. 29 Del. C. § 10142(d); RESTATEMENT (SECOND) OF CONTRACTS § 212(2) ("a question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on ... a choice among reasonable inferences to be drawn"; otherwise, it is a question of law); *see also Delaware State Univ. v. Delaware State Univ. Chapter of Am. Ass'n of Univ. Professors*, 2000 WL 33521111, at *3 (Del.Ch.).

> FN27. *Delaware State Univ.*, 2000 WL 33521111, at *3 (citing *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del.1988)).

### B. *The PERB's Interpretation of the Parity Provision Is Unreasonable*

The initial question before the court requires me to determine, as a threshold matter, whether the PERB was correct in its determination that the term "wages" is ambiguous. [FN28] Generally speaking, the primary consideration in the construction of a contract language is "fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted." [FN29] Where a contract is plain and clear on its face, the writing itself is the sole source for gaining an understanding of intent. [FN30]

> FN28. Both parties agree that the meaning of the term "benefits" is not relevant.

> FN29. *Bell Atl. Meridian Sys. v. Octel Comm'ns Corp.*, 1995 WL 707916, at *5 (Del.Ch.); *see also Burge v. Fidelity Bond & Mortgage Co.*, 648 A.2d 414, 420 (Del.1994); RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981) ("The objective of interpretation in the general law of contracts is to carry out the understanding of the parties....").

> FN30. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992); *City Inv. Co. Liquidating Trust v. Continental Casualty Co.*, 624 A.2d 1191, 1198 (Del.1993).

[3] By the time of oral argument, the issue as to the meaning of the term "wages"--supposedly so central to this case--became an undisputed one. Throughout this controversy, the term "wages" has held a plain and constant meaning. [FN31] There is simply no

Case 1:04-cv-01558-SLR   Document 16-2   Filed 12/09/2005   Page 11 of 17

Not Reported in A.2d                                                                                                    Page 9
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

dispute over the meaning of the term. Both parties agree that "wages" refer generally to the salary or cash compensation provided to union members during the normal scope of their employment--a conception that, significantly, includes salary adjustments based on across-the-board wage increases *as well as* those salary increases that are particular to individual classifications within a particular pay scale. [FN32]

> FN31. *See, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) (Contract terms "will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

> FN32. This conception comports with the dictionary definition of "wage," defined as "a pledge or payment of usu. monetary remuneration by an employer, esp. for labor or services usu. according to contract and on an hourly, daily, or piecework basis and often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits ." WEBSTER'S NEW INT'L DICTIONARY (UNABRIDGED) 2568 (3d ed.1976).

Thus, the City is not fighting over what is and what is not a "wage" for purposes of the parity provision. [FN33] Rather, it argues that certain *methods* by which wages may be increased for other unions--such was the case in the FOP Agreement--do not trigger the parity provision. At bottom, then, this case does not involve an argument about the definitional nuances of the term "wages." Rather, it turns on the scope of the parity provision.

> FN33. *See* RESTATEMENT (SECOND) OF CONTRACTS, § 201(1) (1981) ( "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.").

The City has candidly admitted as much. In its argument before this court, they agreed that an increase in salary, regardless of the manner in which it is effected, represents a "wage increase" under their conception of that term.

*7 THE COURT: I don't think there's any disagreement that a wage dollar... that there's a part of the paycheck of a police officer and part of a paycheck of the firefighter [that's] a wage or it's considered part of their salary. And I think you would agree on that part of the paycheck. Is that correct?
MS. VOSS: Yes.
THE COURT: I think you would agree that if you put an extra dollar into... [the] first-year patrolmen matrix, you put an extra dollar in there into the salary, *that's a dollar of salary or wage.* If you do the same thing for a first-year firefighter, that's an extra ... salary or wage... I don't see [that] you're arguing about an ambiguity in the contractual term... I mean, take the lieutenant who got the highest raise. *You concede every dollar under that contract that went on to that lieutenant was a dollar of wage...* that it arose out of a new salary matrix; correct?
MS. VOSS: *Yes.*

\* \* \*

THE COURT: So what you're saying to me is ... *that the City somehow bargained that it could have particular methods of giving out wage increases, which were not within the scope of this wage agreement; correct?*
MS. VOSS: *Correct.* [FN34]

> FN34. Hearing Tr. at 23-24 (italics added).

The City has been asserting this same argument since the early stages of this dispute. For instance, in its answer to the WFFA's initial charge before the PERB executive director, the City "specifically denied that members of the FOP received *across-the board wage and benefit increases* that were greater than the wage and benefit increases given to the WFFA." [FN35] Again, this was (and is) an argument based on the scope of the parity provision-- not one based on the definition of wages.

> FN35. City Ans. to Charge in PERB Exec. Dir. Hearing ¶ 8, City.App. at A007 (italics added).

When no ambiguity is present in a contractual provision, the court will not resort to extrinsic evidence in order to aid in interpretation, but will enforce the contract in accordance with the plain meaning of its terms. [FN36] When, as here, both parties agree that their conception of the term "wages" was essentially the same as that term's plain and ordinary meaning, no "reasonable person in the position of either party" could have had "expectations

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 12 of 17

Not Reported in A.2d                                                                                                    Page 10
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

inconsistent with [that] contract language." [FN37]

> FN36. *City Inv. Co.,* 624 A.2d at 1198; *McIlquham v. Feste,* 2002 WL 244859, at *5 (Del.Ch.).
>
> FN37. *Eagle Indus.,* 702 A.2d at 1232.

The real issue in this case therefore is whether the parity provision somehow contained some implicit carve-out that gave the City the right to give other unions higher wage increases by styling them as something other than a "general, across the board increase," a "cost of living adjustment," or the like. In other words, is the City's constrained interpretation of the scope of the parity provision a reasonable one? I conclude it is not.

[4] By its own terms, the parity provision is a broad and unqualified protection, requiring the City to accord the firefighters access to any greater wages given to another union. To the extent that the City wished to exempt particular types of wage increases from its scope, it should have bargained for those exemptions or drafted clarifying language. [FN38] It did not.

> FN38. *See, e.g., Northwestern Nat. Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 44 (Del.1996) (when indemnity provision was broad and unqualified, party which argued that certain claims were implicitly carved out lost, because it sought to rely on a "limitation not found in the contract language").

*8 The City's interpretation--and that of the PERB--guts the parity provision. Remember that the WFFA was protecting itself against a contingency entirely within the City's control: the risk that the City would give another bargaining unit a greater wage increase. The WFFA obviously was not going to be a party to the City's negotiations with other unions. It was in no position to control how the City styled or in what manner the City doled out the wage increases it gave to other unions. It was in no position to know all the specific reasons why another unit might argue for higher raises than the WFFA obtained. In this context, the WFFA protected itself by seeking--and obtaining--an unqualified right to receive access to all higher wage increases given to later-signing unions.

Under the City's reasoning, however, the City supposedly retained the right to give every member of another union a raise higher than the WFFA obtained without triggering the parity provision. All the City had to do was to style the raise as something other than a "general, across-the-board increase." By this reasoning, the parity provision was the most easily circumvented contractual provision imaginable. The FOP Agreement is itself proof of that proposition.

At oral argument, the City contended that one of the reasons the FOP got a higher increase was because neighboring police forces were being paid more. [FN39] Of course, this sort of general competitiveness argument is made in all negotiations. Because the greater increase partly based on this factor was styled as a "Salary Matrix" adjustment, the City and the PERB believe that the parity provision in the WFFA contract is not triggered. Yet, if this type of increase does not trigger the parity provision, what does? This is precisely the sort of overall increase that a party like the WFFA reasonably fears will be granted to another union and not to it, and that the parity provision's plain terms cover.

> FN39. The FOP agreement implies as much. *See* FOP Agreement § 16.1, City App. at A329.

Likewise, it is difficult to see how the City's contention that it adjusted the FOP Salary Matrix on the basis of greater use of computers and community policing somehow supports a finding that the resulting wage increase does not trigger the parity provision. That the City may have had a "why" for the greater wage increases it gave to the FOP does not change "what" they were--a greater wage increase given to another bargaining unit.

The problem with the PERB's interpretation is best surfaced by considering what reasonable contracting parties likely would have done had the City actually expressed its current interpretation at the bargaining table. [FN40] That is, suppose the City had said plainly to the WFFA:

> FN40. *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c., *supra* n. 29.

We are prepared to grant you a parity provision. But you should know that we reserve the right to give the FOP higher wage increases than you, so long as we call those increases something other then a 'general, across-the-board' increase. Indeed, the police are presenting arguments based on what nearby forces, such as the State Police, are making. If we give the FOP more and identify that increase

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 13 of 17

Not Reported in A.2d                                                                                                                Page 11
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

as based on competitiveness, or some other factor such as our decision to give our police computers to use, [FN41] the parity provision won't kick in. It will only kick in as to any increase we specifically style as a general increase, even if the other parts of the increase show up in the same Salary Matrix as the general increase. Likewise, we might spread some of the pay raises to the police unequally across ranks, for example, by giving higher raises to sergeants than patrolmen. If we do that, that part of the pay raises we give police won't be covered by the parity provision. Put bluntly, we can give their sergeants a five percent raise and yours a three percent raise without triggering parity.

> FN41. The argument that the City FOP extracted greater wage increases because its members were given access to computers to do their jobs better is hardly a compelling reason for differentiation in this day and age. Usually, workers embrace improved tools to do their jobs, and most police officers hired within the last decade will have come to the job with more than a passing acquaintance with a personal computer.
> In any event, what is important is that these sort of unit-specific issues cannot be the justification for avoiding a parity provision designed specifically to protect an earlier-signing unit from being valued less favorably as an overall matter than a later-signing unit.

*9 It is simply otherworldly to imagine that the WFFA would have signed the CBA if the City had taken this position.

By contrast to the City's position, the WFFA's interpretation makes commercial sense. Under its view, the City was free to provide the FOP with higher wage increases than were contained in the WFFA agreement if it so chose. That is, if the City was convinced (or forced by the FOP's bargaining power) to grant higher wages, it could do so--it just had to give the WFFA the benefit of that concession, too. Put differently, the WFFA extracted a promise that the City could not "value" another unit more highly than it in future negotiations, without giving that same higher value to the WFFA. As a practical matter, this put some fiscal pressure on the City's bargaining flexibility *vis à vis* the FOP. But that is the reality of a parity provision. In the absence of the provision, the City would have been faced with the arguably worse prospect of having to deal with hold-out fire and police unions at the same time. Having gotten the WFFA to give up its hold-out leverage, the City must pay the price by living up to the promise contained in the parity provision.

For all these reasons, I conclude that the parity provision is clear on its face, and that the only reasonable interpretation of its scope is that advanced by the WFFA. I therefore find, as a matter of law, that the PERB erred in adopting the City's interpretation.

C. *Even If The Term "Wages" Is Ambiguous, The PERB's Construction of That Term Is Unsupported By Substantial Evidence*

Even assuming for the sake of argument that the PERB was correct in its finding that the term "wages" is ambiguous and that extrinsic evidence regarding the scope of the parity provision was to be considered, its construction of the provision is unsupported by the record evidence. When an ambiguity exists, the court's primary search is for the common meaning of the parties. [FN42] In this search, the court should consider all objective intrinsic evidence, including the overt statements and acts of the parties, the business context, the parties' prior dealings, and industry custom, to divine the term's meaning. [FN43]

> FN42. *E.I. DuPont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985).
>
> FN43. *Bell Atl. Meridian Sys.*, 1995 WL 707916, at *5 (citing *Klair v. Reese*, 531 A.2d 219, 223 (Del.1987)); *see also Eagle Indus.*, 702 A.2d at 1232 (when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms).

[5] As an initial matter, the PERB executive director inappropriately applied the doctrine of *contra proferentem* when he construed the purported ambiguity against the drafter of the phrase, the WFFA. The give-and-take of the collective bargaining process in general, and the intense haggling over contract terms leading to the CBA in this instance, makes that doctrine inapplicable here as a useful instrument to divine the intentions of the parties.

The parties negotiated over the substance of the firefighters' CBA from the fall of 1998 until the

Case 1:04-cv-01558-SLR    Document 16-2    Filed 12/09/2005    Page 14 of 17

Not Reported in A.2d                                                                                                  Page 12
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

agreement was finally settled in August of 1999--a span of nearly a year. Both sides were supported by lawyers, and the wrangling continued unabated after the City proposed to the WFFA its "Summary of Tentative Agreement" on June 6, 1999. Indeed, in the weeks following presentation of that Tentative Agreement, changes to the final CBA were proposed, clarified, amended, and stricken on a regular basis--a negotiation process, for instance, which included, at the behest of the City, the deletion of a section of the agreement (§ 14.3). [FN44]

> FN44. *See, e.g.,* City Post-Hearing Br. at 8-9, City App. at A396-97. In this section of their brief, the City put forth some thirteen "bullet points" amply illustrating the back-and-forth nature of the bargaining process in the weeks following June 9, 1999.

*10 The rule of *contra proferentem,* when applicable, requires that ambiguity in a particular term of a contract be strictly construed against the drafter. [FN45] But that doctrine, sometimes called a rule of "last resort," applies only where other secondary rules of interpretation have failed to elucidate the contract's meaning. [FN46] Therefore, it is not a mechanistic device to be deployed whenever ambiguity arises. [FN47] Rather, the doctrine's utility hinges upon the extent to which it is helpful in divining the intent of the contracting parties. [FN48]

> FN45. *See, e.g., S.I. Mgmt., L.P. v. Wininger.,* 707 A.2d 37, 42 (Del.1998); 3 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 24.27 (2001).

> FN46. *E.I. DuPont de Nemours & Co.,* 498 A.2d at 1114; 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS (hereinafter "WILLISTON ON CONTRACTS") § 32:12 at 480 (4th ed.1999).

> FN47. *See, e.g.,* 11 WILLISTON ON CONTRACTS, § 32.12 at 480-82.

> FN48. *See id.* at 480; *Northwest Admins., Inc. v. B.V. & B.R., Inc.,* 813 F.2d 223, 226 (9th Cir.1987) (Court refuses to apply *contra proferentem* in collective bargaining context because under circumstances of case, court did not believe doctrine was "of any material help in determining the parties' actual intent in entering into the collective bargaining agreement...").

When the parties have equal bargaining power and have engaged in significant negotiation, the rule of strict construction against the drafter has little utility in ascertaining their intent. [FN49] In the case before me, it is undoubtedly true that the WFFA did draft the initial language contained in the June 24th Letter. But, given that (1) the parties were still actively involved in heated back-and-forth exchanges, and would be for several more weeks, and (2) that the City's lawyer, John Morgan, by his signature, was expressly made party to this portion of the negotiations, it is equally clear that the City had more than ample opportunity to make amendments or otherwise modify its terms. [FN50] Nor can it be said that either party had a clear negotiating advantage over the other. [FN51]

> FN49. 11 WILLISTON ON CONTRACTS § 32:12 at 480-81; *S.I. Mgmt.,* 707 A.2d at 43 (Del.1998) (Supreme Court applies *contra proferentem* where general partner solicited and signed on 1,850 investors to an agreement that those investors had no hand in drafting; court based holding in part on fact that "[t]his was not a bilateral negotiated agreement"); 3 CORBIN ON CONTRACTS § 24.27 (application "may be held to be inappropriate if both parties are equally sophisticated in the use of language"); RESTATEMENT (SECOND) OF CONTRACTS § 206, Reporter's Note to cmt. a (doctrine "has less force when the other party ... is particularly knowledgeable").

> FN50. Indeed, Mr. Morgan testified to the effect that he never would have drafted a document like the June 24 Letter, and pointed to its myriad spelling and grammatical errors as evidence of that fact. But, having read the document closely, he chose not to correct it--either as to grammar or content.

> FN51. *See E.I. DuPont de Nemours & Co.,* 498 A.2d at 1114. Thus, the facts of this case present quite a different factual scenario than one normally giving rise to the application of *contra proferentem*--*i.e.,* one involving an adhesion or otherwise standardized contract where the non-drafting party had little or no chance to provide input as to the language contained therein. *See* RESTATEMENT (SECOND) OF

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

Page 13

CONTRACTS § 206(b).

In these circumstances, therefore, the meaning of the parity provision should not turn on who drafted its words, but rest on the interpretation of the words that is most reasonable in view of all the circumstances. [FN52] And when all the circumstances are considered, the City's interpretation is not a reasonable way to read the broad terms of the parity provision.

> FN52. *See, e.g.*, 11 WILLISTON ON CONTRACTS § 32:12 at 482 (*Contra proferentem* is properly invoked only when "the meaning proposed by the nondrafter... is reasonable."); *see also* 17A AM. JUR. 2D Contracts § 344 ("A reasonable construction will be preferred to one which is unreasonable, and that interpretation should be adopted which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties"); *cf. Klair v. Reese,* 531 A.2d 219, 223 (Del.1987), *disapproved on other grounds, Eagle Indus.,* 702 A.2d at 1233 n. 7 ("In interpreting an integrated agreement, attention is directed to the meaning of the written terms in light of the surrounding circumstances.").

[6] In this vein, the PERB's conclusion that the unqualified terms "greater wages" should be read narrowly to encompass only a "general, across-the-board salary increase" is not supported by substantial evidence. [FN53] The PERB's executive director drew this interpretation from the statements of Personnel Director Dees, who testified to the effect that "prior parity agreements between the city and its other union's [sic] have traditionally been limited to general salary increases and/or bonuses." [FN54] Ms. Dees did testify that she subjectively believed the parity provision to mean that "parity language would have applied to a general increase and any across the board cash increase... that may have been negotiated ... in subsequent collective bargaining negotiations." [FN55]

> FN53. Dec. of PERB Exec. Dir. at 7, City App. at A451.
>
> FN54. *Id.*
>
> FN55. Testimony of Mary Dees, Tr. of Hearing Before PERB Exec. Dir. at 121, City App. at A149.

The problem with the PERB's reliance on this assertion is simple: Ms. Dees never communicated her narrow interpretation of the term "wages" to the WFFA, nor did any member of the City negotiating team. Indeed, in its answering brief before the PERB executive director, the City noted that "during their negotiations, the City and the WFFA did not discuss and thus did not reach agreement on specific parity language." [FN56] They reiterated this point again in their post-hearing brief, stating that "[d]espite ample opportunity to do so, and continuing negotiation of the CBA's 'tentative terms' ... neither side followed up on the issue of parity or drafted formal parity language for inclusion in the CBA... Apparently through inadvertence, the parity issue simply never was discussed or considered again." [FN57] Finally, the City made this same point in its argument before this court: "[T]he evidence shows that there was no discussion of the term [wages] whatsoever on either side. There was the exchange of the letter, which was not even discussed." [FN58]

> FN56. City Ans. to Charge Before PERB Exec. Dir ¶ 18, City App. at A010.
>
> FN57. City Post-Hearing Br. Before PERB Exec. Dir. at 10, City App. at A398.
>
> FN58. Hearing Tr. at 25.

*11 The PERB's heavy reliance on Dees' testimony was unfounded for another reason. Dees purported to base her subjective belief on prior parity agreements signed by the City, all of which--she contended--only dealt with across the board or general increases. But the record evidence of such prior agreements, scant as it is, tends to contradict her assertion. Although the PERB executive director asserted that the City's preferred interpretation finds support in "prior parity agreements negotiated by the City," the only written example of such a prior contract put in the record does not support the contention that "wages" means "across-the-board salary increases."

The only prior agreement in the hearing record, an agreement between the City and an AFSCME local, states that "it is agreed that there will be *parity with regards to salary increases and cash bonuses* given to any City bargaining unit." [FN59] Far from supporting the PERB's contention that this provision supports a carve-out from the broad parity language contained in the firefighters' CBA, this provision is itself a rather broad parity provision. There is nothing in the record supporting the contention that this prior

Case 1:04-cv-01558-SLR   Document 16-2   Filed 12/09/2005   Page 16 of 17

Not Reported in A.2d                                                                                          Page 14
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

agreement was to be construed narrowly such that it would be triggered only when there was an "across-the-board" salary increase. [FN60] As important, it is undisputed that the WFFA had never previously entered into a parity agreement, [FN61] having traditionally been the last City union to negotiate. Thus, the course of dealing between the WFFA and the City does not support the PERB's position that the term "wages" should be so narrowly construed. [FN62]

FN59. Dees Testimony Before PERB Exec. Dir. at 132, City App. at A160 (italics added).

FN60. Dees also testified that following that agreement, the City forged a more precise parity agreement with another local that "more specifically indicates that we are talking about parity with the general increase and... an increase and a cash bonus." *Id*. at 132-33, City App. at A160-61. That contract was not introduced as evidence in this case, and even if it had language of the sort Dees described, her testimony provides at best weak support for the City's argument, and arguably undercuts it. That is, if the language Dees referred to existed in other contracts, this illustrates that the City knew how to craft a more specific and limited parity provision--and thus could have done so in their negotiations with the firefighters, had they chosen that negotiating approach.

FN61. City Ans. Br. at 3.

FN62. The City's concession that its method of doling out increases in the latest FOP agreement was unprecedented, also tends to weaken, not strengthen, Dees' testimony. By springing a new wage increase practice on the WFFA, the City could (in Dees' view) easily get around a broad parity provision because that broad language should be read to accord with Dees' unexpressed opinion of what it covered. Yet, it is precisely because the City was the party in the position to determine how wage increases were allocated in later contracts that it should bear the risk of not having secured a carve-out from the unqualified parity language presented to it by the WFFA.

The court "will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so." [FN63] Because the City never enunciated its narrow view of the term "wages" to the WFFA, and because the prior course of dealing between the parties would not have given the WFFA reason to know of such an interpretation, it cannot be said that the WFFA had "reason to know" of the City's narrow interpretation of that term. For all these reasons, there is no substantial evidence for the PERB's holding that the contracting parties intended that the unqualified language granting the firefighters access to greater "wages" obtained by another unit "wages" was limited to a "general across-the-board salary increase." [FN64]

FN63. 3 CORBIN ON CONTRACTS § 543 (1960); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981) (setting forth the same test); *Klair*, 531 A.2d at 223 (citing § 201 of the Restatement as a proper rule of analysis).

FN64. Decision of PERB Exec. Dir. at 7, City App. at A451.

Again, it also bears emphasis that Dees did not advance a different definition of the term wage; rather, she advanced her interpretation of the method of wage increases covered by the parity provision. For the reasons stated previously, her interpretation-- which the PERB adopted--results in the parity provision having no teeth.

In addition, and significantly, I note that the PERB did not apply the logic of its own interpretation. If, as Dees said, the parity provision applied only to general or across the board increases, why did it not sweep in at least the minimum 4.1 percent increase granted to every member of the FOP? It is arguable that the position-specific increases above this minimum were not within her interpretation, but the higher wage accorded to all police members would appear to fall within even her definition of the term "wages." That is, as to that portion of the Salary Matrix adjustment which went to every FOP member, the increase was in fact "across-the-board" and "general."

### III. *Conclusion*

*12 For the reasons stated herein, I reverse the PERB's decision. This ruling does not attempt to work out the practical issue of how the City must implement parity for the WFFA. As in most labor

Case 1:04-cv-01558-SLR   Document 16-2   Filed 12/09/2005   Page 17 of 17

Not Reported in A.2d                                                                                               Page 15
Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136
**(Cite as: 2002 WL 418032 (Del.Ch.))**

relations matters, implementation here is best addressed in the first instance by the parties themselves at the bargaining table, especially since the parity provision will require retroactive increases. It is obvious that the minimum result of such negotiations must be an increase for the WFFA members of at least the 4.1 percent annual increase given to all FOP members. As to positions other than lieutenant, the record contains no substantial evidence to indicate that the disparate increases above the 4.1 percent level were anything other than a specific manner in which to allocate wage increases sought by the FOP, within an overall bottom line set by the City. Put somewhat differently, the FOP agreement provided for annual average increases of over 4.1 percent, and the "lumpy" [FN65] manner in which that overage was spread likely flowed from a give-and-take between the City and the FOP. As a result, parity as to these increases should be accorded to WFFA members. Otherwise, the parity provision's protective effect would be too easily evaded, because the City could simply agree to give a later-signing unit a lumpy average increase exceeding the WFFA contract without triggering parity. At oral argument, counsel for the WFFA indicated that the WFFA's ranks could be approximated to police ranks, and that the WFFA also operated under a matrix system. In the first instance, however, the parties should attempt to forge a workable method of allocation for themselves.

> FN65. That is, the wages were distributed in an uneven way, such that individuals at certain ranks and/or seniority levels received different percentage increases than those of different rank or experience.

The police lieutenant issue is the one issue that, by contrast, may fall outside of the scope of the parity provision, as reasonably read. The record reflects some support for the proposition that the lieutenant position was so fundamentally changed that the increase above the average given to other officers on the Salary Matrix might not be considered a "wage increase" even under the WFFA's broad interpretation. Specifically, the City contended that police lieutenants were, as of the time of the FOP agreement, expected to supervise a markedly greater workforce than previously. The WFFA contends otherwise. I, however, am sensitive to the argument that a fundamental change in the responsibilities of a particular position so significant that the position is in substance a different one could result in a higher salary that would not be a wage increase captured by the parity provision. This sort of particularized increase in a transformed position that is not widely held is, of course, different than a broader-sweeping argument that every police officer's job had changed so fundamentally that every officer was holding a different position.

The WFFA obviously bargained that the City could not use this broader type of argument to justify a higher overall increase for the police than for the firefighters. It is less obvious that the parity provision restricted the City's ability to increase the responsibilities of a particular, supervisory police position in a fundamental way and to set the pay of that position in a manner to reflect that change, without triggering a parity right for firefighters not affected by an equally profound change in responsibilities.

*13 The record about the lieutenant issue is murky at best, however, and the issue should be addressed in the first instance at the bargaining table. If the parties are unable to agree as to it, their disagreement can then be resolved in light of more tangible evidence about the underlying change in responsibilities to the position.

The parties shall present an implementing order within ten days.

Not Reported in A.2d, 2002 WL 418032 (Del.Ch.), 169 L.R.R.M. (BNA) 3136

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.